# Exhibit A



FBFG | **Finkelstein, Blankinship, Frei-Pearson & Garber, LLP**

445 HAMILTON AVE, SUITE 605
WHITE PLAINS, NY 10601
Phone: (914) 298-3281
Fax: (845) 562-3492
www.fbfglaw.com

July 26, 2019

**Via NYSCEF:**

Hon. Anthony J. Paris
Onondaga County Courthouse - Room 403
401 Montgomery St.
Syracuse, NY 13202

Re:     *Farruggio, et al. v. 918 James Receiver, et al.,* **No. 003831/2017, Proposed Order**

Dear Justice Paris:

      In accordance with Your Honor's rulings from the bench on July 10, 2019, attached please find a proposed Order DENYING, in part, and GRANTING, in part, the newly-added defendants' motions to dismiss (Motion Nos. 13-16); GRANTING plaintiffs' motion to compel and conditionally sanction (Motion No. 17); DENYING plaintiffs' motion for an order of attachment (Motion No. 18); DENYING defendant River Meadows, LLC's motions to seal (Motion Nos. 19-20); and DENYING Finkelstein & Partners, LLP's motion to intervene (Motion No. 20).  Thank you for your continued attention to this matter.

                        Respectfully submitted,

                        /s/ Jeremiah Frei-Pearson
                        Todd S. Garber
                        John Sardesai-Grant
                        Jean L. Sedlak
                        W. Scott Terrell III
                        **FINKELSTEIN, BLANKINSHIP,**
                        **FREI-PEARSON & GARBER, LLP**
                        445 Hamilton Avenue, Suite 605
                        White Plains, New York 10601
                        Tel.: (914) 298-3281
                        Fax: (845) 522-5561
                        jfrei-pearson@fbfglaw.com
                        tgarber@fbfglaw.com
                        jsardesai-grant@fbfglaw.com
                        jsedlack@fbfglaw.com
                        sterrell@fbfglaw.com
                        *Attorneys for Plaintiffs*

CC:  All counsel of record (via email and NYSCEF)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ONONDAGA
COMMERCIAL DIVISION

**PRESIDING JUSTICE: HON. ANTHONY J. PARIS**

| | |
|---|---|
| MICHAEL FARRUGGIO, as Executor of the Estate of THERESA FARRUGGIO, and SUSAN KARPEN, individually and on behalf of all others similarly situated, <br><br>                 Plaintiffs, <br><br> v. <br><br> 918 JAMES RECEIVER, LLC; RIVER MEADOWS, LLC; JAMES SQUARE NURSING HOME, INC.; CLINTON SQUARE OPERATIONS, LLC; LIBERTY SENIOR HOLDINGS, LLC; EXCELERATE HEALTHCARE SERVICES, LLC; JUDY KUSHNER; ABRAHAM GUTNICKI; ELIEZER FRIEDMAN; AND DOES 1-25, <br><br>                 Defendants. | **ORDER DENYING, IN PART, AND GRANTING, IN PART, NEWLY-ADDED DEFENDANTS' MOTIONS TO DISMISS; GRANTING PLAINTIFFS' MOTION TO COMPEL AND CONDITIONALLY SANCTION; DENYING PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT; DENYING DEFENDANT RIVER MEADOWS, LLC'S MOTIONS TO SEAL; AND DENYING FINKELSTEIN & PARTNERS, LLP'S MOTION TO INTERVENE** <br><br> **Commercial Division** <br><br> Index No. 003831/2017 <br> Motion Nos. 13-21 |

WHEREAS, defendants Liberty Senior Holdings, LLC, Eliezer Friedman, Judy Kushner, Abraham Gutnicki, and Excelerate Healthcare Services, LLC (collectively, "Newly-Added Defendants") moved this Court for orders dismissing Plaintiffs' Third Amended Class Action Summons and Complaint ("TAC") pursuant to CPLR §§3211 (a) (1) (3) (7) and (8) (Motions Nos. 13-16), and, upon the reading and filing of: the Notice of Motion by Liberty Senior Holdings, LLC, ("Liberty") dated February 19, 2019 [Dkt. 357]; the Memorandum of Law in support of Liberty's motion [Dkt.358]; the Affidavit of Lisa M. Robinson, Esq., sworn to February 19, 2019 in support of Liberty's motion (Motion 13) [Dkt. 359], with Exhibits A

through E [Dkts. 360 -364]; the Notice of Motion by Eliezer Friedman, ("Friedman") dated

March 4, 2019 [Dkt. 371]; the Memorandum of Law in support of Friedman's motion [Dkt. 372];

the Affirmation of John L. Murad, Esq., dated March 4, 2019 in support of Friedman's motion

(Motion 14) [Dkt. 359]; the Notice of Motion by Judy Kushner ("Kushner") and Abraham

Gutnicki ("Gutnicki"), dated March 4, 2019 (Motion 15) [Dkt. 373]; the Memorandum of Law in

support of Kushner and Gutnicki's motion [Dkt. 374]; the Notice of Motion by Excelerate

Healthcare Services, LLC ("Excelerate"), dated March 8, 2019 (Motion 16) [Dkt. 380]; the

Memorandum of Law in support of Excelerate's motion [Dkt. 383]; the Affirmation of Daniel J.

Hurteau, Esq., dated March 8, 2019, in support of Excelerate's motion [Dkt.381], with Exhibit A

[Dkt. 382]; the Affirmation of Jeremiah Frei-Pearson, Esq., dated April 24, 2019, in opposition

to Motions 13 – 16 [Dkt. 460], with Exhibits A through G [Dkts. 461 – 467]; the Omnibus

Memorandum of Law in opposition to Motions 13 – 16 [Dkt. 459]; the Reply Affirmation of

Jessica M. DeMichiel, Esq., dated May 15, 2019, in further support of Motion 13 [Dkt. 474]; the

Reply Memorandum of Law in further support of Liberty's Motion 13 [Dkt. 475]; the Reply

Affidavit of Eliezer Friedman, sworn to May 14, 2019, in further support of Motion 14 [Dkt.

477], with Exhibits 1 through 3 [Dkts. 478 – 480]; the Reply Memorandum of law in further

support of Motion 14 [Dkt. 488]; the Affirmation of Daniel B. Berman, Esq., dated May 15,

2019, in further support of Motion 14 [Dkt. 481], with Exhibits 4 through 9 [Dkts. 482 – 487];

the Reply Memorandum of Law of Daniel J. Hurteau, Esq. in further support of Motion 15 [Dkt.

489]; the Reply Memorandum of Law of Daniel J. Hurteau, Esq. in further support of Motion 16

[Dkt. 490]; and, after hearing Jessica M. DeMichiel, Esq., in support of Motion 13, Daniel B.

Berman, Esq., in support of Motion 14, Daniel J. Hurteau, Esq., in support of Motions 15 and 16,

and Jeremiah Frei-Pearson, Esq., in opposition to Motions 13 through 16, and after due

deliberation, IT IS HEREBY ORDERED that Motions 13, 14, 15, and 16 are GRANTED, in part, and DENIED, in part, specifically:

that Plaintiffs' First Cause of Action sounding in negligence is stricken from the TAC as duplicative; and Motions 13 through 16 are denied with respect to Plaintiffs' Second Cause of Action; and,

It is ORDERED that, within thirty (30) days of the filing of this Order with Notice of Entry, the Newly-Added Defendants are directed to interpose answers and other responsive pleadings and serve them upon Plaintiffs, who are directed to accept service.

WHEREAS, Plaintiffs moved this Court for an order pursuant to CPLR §§3124 and 3126 Compelling Defendants, 918 James Receiver, LLC, River Meadows, LLC, James Square Nursing Home, Inc., and Clinton Square Operations, LLC,  to Produce Electronically Stored Information ("ESI") or conditionally sanction any of the foregoing Defendants subject to the instant motion who fail to comply with the Court's Order (Motion No. 17) and, upon the reading and filing of the Notice of Motion by Plaintiffs, dated April 4, 2019 [Dkt. 386]; the Memorandum of Law in support of Plaintiff's motion [Dkt.387]; the Affirmation of Jeremiah Frei-Pearson, dated April 4, 2019 in support of Plaintiffs' motion (Motion 17) [Dkt. 388], with Exhibits A through Q [Dkts. 389- 405]; the Affidavit of Lisa M. Robinson, Esq., sworn to on April 24, 2019 in opposition to Motion 17 [Dkt. 428], with Exhibits A through I [Dkts. 429 – 437]; the Affirmation of Christine A. Sullivan, Esq., dated April 24, 2019, in opposition to Motion 17, [Dkt. 439], with Exhibits A through Q [Dkts. 441 – 457]; the Affidavit of Ronald Singh, sworn to on April 24, 2019, in opposition to Motion 17 [Dkt. 440]; the Affirmation of Katherine A. Skeele, Esq., dated April 24, 2019, in opposition to Motion 17, [Dkt. 458]; the Affirmation of Colm P. Ryan, Esq., dated April 24, 2019, in opposition to Motion 17, [Dkt. 468];

the Reply Memorandum of Law of Jeremiah Frei-Pearson in further support of Motion 17 [Dkt. 524], with Exhibit A [Dkt. 525];

AND UPON Plaintiffs' withdrawal of the instant motion as against Defendant, Clinton Square Operations, LLC, except as relating to providing medical records to Defendant, River Meadows, LLC, after hearing Jeremiah Frei-Pearson, Esq., in support of Motion 17 and Lisa M. Robinson, Esq., Chiam Jaffe, Esq., Gabriel Figueroa, Esq., and Christine Sullivan, Esq. in opposition to Motion 17, and after due deliberation, IT IS HEREBY ORDERED that Plaintiffs' motion is GRANTED, specifically:

It is ORDERED that the demanded ESI shall be provided to Plaintiffs within sixty (60) days of the filing of this Order with Notice of Entry; and further

ORDERED that failure to comply with this Order to Compel will result in the striking of responsive pleadings of any defendant responsible for the noncompliance and the imposition of monetary sanctions.

WHEREAS, Plaintiffs moved this Court for an Order of Attachment against Newly-Added Defendants (Motion No. 18), and, upon the reading and filing of the Notice of Motion by Plaintiffs, dated April 4, 2019 [Dkt. 406]; the Memorandum of Law in support of Plaintiffs' motion [Dkt.407]; the Affirmation of Jeremiah Frei-Pearson, dated April 4, 2019 in support of Plaintiffs' motion (Motion 18) [Dkt. 408], with Exhibits A through J [Dkts. 409- 418]; the Memorandum of Law of Daniel B. Berman, Esq. in opposition to Motion 18 [Dkt. 491]; the Affirmation of Daniel B. Berman, Esq., dated May 29, 2019, in opposition to Motion 18 [Dkt. 492], with Exhibits 1 through 8 [Dkts. 493 – 500]; the Memorandum of Law of Jessica M. DeMichiel, Esq. in opposition to Motion 18 [Dkt. 505]; the Affirmation of Jessica M. DeMichiel, Esq., dated May 29, 2019, in opposition to Motion 18 [Dkt. 501], with Exhibits A through C

[Dkts. 502 – 504]; the Memorandum of Law of Daniel J. Hurteau, Esq. in opposition to Motion 18 [Dkt. 506]; the Memorandum of Law of Daniel J. Hurteau, Esq. in opposition of Motion 18 [Dkt. 507]; the Reply Memorandum of Law in further support of Motion 18 [Dkt. 534]; the Reply Memorandum of Law in further support of Motion 18 [Dkt. 535]; the Reply Memorandum of Law in further support of Motion 18 [Dkt. 536]; the Reply Affirmation of Jeremiah Frei-Pearson, Esq., dated June 19, 2019 [Dkt. 537], with Exhibit A [Dkt. 538]; the Reply Memorandum of Law in further support of Motion 18 [Dkt. 539]; the Reply Affirmation of Jeremiah Frei-Pearson, Esq., dated June 19, 2019 [Dkt. 537], with Exhibits A - F [Dkts. 541 - 546]; and, after hearing Jeremiah Frei-Pearson, Esq., in support of Motion 18 and Jessica M. DeMichiel, Esq., Daniel B. Berman, Esq., and Daniel J. Hurteau, Esq., in opposition to Motion 18, and after due deliberation, IT IS HEREBY ORDERED that Plaintiffs' motion is DENIED, without prejudice, as premature pending further discovery.

WHEREAS, defendant River Meadows, LLC moved this Court, pursuant to the Order for Production and Exchange of Confidential and Protected Health Information, for Orders permitting the confidential documents submitted and filed under seal by Plaintiffs in their motion for an order of an attachment to be redacted and filed under seal due to their confidentiality (Motion Nos. 19-20), and, upon the reading and filing of the Notice of Motion by River Meadows, LLC, dated April 9, 2019 [Dkt. 419]; the Affidavit of Lisa M. Robinson, Esq., sworn to on April 9, 2019, in support of River Meadows' motion (Motion 19) [Dkt. 420], with Exhibit A [Dkt. 421]; Notice of Motion by River Meadows, dated April 29, 2019 [Dkt. 469]; the Affidavit of Lisa M. Robinson, Esq., sworn to on April 29, 2019, in support of River Meadows' motion (Motion 20) [Dkt. 470]; after hearing Lisa M. Robinson, Esq., in support of Motions 19

and 20, and after due deliberation, IT IS HEREBY ORDERED that defendant River Meadows, LLC's motions are DENIED.

WHEREAS, the law firm of Finkelstein & Partners, LLP moved to intervene in the matter for the purpose of opposing River Meadows, LLC's motions 19 and 20 to seal (Motion No. 21), and, upon the reading and filing of the Notice of Motion by Finkelstein & Partners, LLP, dated May 29, 2019 [Dkt. 516]; the Memorandum of Law in support of Finkelstein & Partners, LLP's motion; the Affirmation of Ann R. Johnson, Esq., dated May 29, 2019, in support of Finkelstein & Partners, LLP's motion (Motion 21) [Dkt. 517], with Exhibits A - E [Dkts. 518 - 522]; the Memorandum of Law of Lisa M. Robinson, Esq., in opposition to Motion 21 [Dkt. 547]; the Affidavit of Lisa M. Robinson, Esq., sworn to on June 26, 2019, in opposition to Motion 21 [Dkt. 548], with Exhibits A – C [Dkts. 549-551]; the Affirmation of Jessica M. DeMichiel, Esq., dated June 26, 2019, in opposition to Motion 21 [Dkt. 553]; the Memorandum of Law of Daniel J. Hurteau, Esq. in opposition to Motion 21 [Dkt. 554]; the Reply Memorandum of Law of Ann R. Johnson, Esq. in further support of Motion 21 [Dkt. 555]; and, after hearing Victoria Lightcap, Esq. in support of Motion 21 and Lisa M. Robinson, Esq. in opposition to Motion 21, and after due deliberation, IT IS HEREBY ORDERED that Finkelstein & Partners, LLP's motion is DENIED.

Dated: _____
       Syracuse, New York

                                       _____
                                     Hon. Anthony J. Paris, JSC

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF ONONDAGA   :  CIVIL TERM

3    -------------------------------------------

4    MICHAEL FARRUGGIO, THERESA FARRUGGIO
     and SUSAN KARPEN,

5
                         Plaintiffs,

6      vs.                           Index No. 003831/2017

7                                       MOTION PROCEEDING
     918 JAMES RECEIVER, LLC; RIVER

8    MEADOWS, LLC; JAMES SQUARE NURSING HOME,
     INC.; CLINTON SQUARE OPERATIONS, LLC;

9    LIBERTY SENIOR HOLDINGS, LLC; EXCELERATE
     HEALTHCARE SERVICES, LLC; JUDY KUSHNER;

10   ABRAHAM GUTNICKI; ELIEZER FRIEDMAN,

11                      Defendants.
     -------------------------------------------

12
                              Onondaga County Courthouse

13                            401 Montgomery Street
                              Syracuse, New York  13202

14
                              July 10, 2019

15

16   B e f o r e:

17            HONORABLE ANTHONY J. PARIS,

18                       Justice

19   A p p e a r a n c e s:

20     FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER,
       LLP

21      Attorneys for the Plaintiffs
        445 Hamilton Ave, Suite 605

22      White Plains, NY  10601
        BY:  JEREMIAH FREI-PEARSON, ESQ.

23           W. SCOTT TERRELL, ESQ.

24

25

```
 1   A p p e a r a n c e s (con't):

 2    BARCLAY DAMON, LLP
        Attorneys for Defendant 918 James Receiver
 3      125 East Jefferson Street
        Syracuse, New York
 4      BY:  GABRIELLE A. FIGUEROA, ESQ.

 5
      GOLDBERG SEGALLA, LLP
 6      Attorneys for Defendant River Meadows
        5786 Widewaters Parkway
 7      Syracuse, NY 13214
        BY:  LISA M. ROBINSON, ESQ.
 8

 9    SCOLARO, FETTER, GRIZANTI & MCGOUGH, P.C.
        Attorneys for Defendant James Square Nursing Home
10      507 Plum Street
        Syracuse, NY  13204
11      BY:  CHAIM JAFFE, ESQ.

12
      GALE, GALE & HUNT, LLC
13     Attorneys for Defendant Clinton Square Operations
       7136 E. Genesee Street
14     Fayetteville, NY  13066
       BY:  CHRISTINE A. SULLIVAN, ESQ.
15

16    KAUFMAN, BORGEEST & RYAN, LLP
       Attorneys for Defendant Liberty Senior Holdings
17     701 Seneca Street
       Buffalo, NY  14210
18     BY:  JESSICA DEMICHIEL, ESQ.
            STEVE WEINER, ESQ.
19

20    NIXON PEABODY, LLP
       Attorneys for Defendants Gutnicki, Kushner
21     and Excelerate
       677 Broadway, 10th Floor
22     Albany, NY  12207
       BY:  DANIEL HURTEAU, ESQ.
23

24

25
```

```
 1   A p p e a r a n c e s (con't):

 2

 3     HANCOCK ESTABROOK, LLP
        Attorneys for Defendant Friedman
        100 Madison Street
 4      Syracuse, NY  13202
        BY:  DANIEL B. BERMAN, ESQ.

 5

 6     FINKELSTEIN & PARTNERS
        Attorneys in opposition to defendants' motion to
 7      seal
        108 Jefferson Street, Suite 401
 8      Syracuse, NY  13202
        BY:  VICTORIA LIGHTCAP, ESQ.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Proceed with arguments on
 2       Farruggio v. 918 James.
 3              Could you please state your appearances
 4       and who you're representing for the court
 5       reporter.
 6              THE COURT:  Why don't the plaintiffs start
 7       their appearances first.
 8              MR. FREI-PERSON:  Good morning, your
 9       Honor.  Jeremiah Frei-Pearson.
10              MR. TERRELL:  W. Scott Terrell.
11              MS. LIGHTCAP:  Good morning, your Honor.
12       Victoria Lightcap on behalf of Finkelstein &
13       Partners on motion to intervene in the opposition
14       to defendants' motion to seal.
15              MR. HURTEAU:  Good morning, your Honor.
16       Dan Hurteau with the law firm of Nixon Peabody.
17       I represent Abraham Gutnicki, G-u-t-n-i-c-k-i,
18       and Judy Kushner, K-u-s-h-n-e-r, and Excelerate,
19       E-x-c-e-l-e-r-a-t-e, LLC.
20              MS. DEMICHIEL:  Good morning, your Honor.
21       Jessica DeMichiel, D-e-M-i-c-h-i-e-l, with the
22       law firm of Kaufman, Borgeest & Ryan on behalf of
23       Liberty Senior Holdings.
24              MR. WEINER:  Good morning, Judge.  Steve
25       Weiner, also from the law firm of Kaufman,
```

1    Borgeest & Ryan.

2            MR. BERMAN:  Good morning, your Honor.

3    Dan Berman, Hancock Estabrook, on behalf of

4    Eliezer Friedman.

5            MS. FIGUEROA:  Good morning, your Honor.

6    Gabrielle Figueroa, F-i-g-u-e-r-o-a, law firm of

7    Barclay Damon, on behalf of 918 James Receiver,

8    LLC.

9            MS. ROBINSON:  Lisa Robinson on behalf of

10   River Meadows.

11           MR. JAFFE:  Chaim Jaffe, C-h-a-i-m,

12   J-a-f-f-e, Scolaro Law Firm, on behalf of James

13   Square Nursing Home, Inc.

14           MS. SULLIVAN:  Good morning, your Honor.

15   Christine Sullivan on behalf of Clinton Square

16   Operations.

17           THE COURT:  Okay.  Motions?  Well,

18   actually, defendants' motion first to dismiss.

19           Who wants to be heard?  Are we all going

20   to be heard or have you elected a representative?

21           MR. BERMAN:  We all have separate motions,

22   I believe, your Honor.

23           THE COURT:  Okay.

24           MS. DEMICHIEL:  Your Honor, Jessica

25   DeMichiel on behalf of Liberty Senior Holdings.

1              Your Honor, we moved to dismiss the

2     complaint in this case in lieu of an answer under

3     3211(a)(1) based on documentary evidence,

4     3211(a)(7) based on failure to state a cause of

5     action, as well as that the claims are time

6     barred by the statute of limitations in part.

7              Your Honor, we represent Liberty Senior

8     Holdings.  Attached to the complaint as Exhibit E

9     was the New York State Department of Health

10    public health and health planning executive

11    summary.  As set forth in that attachment,

12    plaintiffs' complaint, it clearly showed that

13    Liberty Senior Holdings was neither the owner nor

14    the operator of the nursing home at issue.  That

15    clearly refutes the allegations set forth in

16    plaintiffs' complaint as a basis for liability

17    under the two causes of action asserted, which

18    was the violation of Public Health Law 2801(d),

19    as well as the negligence cause of action.

20             The executive summary laid out the fact

21    that Liberty Senior Holdings is in fact a real

22    estate holding company.  They purchased the

23    property on which the nursing home operated and

24    then they sent back to the nursing home.

25             In reply to the motion to dismiss,

1      plaintiffs submitted two documents that directly

2      went to the motion to dismiss brought by Liberty

3      Senior Holdings.  The first one was the

4      disagreement between River Meadows and Liberty

5      and then the testimony of Abraham Gutnicki, one

6      of the owners of River Meadows, LLC, who is the

7      operator of the facility.  Neither of those

8      documents raised an issue of fact that these

9      causes of action are not valid against Liberty.

10     As a real estate holding company, they cannot be

11     directly liable under Public Health Law 2801(d).

12     That only applies to nursing homes and

13     residential health care facilities, so the actual

14     operator.  The claim is that then they are

15     controlling person of either a nursing home or a

16     residential health care facility under Public

17     Health Law 2808(a).

18            However, the case law and the legislative

19     history makes it clear that in order to be liable

20     under 2808(a) of the Public Health Law, you have

21     to satisfy two elements, both ownership of the

22     operator issue, River Meadows, LLC, as well as

23     the ability to either manage the facility or

24     control the policies of the facility.

25            In the lease agreement, the terms of the

1          lease agreement do not matter when it goes to the

2          ownership.  That is something that has not been

3          established or refuted by any documentary

4          evidence submitted by the plaintiff in opposition

5          to the motion.

6               The testimony of Abraham Gutnicki made it

7          clear that before River Meadows, LLC, began to

8          operate, that the established operator was River

9          Meadows, approved by the Department of Health,

10         and the established owners were two individuals,

11         Abraham Gutnicki and Judith Kushner, also

12         approved by the Department of Health, and there

13         is no other evidence submitted in opposition to

14         the motion to show that they -- that Liberty

15         satisfied the ownership in trust in order to have

16         the controlling person standard satisfied under

17         2808(a).

18               In reply to the motion, we submitted the

19         entire certificate of the application to the New

20         York State Department of Health.  Throughout that

21         document, there are a plethora of individualized

22         documents from the application which establishes

23         that Liberty is neither the owner operator.

24         There are affidavits by the actual owners stating

25         that they are in fact the owners and River

1          Meadows is the actual operator, and the documents

2          establish that Liberty was nothing more than a

3          real estate holding company who entered into a

4          lease agreement on terms that were approved by

5          the Department of Health.

6                  Because there isn't established ownership

7          on behalf of Liberty, the motion to dismiss the

8          violation of Public Health Law 2801(d) claims

9          must be granted as a matter of law because that

10         element is necessary to maintain that cause of

11         action.

12                 When you go to the negligence cause of

13         action, the question is whether a real estate

14         holding company can either be liable for

15         professional negligence, which the case law

16         establishes that they cannot be held liable for

17         that.  They are not either a licensed medical

18         professional or a company that is licensed to

19         render medical professional services, and they

20         cannot be held liable under regular ordinary

21         negligence.  There is no premise of liability

22         claim and there is no duty asserted that Liberty

23         breached that they owed to the plaintiffs in

24         order to maintain that cause of action against

25         Liberty.

1            In addition, even if this court were not

2      to grant the motion to dismiss the violation of

3      Public Health Law 2801(d) claim or the negligence

4      claim, most of the claims are barred by the

5      applicable statute of limitations.  This case was

6      not brought against Liberty by the amendment of a

7      summons and complaint that was filed on January

8      11th, 2019.  That means all of the claims against

9      Liberty Senior Holdings before January 10th of

10     2016 would be time barred under the three-year

11     statute of limitations applicable to both

12     negligence and the violation of Public Health Law

13     cause of action.  So those claims that predate

14     January 10th of 2016 should be dismissed.

15            Thank you.

16            THE COURT:  Thank you.

17            Mr. Berman?

18            MR. BERMAN:  Thank you, your Honor.

19            Our motion is similar, but there's a

20     slight difference because Mr. Friedman is the

21     member of Liberty in a slightly different

22     position than the company itself.

23            I am not here to argue that 2808(a) does

24     not abrogate the shield provided to somebody

25     operating a corporation.

1           I'm here to argue very simply, your Honor,

2     that Mr. Friedman does not and it is established

3     by both the exhibits to the complaint and then

4     the submissions made in opposition to the motion

5     that Mr. Friedman has no ownership interest in

6     the operator of River Meadows.

7           The testimony that was submitted to the

8     court by the plaintiffs in opposition of this

9     motion, from the 3401 -- the meeting of creditors

10    at the bankruptcy court -- I forgot the number --

11    makes clear that Liberty purchased the assets

12    from the Leffler estate of James Square, both the

13    operations and the -- not the operations -- the

14    real property and the assets and formed a new

15    entity to operate River Meadows.  River Meadows

16    was then -- the members of River Meadows became

17    Mr. Gutnicki and Ms. Kushner.  Mr. Gutnicki

18    entered into a lease with Liberty to lease the

19    real property and what Liberty did was owned the

20    real property.  Eli Friedman was the member of

21    the landlord.

22          It is clear from the testimony that

23    Mr. Gutnicki gave at that hearing -- and that was

24    submitted by the plaintiffs -- that what happened

25    very simply is that Liberty did not wish to be

1          the operator and Mr. Friedman did not wish to own

2          an operator of the facility and therefore River

3          Meadows was created.  Its members were

4          Mr. Gutnicki and Ms. Kushner.  They applied to

5          the Department of Health and submitted all of the

6          information which is contained in Exhibit 1 to

7          Mr. Friedman's affidavit.  It's clear that,

8          according to Mr. Gutnicki's testimony, prior to

9          the negotiation of the lease in October, 2013,

10         Mr. Friedman transferred any interest he had in

11         River Meadows to Mr. Gutnicki and Ms. Kushner,

12         that Mr. Gutnicki negotiated and executed the

13         lease.

14              The documents that the plaintiffs attached

15         to their complaint and which they refer to as the

16         approval of River Meadows' purchase of James

17         Square establishes that all relevant times the

18         only two members of River Meadows were

19         Mr. Gutnicki and Ms. Kushner, each of whom held a

20         fifty percent membership interest.  Schedule 2 to

21         the certificate of need application, which is

22         Exhibit 1 to Mr. Friedman's affidavit, lists

23         Gutnicki and Kushner as the only two members, as

24         does Schedule 3B that's on page eight of that

25         document.  River Meadows' operating agreement is

1          attached as -- to Exhibit 2, the application of

2          the Department of Health, and that identifies the

3          only two members of River Meadows as Mr. Gutnicki

4          and Ms. Kushner.

5               I know there was some mention and

6          highlighting of the fact that Mr. Friedman had

7          signed the operations transfer agreement between

8          River Meadows and the Leffler estate entities,

9          but it's very clear from Schedule 4 that he was

10         given authority that was nunc pro tunc authority

11         by a resolution signed by both Ms. Kushner and

12         Mr. Gutnicki as River Meadows members.  And under

13         New York law, as your Honor knows, an LLC need

14         not have the members to be created.  It just

15         needs an authorized signatory.  So at the time

16         the agreement was signed, there were no members;

17         but the members, once they became the members,

18         Gutnicki and Kushner authorized that signature.

19              Exhibit 6, the summary information for

20         James Square Health & Rehabilitation Center --

21         this is all part of the CON application --

22         identifies the new owner -- I'm sorry.  Oh, okay.

23              Exhibit 6 to my affidavit, which is a

24         summary information, identifies James Square

25         Health & Rehabilitation Center and to establish

 1        River Meadows LLC as the operator.  It

 2        establishes that the application -- that the

 3        final letter approving the application was sent

 4        on May 28th, 2015.

 5              So there is, I submit, your Honor, no

 6        question that the only two members, the only two

 7        people with ownership interest in the operator

 8        were Mr. Gutnicki and Ms. Kushner.

 9              To the extent that the lease -- counsel

10        for the plaintiff in his submissions points out

11        all of these provisions in the lease, which

12        somehow he claims show elements of ownership.  I

13        would submit, as your Honor has seen in

14        commercial leases, that they are merely the

15        security provisions normally provided in the

16        lease.  For example -- oh, and by the way, this

17        lease in its final form was approved by DOH.

18              THE COURT:  Maybe they should be a party?

19              MR. BERMAN:  What?  I am not going to

20        suggest DOH be a party, but the bottom line is,

21        Judge, DOH did review this lease and did approve

22        this lease.

23              The rent in this lease, as was shown by

24        the analysis, which is attached to Mr. Friedman's

25        affidavit, was market rate rent.  Yes, it was

 1      greater.  Yes, it was greater than the rent --

 2      the Leffler -- one of the Leffler state entities

 3      charged another Leffler state entity, but it was

 4      market rate.  DOH approved it.  DOH approved the

 5      terms of the lease and did in fact require

 6      certain changes, which were made.  But the lease,

 7      even the lease as submitted, does not contain any

 8      provisions that are out of the ordinary.

 9              Section 1701(a) sets forth the usual

10      circumstances under which a tenant can be deemed

11      in default under the terms of the lease of

12      declaration and remedies for default argument

13      landlord sole discretion.

14              Section 77 prevents River Meadows from

15      making distributions to members when it's in

16      default and the payment to protect the priority

17      of the rent over Mr. Gutnicki and Ms. Kushner's

18      profits from the operation.

19              7(b) protects the -- also protects the

20      stream of rent.

21              THE COURT:  Are you going to read the

22      whole lease?

23              MR. BERMAN:  No, I'm not going to read the

24      whole lease.

25              Your Honor, very simply, the lease is an

1       ordinary lease.  There's nothing indicating

2       ownership about that.

3              It is clear that 2808(a) requires control

4       by reason of ownership.  Here there's no

5       ownership.  That cause of action as against Mr.

6       Friedman must be dismissed.

7              With respect to the negligence, there is

8       not a single allegation.  We've outlined this in

9       detail in our submissions, reply submissions.

10      There is not any allegation that Mr. Friedman

11      participated in the care and treatment of these

12      patients.  The ordinary negligence claim must

13      also be dismissed.

14              Thank you.

15              THE COURT:  Thank you.

16              MR. HURTEAU:  Good morning, your Honor.

17      Dan Hurteau from the law firm of Nixon Peabody.

18      I represent Abraham Gutnicki and Judy Kushner,

19      who are the members of River Meadows, LLC, and we

20      have moved on their behalf to dismiss the third

21      amended complaint.

22              I also represent Excelerate, LLC, which

23      also moved to dismiss the action on the third

24      amended complaint which they were made a party

25      to.

1              There are also some other motions.  I'm

2       not certain if you want me to address them.

3       There's a motion for --

4              THE COURT:  No.  We'll take them as they

5       --

6              MR. HURTEAU:  So I'll begin with the

7       motion to dismiss by Abraham Gutnicki and Judy

8       Kushner.

9              Your Honor, there is an important issue of

10      law and public policy that's presented by this

11      motion.  For a very long time in this state, this

12      state protects shareholders or members of

13      corporations, and corporations were an LLC.  The

14      law is very clear that they do not suffer

15      personal liability unless certain things happen.

16      The way those things can happen typically in a

17      lawsuit would be if someone can pierce the

18      corporate veil.  Here there is really no argument

19      made by the plaintiffs to pierce the corporate

20      veil.

21             The other way you might be able to get

22      liability on behalf of a member of an LLC would

23      be if the legislature has specifically denoted

24      that a member of an LLC or a shareholder of a

25      corporation is going to be personally

1        responsible.

2               There is one instance where the

3        legislature, approved by the governor, signed

4        into law has specifically made a corporate member

5        of an LLC or a shareholder of a corporation

6        responsible personally, and that is when they

7        fail to pay the wages of their employees.  That

8        is specifically set out as to businesses in the

9        Business Corporation Law where right in the

10       statute that protects the shareholders from

11       personal liability, there is a carve-out, an

12       exception that clearly states that where you

13       don't pay the wages and salaries of your

14       employees, you could be personally responsible.

15       For corporations, it's the top ten members of

16       that corporation.  That very same concept is

17       embedded in the LLC law.

18               Right after the LLC law provides

19       protection to the members for personal liability,

20       there is another section that provides that in

21       the case of salaries, for wages for employees,

22       that there can be personal responsibility.

23               In the LLC law and in the corporate --

24       Business Corporation Law, there is nowhere that

25       it says there's some sort of an exception related

1          to a case like this.  What the plaintiffs point

2          to is Public Health Law 2808(a), and they try to

3          say -- seems to me -- they're trying to argue

4          that that is an exception to the protections that

5          are provided by members of an LLC.

6                  When you look at that and you look at the

7          arguments on that, first of all, there are only a

8          handful of cases that have dealt with 2808(a).

9          There is one case directly on point in the Fourth

10         Department, the Wasileski case, where the Fourth

11         Department was looking to see whether a corporate

12         -- a shareholder of a nursing home had personal

13         liability and responsibility for a wrongful death

14         claim that had been made, and that court, the

15         Fourth Department, said that they did not, unless

16         there was some allegation that that shareholder

17         had done something directly to that individual or

18         somehow had some responsibility for the

19         activities or the actions that caused the

20         wrongful death.  In that case, even though that's

21         a 2003 case, which came long after Public Health

22         Law 2808 was enacted, they did not specifically

23         raise the issue of 2808(a).  But the court was

24         clear in saying that a shareholder or a corporate

25         shareholder did not have personal responsibility.

1          That is the case that we argue binds this court

2     to find that Abe Gutnicki and Judy Kushner do not

3     have personal liability and are protected by the

4     LLC laws in the state.

5          We also -- and just a quick note --

6     there's no other cases in the State of New York

7     that finds a member of an LLC liable under Public

8     Health Law 2808(a).  There are five other cases

9     that even mention it.  Three of them don't find

10    any liability, and in those cases they involve

11    financial obligations.  And there are two other

12    cases that make reference to the law but don't

13    specifically hold that the members of an LLC are

14    responsible, personally responsible.

15         Two other issues that we raise, your

16    Honor.  One is statute of limitations.  This case

17    and the claims alleged by the representative

18    plaintiff in the class action said that they were

19    in the facility in 2015.  They're claiming that

20    their injuries began when they were at the

21    facility in 2015.  The third amended complaint

22    was not amended, and Judy Kushner and Abe

23    Gutnicki were not added to this case until 2019.

24    There is a three-year statute of limitation.

25    They are outside the statute as to my clients.

1    Their argument seems to be a continuing harm

2    argument.

3              There's a case out of the Court of Appeals

4    of Shelley (Phonetic), which was cited to in our

5    papers, that says that's not the case, that they

6    cannot argue or do not have an argument for

7    continuing service of representation of these

8    individuals.  So we argue that this case is also

9    on the statute of limitations.

10             And, finally, we make the argument that

11   there is no jurisdiction here.  The papers --

12   originally the third amended complaint cited to

13   301 as being the basis for jurisdiction against

14   my clients.  I understand the response papers to

15   say that they didn't mean 301, they meant 302.

16   But even under 302, you have to do more than just

17   say that someone is a member of a corporation.

18   You've got to establish, you have to argue that

19   there's some connection between the activities of

20   the corporation and/or the individuals to

21   whatever their liability is.

22             So for those reasons, your Honor, we ask

23   that you dismiss the claims as to Abraham

24   Gutnicki and Judy Kushner.

25             Excelerate, there are similar arguments in

1    Excelerate, and I won't repeat some of the ones I

2    made, but the difference for Excelerate is that

3    Excelerate was a vendor to River Meadows.  There

4    is a contract that we included with our papers

5    that shows exactly that.  They are a contractor.

6    As a contractor, they don't even meet the

7    criteria for the statute Public Health Law 2808

8    or I think it's 2806.  They're not a health care

9    facility.  They're a vendor.  There's nothing

10   other than some rumor and innuendo in the

11   response papers to indicate that they are

12   anything other than a vendor.  There's some

13   argument that at some meeting at the facility

14   someone said that Excelerate runs this place.

15   That's not good enough in the face of a contract,

16   a duly executed contract that provides that

17   Excelerate was a vendor.  As a vendor, they have

18   no liability under Public Health Law because they

19   cannot be established as a controlling person.

20          We also have similarly the argument for

21   statute of limitations and jurisdiction.

22          Thank you, your Honor.

23          THE COURT:  Thank you.

24          Who's next?  Alphabetically or just jump

25   in?  Ms. Robinson?

 1              MR. HURTEAU:  Dan Hurteau from Nixon

 2      Peabody.

 3              Your Honor, I think we've addressed the

 4      motions to dismiss that are pending.

 5              The other motions I understand were

 6      motions and were brought by the plaintiff, one

 7      for an attachment, one for some discovery related

 8      sanctions, and there's also an intervention

 9      motion made by parties that are not in the

10      Farruggio action, so I think --

11              THE COURT:  So we'll hear from plaintiffs

12      with regard to the motions to dismiss.

13              MR. HURTEAU:  Thank you, your Honor.

14              THE COURT:  Counsel, are you ready?

15              MR. FREI-PEARSON:  Yes, your Honor.

16      Jeremiah Frei-Pearson.  And I apologize.  I could

17      be a fast talker.

18              Your Honor, what happened was not a

19      mistake.  Abraham Gutnicki, Eliezer Friedman and

20      Judy Kushner got together and decided that they

21      wanted to extract as much money as possible from

22      the James Square Nursing Home and they did this

23      via a variety of ways.  First of all, they

24      decided to stop paying the amount of money that's

25      needed to pay to safely staff and operate the

1       home.  They cut staff members left and right.

2       That was a deliberate decision, and the results

3       of that decision were twofold.  First of all,

4       elderly people who trusted the home to take care

5       of them were left lying in their own urine,

6       abandoned, harmed.  Ultimately, they were rated

7       by the state A.G. for that.  But the other result

8       of that was there was a lot of extra money that

9       went into the home that wasn't spent on taking

10      care of the people it was supposed to take care

11      of.

12              And the thing that shows that this was not

13      just a horrible accident where maybe people who

14      didn't know how to run a nursing home bought it

15      and they just didn't know how to staff it and

16      something happens, is they set up all of these

17      corporate structures to try to pin liability on

18      River Meadows, an entity they bankrupted, while

19      they personally looted the facility.

20              Counsel was talking earlier about how the

21      lease agreement was negotiated at arm's length.

22      The lease went from one point two million to four

23      point two million in three years.  You know, I

24      live a little further down than Syracuse, but I

25      don't think there's anywhere in the country in

1          the last five years where the lease rate has gone

2          -- has tripled.  That's not an arm's length

3          agreement.  There were numerous papers that on

4          paper which showed that this was just run by

5          River Meadows.  That's why in our first complaint

6          we didn't name Gutnicki and Kushner.  But we got

7          documents from River Meadows after a lot of

8          fighting in August of 2018 that showed all of

9          these financial choices to extract money, and the

10         choices were made by Gutnicki and Kushner, who

11         were absolutely liable under 2801.  2801 was

12         amended to specifically say that the controlling

13         people are liable.  Individuals who own nursing

14         homes have been found to be parties in these

15         cases.  The Passucci case that your Honor cited,

16         that happened.

17               So, anyway, Gutnicki and Kushner teamed up

18         with Mr. Friedman.  They signed papers

19         interchangeably on behalf of the assets.  They

20         did things like the lease with Liberty.  They did

21         things like giving Excelerate a share of the

22         profits which made Excelerate an owner.

23         Companies were owned by Gutnicki, Friedman,

24         Kushner or their children.

25               One moment that would have been funny if

Motion argument                                        26

1        not for the fact that real people were harmed,

2        that the creditors meeting was Mr. Gutnicki was

3        asked who owned one of the various companies and

4        he claimed not to know; and the person

5        questioning him, Mr. Lieberman, the trustee,

6        said, well, is it someone related to you, and

7        Mr. Gutnicki responds maybe. So Mr. Lieberman

8        asked the question again, your children, and

9        Mr. Gutnicki said yes. And so this company that

10       they represented to be a third party independent

11       company was owned by his children. Again, it

12       would be funny, except real people died.

13              So with all due respect to my colleagues

14       on the defense bar, people were hurt. It was in

15       violation of the law, and the defendants that we

16       named in this amended complaint are all

17       absolutely liable and should be held accountable.

18              Thank you very much, your Honor.

19              THE COURT:  Thank you.

20              All right.  Do you want to be heard on

21       your motion?

22              MR. FREI-PERSON:  Of course.

23              MR. BERMAN:  May I just respond quickly,

24       your Honor?

25              THE COURT:  No, thank you.

 1            MR. FREI-PEARSON:  So there's two motions.

 2       The ESI motion, just very briefly on that.

 3            Counsel, we've been trying to get

 4       electronically stored information from River

 5       Meadows since October of 2017.  We filed a motion

 6       to compel on it last year.

 7            In court before your Honor in December,

 8       counsel for River Meadows represented that they

 9       would produce all of the electronically stored

10       information by March 11th.  Your Honor signed an

11       order requiring them to do so.  Today it's July

12       8th(sic.) and we still don't have the ESI.  And

13       in speaking to counsel, there's a bunch of

14       issues.

15            I don't like bothering the court with

16       things like please produce documents by this

17       date, but ultimately on that we need a date

18       certain, and I think we need sanctions if we

19       don't get the documents or I just -- just as we

20       first saw this information in 2017, now it's

21       2019.  It will be 2021 if we don't get a firm

22       date.  I'm happy to work cooperatively with

23       counsel.  Just today I learned about a bunch of

24       issues that I won't bore your Honor with.

25            But when we reach a firm date, just like

1           we did in December where they said the firm date

2           would be March --

3                      THE COURT:  I'll take care of it.

4                      MR. FREI-PEARSON:  Thank you very much,

5           your Honor.

6                      On the motion to attach, New York law

7           requires -- allows for attachment when companies

8           have -- when defendants who are not domiciled in

9           the State of New York have been shown to hide

10          assets with fraudulent intent.  That is what

11          happened here, and when there's a good likelihood

12          of recovery.  You hear all these technical

13          arguments from defendants, and your Honor will

14          decide those, but you don't hear much of an

15          argument that what happened in this nursing home

16          was okay because it's not.

17                      Plaintiffs are very, very confident that

18          when we get to trial, plaintiffs are going to

19          prevail on the merits.  To my knowledge, only one

20          similar class action has gone to trial.  It was

21          in California.  The jury awarded five hundred and

22          sixty-two million dollars.  Here the minimum

23          statutory damages are twenty-six million nine

24          hundred and seventy-one thousand.  Again, I'm

25          very confident that a jury who sees these facts,

1      who hears that Mr. Farruggio, who cannot talk

2      about this case without crying because his

3      mother's last words to him were "Get me out of

4      this home" and instead the home killed her.  When

5      the jury hears that, not only will we get the

6      minimum statutory damages, we're going to get

7      punitive damages well beyond twenty-six million

8      nine hundred and seventy-one thousand.  But

9      that's the amount we've sought for attachment

10     because it's an easy amount that shouldn't be

11     contested.

12          With regard to showing fraudulent intent,

13     all of the documents that your Honor has seen and

14     documents that we don't have because we don't

15     have discovery, they reek of fraudulent intent.

16     You don't have three people conspired to buy a

17     nursing home and hide the ownership through a

18     variety of different entities all of which

19     they're funneling money this way and that way

20     because you're running a legitimate honest

21     business.  These are people who hid everything.

22          In fact, as soon as your Honor ordered

23     that we could add these defendants to this

24     complaint, literally the day after your Honor's

25     order was entered, River Meadows filed for

1    bankruptcy to try to stop this case.  The

2    bankruptcy judge lifted that stay.  But these are

3    people who are going to hide the money from the

4    vulnerable people who need it.  And without this

5    court's assistance, it is very likely that that

6    money will be secreted away, and we need it to

7    the attachment.  We are prepared to offer an

8    undertaking.  The amount of the undertaking we

9    propose is consistent with case law.  But should

10   your Honor require a higher one that's

11   reasonable, my firm is happy to make that

12   investment.  We respectfully submit that we need

13   the undertaking in order to prevent the people

14   who did this from getting away with it.

15           Thank you very much, your Honor.

16           THE COURT:  Responses?

17           MS. DEMICHIEL:  Jessica DeMichiel, Liberty

18   Senior Holdings.

19           Your Honor, with respect to the

20   attachments, Liberty Senior Holdings is a New

21   York State domicile corporation, so plaintiff has

22   not met that element that is required for an

23   attachment.

24           He indicated just now that these documents

25   were hidden and they reek of fraudulent intent.

 1           We submitted the entire certificate of need

 2      application.  Every single document that

 3      plaintiff cites for this fraudulent intent was

 4      given to the state, the New York State Department

 5      of Health, to review throughout a

 6      two-and-a-half-year process.  If a corporation is

 7      trying to hide something, you wouldn't put it in

 8      the plain sight of the New York State Department

 9      of Health.  They reviewed it.  They recommended

10      changes to the lease agreement terms, which is

11      the only document that pertains to Liberty Senior

12      Holdings.  We submitted the amended lease

13      agreement, and that is the only document that

14      they produced at any point to show some

15      fraudulent intent to defraud creditors from the

16      enforcement of a judgment.  That is simply not

17      enough.  They have to show that Liberty Senior

18      Holdings at some point either took a step or is

19      about to take a step to hide their assets, and

20      they simply just have not done that.  They

21      haven't met their burden of proof of showing that

22      there was any fraudulent intent whatsoever when

23      every single document that they cite was

24      literally produced to the State of New York.

25           They use the statement of deficiencies

1     which shows where River Meadows was cited for a

2     violation of the regulations; but yet when the

3     regulations were followed with regard to the

4     purchase and sale of the actual real estate that

5     Liberty Senior Holdings owned, they reproduced

6     every one of those document.  Those documents

7     showed that this was just a natural winding down

8     of the corporation purchase and then winding down

9     of a corporation.  They have showed not one

10    document whatsoever at any point in time that any

11    of the assets from the purchase, any assets of

12    the sale were in any way hid or about to be hid

13    from anybody.  Without showing any of that proof,

14    you just cannot ask this court for an order of

15    attachment where your burden is simply not met.

16         With regard to the minimum statutory

17    damages, plaintiff has an obligation.  It is his

18    obligation under the law.  These aren't technical

19    statutory discrepancies that we're harping on.

20    These are requirements under the law to show as

21    to Liberty Senior Holdings in particular why

22    those statutory damages are valid, and

23    plaintiffs' counsel had the opportunity to not do

24    that once but twice when he resubmitted his

25    documents in opposition to that motion, and he at

1      no point in time submitted any evidentiary proof

2      whatsoever to support that those minimum

3      statutory damages would be applicable to Liberty

4      Senior Holdings specifically, and that is

5      required.  And for that reason, the order for

6      attachment should be denied as to Liberty.

7                   THE COURT:  Thank you.

8                   MS. DEMICHIEL:  You're welcome.

9                   THE COURT:  Mr. Berman?

10                  MR. BERMAN:  Thank you, your Honor.

11             I want to make clear to the court, if I

12     can, that Mr. Friedman is not trying in any way

13     to argue about the significance of claims that

14     plaintiff may be making here.  That's not what

15     we're addressing today.  Very simply, today is

16     whether or not he is liable and whether or not

17     there should be attachment.  And with attachment

18     the first requirement, even with an out-of-state

19     resident -- and I will point out in this case Mr.

20     Friedman, while he may live in New Jersey, chose

21     to do business through Liberty in New York, LLC.

22                  THE COURT:  Lucky us.

23                  MR. BERMAN:  Excuse me?

24                  THE COURT:  Nothing.

25                  MR. BERMAN:  Sorry.  But likely their

1    success on the merits is very important.  Here,

2    frankly, your Honor, even if the court doesn't

3    find that the submissions, the documents, that

4    the plaintiff -- the plaintiffs themselves

5    submitted to this court in opposition to dismiss

6    are not sufficient to cause a dismissal, the

7    likelihood of success on the merits, I would

8    respectfully submit, is di minimus.

9         Counsel said here that they entered into a

10   scheme to extract as much money as possible and

11   that they did so by cutting staff and not

12   spending money.  That decision was made by

13   Mr. Gutnicki and Ms. Kushner, the owners -- the

14   operators -- or the owners of the operator of the

15   facility, not by Mr. Friedman.

16        They talk about the lease rate.  And,

17   again, yes, the lease rate went from a lease

18   between related entities, which was not an arm's

19   length transaction, which was an inside deal, to

20   one at market rates; and, again, one that was

21   approved by the Department of Health.

22        THE COURT:  Who did the appraisal of the

23   market value?

24        MR. BERMAN:  It's attached.  It's

25   certified in one of the exhibits.  It's an

 1        exhibit to Mr. Friedman's --

 2                  THE COURT:  Local?

 3                  MR. BERMAN:  If I might, your Honor?

 4                  THE COURT:  No.  That's okay.

 5                  MR. BERMAN:  It's there.

 6                  THE COURT:  I was just wondering what

 7        market we're talking about.

 8                  MR. BERMAN:  They did a series of markets,

 9        but they came to the conclusion that the market

10        rate is based on a certain capitalization rate

11        and it -- if I could explain that to you, I'd be

12        doing certiorari cases and making a lot more

13        money than I make here.

14                  So -- but the rate -- the interest -- the

15        rents were market rate.  They have come up with

16        no indication that Mr. Friedman has done anything

17        to try to hide any assets.

18                  Again, as counsel has said, all the

19        paperwork involving this was put before the

20        Department of Health.  It was a matter -- it is

21        and was a matter of public record.  Mr. Friedman

22        very clearly decided that he did not want to be

23        in the business of operating a nursing home, and

24        that's why Mr. Gutnicki and Ms. Kushner came in

25        and took that responsibility.

Motion argument                                      36

1          Mr. Friedman very simply -- the likelihood

2     of success on the merits, even if your Honor

3     finds enough to get past a motion to dismiss, is

4     insignificant to the extent necessary to sustain

5     attachments.

6          And the other thing I would point out is

7     that the statute of limitations argument will

8     preclude damage -- a lot of the damages claimed

9     by the plaintiff as against.

10         Anyway, it's in our papers, your Honor.

11    Thank you.

12         THE COURT:   Thank you.

13         Counsel?

14         MR. HURTEAU:   Thank you, your Honor.   Dan

15    Hurteau again.

16         Your Honor, they pretty much said

17    everything I was going to say.   I'll just focus

18    quickly on two things.

19         The plaintiffs' counsel -- and I

20    understand why he wants to do this -- wants to

21    lump everyone in and call it some sort of

22    conspiracy.   There was no claim for conspiracy in

23    the third amended complaint.

24         And as it relates to the attachment, there

25    is no conspiracy between these parties.

 1              Also, as everyone else has argued, they

 2       have not met their burden.  The burden is more

 3       than what it would be on a motion to dismiss.

 4       They actually have to come forward with something

 5       other than just claiming that there's a

 6       conspiracy or claiming that there's some concern

 7       or fear that people are going to run off with

 8       money.  They have no evidence that anyone has met

 9       either elements of what you have to show for an

10       attachment.  They have not shown that anyone is

11       spiriting money out of the state or spiriting

12       money out of the state account.  They have shown

13       no evidence of intentional fraud.

14              Lastly, there is a requirement for a bond

15       if they're successful on this attachment.  The

16       amount that they suggest is wholly inadequate.

17       It's certainly not enough when you're talking

18       about twenty-eight million dollars, which they

19       claim is going to be the damages here.

20              And also given the status of this case,

21       just a couple things to make note of, class

22       certification itself, which was not certified,

23       just assuming that the parties that are here now

24       moving to dismiss end up in this lawsuit, this

25       lawsuit was not certified.  So this lawsuit would

1      have to be certified against them.

2             There's an appeal pending currently on the

3      original class certification.  There is a lot of

4      legal work that's going to happen over the next

5      several years and a lot of questions as to who's

6      going to be in this lawsuit long term or not.  So

7      to file and get an attachment this early in the

8      case without any evidence clearly to me doesn't

9      make sense in this case and is not sanctioned by

10     the law.

11            Thank you, your Honor.

12            THE COURT:  Thank you.

13            Ms. Robinson?

14            MS. ROBINSON:  Thank you, your Honor.

15     Lisa Robinson.  I represent River Meadows, and

16     I'm just going to talk briefly about the motion

17     to compel the ESI, your Honor.

18            I did receive an external hard drive and a

19     thumb drive from the Clinton Square attorneys on

20     June 6th with what was considered to be emails

21     and other documents, responsive documents from

22     their server.  We started looking at that so that

23     we could make a production to plaintiffs' counsel

24     in this case and noticed there were a lot of

25     issues, like file folders had passwords, file

1    folders had nothing in it that should have

2    something in it, and I learned this morning that

3    I guess there was an error in copying that

4    material, so I guess they are going to have to

5    redo that material.  I mean, I've gotten it on

6    June 6th and we've been trying to look at five

7    hundred gigabytes of data and noticed those

8    mistakes.

9         We can make some sort of a protection of

10   payroll.  However, some of the other issues we're

11   going to have to be -- we'll have to address with

12   whatever defendants remain in this action, your

13   Honor.

14        And I guess they produced some of the

15   EMRs, which are the electronic medical records,

16   but I guess additional issues have arisen with

17   some of the other ESRs.

18        And, finally, your Honor, I just want to

19   point out -- I know that plaintiff is trying to

20   push this ESI as soon as possible, but my client

21   has not even yet been served with the third

22   amended complaint.  He has not even answered it

23   yet.  But my calculations --

24        THE COURT:  You don't want to be served

25   with it.

1              MS. ROBINSON:  Well, I would like to have

2        issues joined with regard to the current pleading

3        and to determine what parties remain in this

4        action to see who may have an interest in looking

5        at this ESI before it's produced because all of

6        the remaining entities may have some sort of

7        privilege.  They may want to do a search for

8        privilege or not depending on what your Honor

9        decides today regarding the motions.

10             Thank you, your Honor.

11             THE COURT:  What about your motion to

12       seal?

13             MS. ROBINSON:  My motion to seal?

14             THE COURT:  Yes.

15             MS. ROBINSON:  We made a motion to seal

16       documents that were protected by the HIPPA

17       compliant protective order that was filed back in

18       -- I think it was in August.  The plaintiffs'

19       counsel filed an unredacted version on the

20       docket, and we just move to seal them.  And for

21       the reasons set forth in our motion, we believe

22       they should remain sealed.

23             Thank you, your Honor.

24             THE COURT:  Thank you.

25             Mr. Jaffe?

1          MR. JAFFE:  Good morning, your Honor.

2      Chaim Jaffe on behalf of James Square Nursing

3      Home.

4          Your Honor, I'm going to be very brief.  I

5      think plaintiffs' counsel has acknowledged that

6      James Square Nursing Home is not in possession or

7      control of any electronically stored information,

8      that it's not seeking sanctions against the

9      nursing home.

10          Also, to the extent that any privileged

11      information is inadvertently disclosed during the

12      production process, the nursing home will rely on

13      the confidentiality agreement that was entered

14      into.

15          And, your Honor, finally to the extent

16      that there's going to be a preview among the

17      defendants of the information that's going to be

18      produced, I just reserve the right to participate

19      in that process.

20          Thank you.

21          THE COURT:  Thank you.

22          MS. FIGUEROA:  Good morning, your Honor.

23      Gabriel Figueroa from Barclay Damon on behalf of

24      the 918 James Receiver, LLC.  I will also be

25      brief.

1            With respect to the discovery motion,

2      James Square Receiver is not in possession of any

3      electronically stored information.  We are not

4      holding up any discovery.  We request the same

5      right to reserve an opportunity to be heard.

6      Thank you.

7            THE COURT:  Thank you.

8            MS. SULLIVAN:  Christine Sullivan.  I

9      represent Clinton Square Operations.  Just

10      briefly, your Honor, on the motion to compel.

11            This morning I did discuss with

12      plaintiffs' counsel there has been an issue with

13      a finalized copying of the medical records.  He

14      has agreed to give the copying company until

15      August 8th to complete this.

16            Your Honor, with regard to the server

17      issue that Ms. Robinson brought up on oral

18      argument, we are working with her to resolve

19      those promptly.

20            Thank you.

21            THE COURT:  Thank you.

22            Intervention?

23            MS. LIGHTCAP:  Yes, your Honor, just

24      briefly.  Victoria Lightcap on behalf of

25      Finkelstein & Partners.  We represent the

1      plaintiffs not associated with the class, your

2      Honor, and we seek leave for the court to

3      intervene to join in opposing the motion by the

4      defendants to seal consistent with the case of

5      Fordham v. Coleman (Phonetic) where there is

6      evidence that a company's failure to discharge

7      its duties resulted in a customer's death.

8      Public health and safety concerns weigh against a

9      finding of good cause to seal.  We submit that

10     there is no good cause to seal here, your Honor,

11     particularly when weighing those interests of the

12     public and particularly in this situation where

13     there's an allegation of fraud.  Failure to

14     discharge the duties to the plaintiff, the class

15     resulted in numerous deaths, injuries and

16     needless suffering, some of which are in this

17     audience here today, and engaged in fraud and

18     other wrongdoing by collecting payments which

19     were intended to care for plaintiffs and class

20     members and yet diverting that money for personal

21     gain.

22             Based upon the foregoing, your Honor, we

23     submit that there is evidence presented to allow

24     the public to have access to these redacted

25     records and filings by River Meadows; and,

1       therefore, their motion to request to seal should

2       be denied.  Thank you.

3               MS. ROBINSON:  Your Honor, briefly, in

4       opposition to the motion to intervene, my papers

5       discuss the fact that they were made in violation

6       of the stay.  There is no lifting of the stay in

7       the five cases that she is representing the

8       plaintiffs on in order to move in this case, so I

9       believe it was a violation of the stay of the

10      bankruptcy court.

11              And I just checked the docket yesterday.

12      No other motions to lift the stay have been filed

13      by any of these plaintiffs that she represents

14      in those separate actions; and, as such, we also

15      made the motion at this point -- the motion is

16      moot because those plaintiffs are class members,

17      unless they have opted out.

18              Thank you, your Honor.

19              THE COURT:  Thank you.

20              Anything further from anyone?

21              MR. BERMAN:  No, your Honor.

22              MS. DEMICHIEL:  No, your Honor.

23              MR. HURTEAU:  No, your Honor.

24              THE COURT:  All set?

25              There are a number of motions before the

1        court in this class action lawsuit concerning the

2        former James Square Nursing Home.  The court will

3        address these motions in the following words:

4               One:  The pre-answer motions to dismiss

5        plaintiffs' third amended complaint brought by

6        Defendants Friedman, Kushner, Gutnicki, Liberty,

7        Excelerate pursuant to CPLR 3211(a)(1) and

8        (a)(7).  These motions are opposed by plaintiffs.

9               Two:  The motion for an order of

10       attachment brought by plaintiffs pursuant to CPLR

11       6201 and 6212.  This motion is opposed by the

12       defendants.

13              Three:  The motion to compel the

14       production of ESI, electronically stored

15       information, brought by plaintiffs and opposed by

16       Defendant River Meadows.

17              Four:  The motion by Defendant River

18       Meadows to have certain confidential information

19       remain under seal pursuant to the protective

20       order.

21              And, five, the motion by Finkelstein &

22       Partners to intervene to join plaintiffs'

23       opposition to Defendant River Meadows' sealing

24       motion.

25              Plaintiffs seeks to hold defendants liable

Motion decision                                    46

1         to their class pursuant to the cause of action

2         under Public Health Law Sections 2801(d) and

3         2808(a), among other provisions, as controlling

4         persons/entities of the public health care

5         facility.  Plaintiffs also seek to hold these

6         newly named defendants liable under a common law

7         negligence cause of action.

8              In determining whether a complaint fails

9         to state a cause of action, under CPLR

10        3211(a)(7), the court is required to accept the

11        facts as alleged in the complaint as true and

12        afford the plaintiff the benefit of every

13        possible favorable inference.  The court must

14        liberally construe the allegations and determine

15        if from the four corners of the pleadings and the

16        submissions in opposition to the dismissal motion

17        if the facts as alleged by plaintiff fit within

18        any cognizable legal theory.

19             Simkin v. Blank, 19NY3d 46.

20             Wells v. Hurlburt Road Company, 145AD3d

21        1486.

22             In addition, a dismissal under 3211(a)(1)

23        is warranted only where the documentary evidence

24        submitted conclusively establishes a defense to

25        the claims asserted by plaintiff as a matter of

Motion decision                                          47

1    law.

2              511 West 232nd Owners Corp. v. Jennifer

3    Realty Company, 98NY2d 144.

4              Leon v. Martinez, 84NY2d 83.

5              Carlson v. American International Group,

6    130AD2d 1479.

7              The criteria is whether there is a cause

8    of action, not whether one is misstated.

9              When viewing and construing the third

10   amended complaint and plaintiffs' submissions in

11   opposition to these motions in the requisite

12   liberal manner, the motions of the respective

13   defendants must be partially denied as plaintiffs

14   have set forth legal and cognizable theories of

15   liability under both Public Health Law and common

16   law negligence, and the documentary evidence

17   relied upon by defendants do not establish a

18   defense as a matter of law at this stage of the

19   proceedings.

20             However, it appears that plaintiffs'

21   negligence cause of action is duplicative of the

22   Public Health Law cause of action and, as such,

23   their negligence cause of action is hereby

24   stricken.  In addition, pending further

25   discovery, defendants' claim of lack of long-arm

1        jurisdiction is reserved for future motion

2        practice.

3              Therefore, the pre-answer motions of the

4        moving defendants are denied, and they are

5        directed to interpose answers and other

6        responsive pleadings within thirty days of the

7        filing of this order with notice of entry.

8        Service is to be made upon plaintiffs' attorneys,

9        who are directed to accept service.

10             As to plaintiffs' motion for an order of

11       attachment, that motion is denied without

12       prejudice as premature pending further discovery.

13             Plaintiffs' motion to compel is granted.

14       Defendant River Meadows has had sufficient time

15       since the lifting of the bankruptcy stay

16       proceeding to compile the demanded ESI materials.

17             Any costs associated with the harvesting

18       of these materials shall be equally borne by the

19       defendants, and all such materials shall be

20       provided to plaintiffs' counsel within sixty days

21       of the filing of this order with notice of entry.

22             Failure to comply with this order to

23       compel will result with the striking of

24       responsive pleadings of any un-cooperating

25       defendant and the imposition of monetary

1        sanctions.

2               With respect to Defendant River Meadows'

3        motion to seal alleged confidential information

4        and the motion of Finkelstein & Partners to

5        intervene in plaintiffs' opposition to that

6        motion, both motions are denied.

7               River Meadows has failed to exhibit any

8        good cause as to why corporate and/or individual

9        defendant information should be sealed and kept

10       from public disclosure.

11              The record does not appear to reflect any

12       opposition filed by plaintiffs to this motion.

13       Therefore, Finkelstein & Partners have nothing to

14       intervene with.

15              Counsel, you'll prepare the order, attach

16       a copy of the transcript, send it to all the

17       attorneys for their approval.

18              MR. FREI-PEARSON:  Thank you very much,

19       your Honor.

20              MR. BERMAN:  Thank you, your Honor.

21              (Whereupon, the proceeding was adjourned)

22

23                    *       *       *       *

24

25

50

1

2

3

4                          *      *      *      *

5                     C E R T I F I C A T E

6

7        This is to certify that I am a Senior Court

8   Reporter of the Fifth Judicial District; that I

9   attended and reported the above-entitled proceedings;

10  that I have compared the foregoing with my original

11  minutes taken therein, and that it is a true and

12  correct transcript thereof and all of the proceedings

13  had therein.

14

15        _____
                 Deborah A. Dlugolecki, C.M.
16

17

18

19

20

21

22

23

24

25

# Exhibit B

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 60 of 134 PageID #: 700

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ONONDAGA

MICHAEL FARRUGGIO, as Executor of the Estate of
THERESA FARRUGGIO, and SUSAN KARPEN,
individually and on behalf of all others similarly
situated,

Plaintiffs,

v.

918 JAMES RECEIVER, LLC; RIVER MEADOWS,
LLC; JAMES SQUARE NURSING HOME, INC.; and
CLINTON SQUARE OPERATIONS, LLC,

Defendants.

RJI NO: 33-17-4151

Index No. 003831/2017

**[PROPOSED]
ORDER DENYING
DEFENDANTS RIVER
MEADOWS, LLC AND
CLINTON SQUARE
OPERATIONS, LLC'S
MOTIONS FOR SEVERANCE
AND GRANTING
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

Plaintiffs Michael Farruggio and Susan Karpen ("Plaintiffs") having moved for

certification of this action as a class action (Motion Sequence No. 5) (NYSCEF Doc. Nos. 128-

160 & 207-208), and defendants River Meadows, LLC ("River Meadows"), 918 James Receiver,

LLC ("918 James"), and James Square Nursing Home, Inc. ("JSNH") having opposed said

motion (NYSCEF Doc. Nos. 180-185 [River Meadows] & 193 [JSNH] & 194-203 [918 James]);

and

Defendant Clinton Square Operations, LLC ("Clinton Square") having moved for

severance (Motion Sequence No. 4) (NYSCEF Doc. Nos. 119-123), and defendant River

Meadows having cross-moved for severance (Motion Sequence No. 6) (NYSCEF Doc.

Nos. 165-179 & 204-206), and Plaintiffs having opposed said motion and cross-motion

(NYSCEF Doc. Nos. 186-192);

NOW, upon the reading of Plaintiffs' notice of motion for class certification; Plaintiffs'

memorandum of law in support thereof; the affirmation of Jeremiah Frei-Pearson, with exhibits,

on behalf of Plaintiffs in support thereof; the affidavits of Michael Farruggio, Susan Karpen,

1

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 61 of 134 PageID #: 701

Ross Martin, Donna Stewart, Carrie Roundy, Sharon Patrick, Michelle Dumas, Jeanine Stephens,

Arelia Robinson-Tarver, Shirley Hubbard, Gloria Smith, Genevieve Shuma, Constance Coleman,

Barbara Kirsch, Nancy McDevitt, Charlene McCree, Thomas Reitano, Beatrice Maher-Colin,

Gene Luteran, Robert Hennessey, Sandra Kimball; the affirmation of Lyuba Gafton; defendant

River Meadows's memorandum of law in opposition; the affirmation of Lisa Robinson, with

exhibits, on behalf of defendant River Meadows in opposition; defendant JSNH's memorandum

of law in opposition; the affirmation of Colm P. Ryan, with exhibits, on behalf of defendant 918

James in opposition; defendant 918 James's memorandum of law in opposition; Plaintiffs' reply

memorandum of law in further support; and the reply affirmation of Jeremiah Frei-Pearson in

further support of Plaintiffs' motion; and upon the remaining parties taking no position regarding

the motion; and upon oral argument of the motion; and

      Upon the reading of defendant Clinton Square's notice of motion for severance; the

affirmation of Kevin Hunt, with exhibits, on behalf of Clinton Square in support thereof;

defendant River Meadows notice of cross-motion for severance; defendant River Meadows's

memorandum of law in support thereof; the affirmation of Lisa Robinson, with exhibits, on

behalf of defendant River Meadows in support thereof; Plaintiffs' memorandum of law in

opposition to the motion and cross-motion for severance; the affirmation of Jeremiah Frei-

Pearson, with exhibits, on behalf of Plaintiffs in opposition to the motion and cross-motion for

severance; defendant River Meadows's reply memorandum of law in further support; the reply

affirmation of Lisa Robinson in further support of River Meadows's cross-motion; and upon the

remaining parties taking no position regarding the motion; and upon oral argument of the

motion; and

2

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 62 of 134 PageID #: 702

Upon the reading of the June 12, 2018 notice of settlement between the Plaintiffs and Clinton Square; and

Upon due deliberation having been had, and the Court having found that the proposed Class for Plaintiffs' claims pursuant to New York Public Health Law § 2801-d meets all of the requirements of Article 9 of the CPLR in that: (i) the proposed Class is so numerous that joinder of all Class Members is impracticable; (ii) there are questions of law or fact common to the Class which predominate over any questions affecting only individual Class Members; (iii) the claims or defenses of the Class Representatives are typical of the claims or defenses of the Class; (iv) the proposed Class Representatives and the law firm of Finkelstein, Blankinship, Frei-Pearson & Garber, LLP will fairly and adequately protect the interests of the Class; and (v) a class action is superior to other available methods for the fair and efficient adjudication of the controversy; and

For the reasons set forth in the attached transcript of the Court's decision dated June 13, 2018, it is hereby

**ORDERED** that defendant Clinton Square's motion for severance is **DENIED** as moot; and it is further

**ORDERED** that defendant River Meadows's cross-motion for severance is **DENIED** as premature, without prejudice to renew; and it is further

**ORDERED** that the branch of Plaintiffs' motion seeking class certification of Plaintiffs' claims pursuant to New York Public Health Law § 2801-d is **GRANTED** with a Class defined as: all persons or their survivors who reside or have resided at James Square Health and Rehabilitation Centre, renamed the Bishop Rehabilitation and Nursing Centre in December 2017 (the "Facility"), located at 918 James Street, Syracuse, New York 13203, from August 25, 2014, to the present (the "Class Period"); and it is further

3

**ORDERED** that the branch of Plaintiffs' motion seeking class certification of Plaintiffs' negligence claims is **DENIED** as premature, without prejudice to renew when discovery is completed; and it is further

**ORDERED** that plaintiffs Michael Farruggio and Susan Karpen are appointed Class Representatives; and it is further

**ORDERED** that Finkelstein, Blankinship, Frei-Pearson & Garber, LLP is appointed Class Counsel; and it is further

**ORDERED** that defendants will cooperate with and facilitate the prompt transmittal to Class Counsel of the names and other pertinent information regarding all residents of the Facility during the Class Period so that notice can be sent to the Class; and it is further

**ORDERED** that this Order may be filed without further notice with the Clerk of the Court.

Dated: _8/21/18_
      Syracuse, New York

                                    Hon. Anthony J. Paris, J.S.C.

                                      ENTER:

4

FILED: ONONDAGA COUNTY CLERK 08/21/2018 04:02 PM

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 64 of 134 PageID #: 704

1

```
 1      SUPREME COURT OF THE STATE OF NEW YORK

 2      COUNTY OF ONONDAGA

 3      -------------------------------------------X

 4      MICHAEL FARRUGGIO, as Executor of the      :  Index No.
        Estate of THERESA FARRUGGIO, and SUSAN        00381/2017
 5      KARPEN, individually and on behalf of all  :
        others similarly situated,
 6                                                  :

 7                      Plaintiffs,                 :

             -vs-
 8                                                  :

        918 JAMES RECEIVER, LLC; RIVER MEADOWS,       Decision
 9      LLC, JAMES SQUARE NURSING HOME, INC., and  :
        CLINTON SQUARE OPERATIONS, LLC,
10                                                  :

11                      Defendants.                 :

        -------------------------------------------X
12

13

14                                    June 13, 2018
                                      Onondaga County Courthouse
15                                    401 Montgomery Street
                                      Syracuse, New York  13202

16

17      B E F O R E :

18             HON. ANTHONY J. PARIS,

19                       Supreme Court Justice

20

21

22

23

24

25
```

2

APPEARANCES:

        FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
            Attorneys for Plaintiffs
            445 Hamilton Avenue, Suite 605
            White Plains, New York  10605
            BY:  JEREMIAH FREI-PEARSON, ESQ.
                 JEAN SEDLAK, ESQ.

        GOLDBERG SEGALLA
            Attorneys for Defendant River Meadows
            5786 Widewaters Pkwy, East
            Dewitt, New York  13057
            BY:  LISA ROBINSON, ESQ.

        SCOLARO, FETTER, GRIZANTI, MCGOUGH & KING, P.C.
            Attorneys for Defendant James Square
            507 Plum Street Suite 300
            Syracuse, New York  13204
            BY:  CHAIM J. JAFFE, ESQ.

        BARCLAY DAMON, LLP
            Attorneys for Defendant 918 James Receiver
            Barclay Damon Tower
            125 East Jefferson Street
            Syracuse, New York  13202
            BY:  COLM RYAN, ESQ.

        GALE, GALE & HUNT
            Attorneys for Defendant Clinton Square
            7136 E. Genesee Street
            Fayetteville, New York  13066
            BY:  KEVIN HUNT, ESQ.

Reported by:  Elizabeth A. Black, CSR, RMR, CRR

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 66 of 134 PageID #: 706

Decision                                                                3

1              COURT CLERK:  Are you ready for arguments?

2              THE COURT:  Yes, I am.

3              COURT CLERK:  Proceed with arguments on Farruggio

4    v. 918 James Receiver.  Could you please state your

5    appearances and who you're representing?

6              MR. FREI-PEARSON:  Good morning, Your Honor.

7    Jeremiah Frei-Pearson for plaintiffs.

8              MS. SEDLAK:  Jean Sedlak for plaintiffs.

9              MS. ROBINSON:  Lisa Robinson, Goldberg Segalla for

10   defendant River Meadows.

11             MR. JAFFE:  Chiam Jaffe for James Square Nursing

12   Home.

13             MR. RYAN:  Colm Ryan, Barclay Damon, attorney for

14   defendant, 918 James Receiver, LLC.

15             MR. HUNT:  Kevin Hunt here for Clinton Square

16   Operations with my client Margaret Mary Wagner, who is the

17   administrator of the nursing home.

18             THE COURT:  Thank you.  Please be seated.  Counsel

19   want to be heard?

20             MR. FREI-PEARSON:  Very briefly, Your Honor.

21             (Whereupon off-the-record motion argument by Mr.

22   Frei-Pearson.)

23             MR. HUNT:  Your Honor, we rely on our papers.

24   Thank you.

25             MS. ROBINSON:  Yes.

Decision                                                                 4

1               (Whereupon off-the-record motion argument by Ms.

2        Robinson.)

3               THE COURT:  Thank you.

4               MS. ROBINSON:  Thank you.

5               MR. JAFFE:  Your Honor, we rest on our papers.

6               THE COURT:  Thank you.

7               MR. RYAN:  Your Honor, Colm Ryan.  We rest on our

8        papers.

9               THE COURT:  Do you want to address the severance

10       motion?

11              MR. FREI-PEARSON:  Yes.

12              (Whereupon off-the-record motion argument by Mr.

13       Frei-Pearson.)

14              THE COURT:  Thank you.  Anything further?

15              (Whereupon off-the-record motion argument by Ms.

16       Robinson.)

17              THE COURT:  Thank you.  The court has before it

18       today motions for severance by defendants River Meadows and

19       Clinton Square and a motion for class action certification

20       by the plaintiffs.

21              The motion by defendant Clinton Square is moot as

22       it is the court's understanding that plaintiffs and this

23       defendant have entered into a settlement agreement leaving

24       only the severance motion of defendant River Meadows.  The

25       plaintiffs oppose this motion and defendant 918 James

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 68 of 134 PageID #: 708

Decision                                                                5

1    Receiver/James Square has not submitted any opposition and

2    relies on their papers regarding this motion.

3            Plaintiffs' motion for class certification under

4    Article 9 of the CPLR is opposed by the remaining

5    defendants, 918 James Receiver/James Square and River

6    Meadows.

7            Addressing the Section 603 severance motion by

8    defendant River Meadows, the court may exercise its

9    discretion and grant a severance or order a separate trial

10   of any claim or issue so as to avoid prejudice to a party.

11   Severance may be appropriate where individual issues

12   predominate concerning particular circumstances applicable

13   to each defendant and there may be a possibility of

14   confusion for the jury.  Miller v. Howard, 137 AD3d 1698.

15   Matter of 8th Judicial District Asbestos Litigation v.

16   Niagara Insulations, 106 AD3d 1453.

17           While this is a complex matter possibly involving

18   a number of party plaintiffs, it appears at this preliminary

19   stage the issues of negligence and violations of Public

20   Health Law Section 2801 by the respective defendants are

21   fairly uniform.

22           As such, defendant has not met its burden to show

23   substantial prejudice and it would be an abuse of the

24   court's discretion to grant the severance motion until the

25   record is more fully developed during the course of

Decision                                                                6

1      discovery.  <u>Allen v. General Electric</u>, 11 AD3d 993.

2              Therefore, defendant's motion is denied at this

3      time as premature, without prejudice, pending discovery,

4      which would then allow the court to systematically and

5      comprehensively determine whether and to what extent

6      severance may be appropriate.

7              As to plaintiffs' motion for class certification,

8      in New York a class action may be maintained only after five

9      prerequisites set forth in CPLR Section 901(a) have been

10     met.  <u>DeLuca v. Tonawanda Coke Corp.</u>, 134 AD3d 1534.

11             The prerequisites are:

12             1)  That the class is so numerous that joinder of

13     all members is impracticable;

14             2)  that common questions of law or fact

15     predominate over questions affecting only individual

16     members;

17             3)  that the claims or defenses of the

18     representative parties are typical of the class as a whole;

19             4)  that the representative parties will fairly

20     and adequately protect the interests of the class'; and

21             5)  that a class action is superior to other

22     available methods for the fair and efficient adjudication of

23     the controversy.

24             Based on the record before the court, including

25     among other things the affidavit of Dr. Terry Gottlieb, the

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 70 of 134 PageID #: 710

Decision                                                              7

1    citation of the facility in 2017 by the New York State

2    Department of Health, and the twenty-two supporting

3    affidavits submitted by residents, former residents and/or

4    their survivors, it appears that plaintiffs have established

5    the five prerequisites necessary for class certification at

6    least concerning Public Health Law Section 2801.

7         The numerosity requirement has been met by

8    plaintiffs based on the supporting affidavits and the other

9    individual lawsuits, some of which Miss Robinson's firm is

10   defending.  The court finds that the proposed class has

11   sufficient members.

12        As to the commonality requirement, while all

13   issues need not be identical, the predominance requirement

14   may be satisfied even if all members of the class were not

15   subjected to all of the alleged improper conduct.  City of

16   New York v. Maul, 14 NY3d 499.  Ferrari v. NFL, 153 AD3d

17   1589.

18        Here, both the twenty-two supporting affidavits

19   and the self-reported data in the record indicate that there

20   are a number of common questions that predominate over

21   individual issues.

22        For example, whether during the class period of

23   August 25, 2014 to present defendants violated any laws by

24   depriving residents of statutory rights or failed to provide

25   them with adequate or appropriate medical care, or failed to

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 71 of 134 PageID #: 711

Decision                                                        8

1     employ an adequate and sufficient number of qualified

2     personnel, or failed to comply with the state and federal

3     regulations which impacted the health and safety of class

4     members.

5            Moreover, while the amount of damages suffered by

6     individual class members may vary, a class action should

7     still go forward where the important legal or factual issues

8     involving liability are common to the class.  See Borden v.

9     400 East 55th Street Associates, 24 NY3d 382.

10           As to the typicality requirement, there is no

11    question that in this nursing home context all residents and

12    patients lived or live in the same facility and were and are

13    exposed to the same staffing and regulatory issues, business

14    practices and conduct by defendants so as to establish this

15    requirement.

16           As to the representative ability of plaintiffs

17    vis-a-vis the class, the court based on the record is

18    confident that they will fairly and adequately represent all

19    class members.  As Public Health Law Section 2801-4

20    Subdivision 4 contemplates class actions in nursing home

21    cases such as this matter, a class action is the most

22    efficient and expedient manner of adjudication of these

23    issues.

24           Defendants' contentions in opposition to this

25    branch of the motion are neither compelling nor persuasive.

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 72 of 134 PageID #: 712

Decision                                                                9

1              Therefore, based on the foregoing, plaintiffs'

2       motion for class certification on the issues involving

3       Public Health Law Section 2801 is granted and the class is

4       defined as all persons or their survivors who reside or have

5       resided in the facility from August 25, 2014 to present.

6              Also, plaintiffs are hereby designated as the

7       class representatives with the Finkelstein Law Firm as

8       attorneys.

9              In addition, defendants are hereby directed to

10      cooperate with and facilitate the transmittal to plaintiffs'

11      attorneys the names and other pertinent information

12      regarding all residents of the facility during the class

13      period.

14             While class certification is appropriate

15      concerning the predominantly common issues regarding the

16      Public Health Law allegations, it is premature to grant

17      class certification as to the negligence and wrongful death

18      claim at this time until discovery is completed with regard

19      to those issues.

20             Therefore, that branch of plaintiffs' motion is

21      denied without prejudice as premature, with permission to

22      refile when discovery is completed.

23             Counsel, will you prepare the order, attach a copy

24      of the transcript, send it to counsel for their approval.

25             MR. FREI-PEARSON:  Yes, I will.  Thank you, Your

INDEX NO. 003831/2017

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 73 of 134 PageID #: 713

RECEIVED NYSCEF: 08/21/2018

1        Honor.

2

3

4

5                          CERTIFICATE

6

7             I, ELIZABETH BLACK, an Official Court Reporter

8        in and for the State of New York, Fifth Judicial District,

9        do hereby certify that I recorded stenographically the

10       foregoing proceedings, at the time and place noted in the

11       heading hereof, and that it is a true and correct transcript

12       of the proceedings therein to the best of my ability.

13

14

                         Elizabeth Black,
17                       Senior Court Reporter

18

19            Dated: June 19, 2018

20

21

22

23

24

25

# Exhibit C

To commence the statutory time
for appeals as of right (CPLR 5513 [a]),
you are advised to serve a copy of this
order, with notice of entry, upon all parties.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

-------------------------------------------------------------X

WILLIAM JENACK, as Attorney-in-Fact for
MARY RICE and WILLIAM RAMLOW as
Administrator of the Estate of ADELINE RAMLOW,
individually and on behalf of all others similarly
situated,

**DECISION AND ORDER**

Index No.:EF008129/2018
Motion Date: 12/3/18
Sequence Nos. 1 & 2

                                         Plaintiffs,

    -against-

GOSHEN OPERATIONS, LLC d/b/a SAPPHIRE
NURSING AND REHAB AT GOSHEN; RICHARD
PLATSCHEK; ESTHER FARKOVITS; MACHLA
AMRAMCZYK and ROBERT SHUCK,

                                  Defendants.

-------------------------------------------------------------X

SCIORTINO, J.

      The following papers numbered 1 to 11 were read on the separate motions by Defendants for:

1) an order dismissing the Complaint pursuant to CPLR §3211(a)(3) and §3013 (Seq. No.1); and

2) an order striking the pleadings of class certification pursuant to CPLR §901 and §902 and severing

the claims of individual plaintiffs pursuant to CPLR §603 (Seq. No.2):

| PAPERS | NUMBERED |
|---|---|
| Notice of Motion/ Quinn Affirmation with Exhibit A | 1 - 3 |
| Affirmation in Opposition (Garber) with Exhibits 1 - 3 | 4 - 5 |
| Notice of Motion//Rath Affirmation with Exhibit 1 | 6 - 8 |
| Affirmation in Opposition (Garber) with Exhibits A - H | 9 - 10 |
| Memorandum of Law in Opposition | 11 |

      Plaintiffs bring this action on behalf of themselves and the other nursing home patients

alleging defendants provided unsafe and inadequate care in the nursing home facility in violation of

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 76 of 134 PageID #: 716

New York's Public Health Law (PHL) §2801-d. Defendants move to dismiss the action on two

bases. first, that plaintiff, William Ramlow, had not yet been appointed Executor of his mother's

estate at the time the action was commenced and failed to provide the Letters showing that he has

been duly appointed pursuant to EPTL § 5-4.1. Second, that the complaint is insufficiently particular

as to the laws allegedly violated by defendants or the injury to plaintiffs.

EPTL § 5-4.1 provides in pertinent part as follows:

Action by personal representative for wrongful act, neglect or default causing death
of decedent
1. The personal representative, duly appointed in this state or any other
jurisdiction, of a decedent who is survived by distributees may maintain an action to
recover damages for a wrongful act, neglect or default which caused the decedent's
death against a person who would have been liable to the decedent by reason of such
wrongful conduct if death had not ensued.

"[T]he statutory requirement of a duly appointed administrator is in the nature of a condition

precedent to the right to bring the suit." (*Carrick v Central Gen. Hasp.,* 51 NY2d 242, 250 [1980])

In opposition to defendants' motion, plaintiffs argue that Mr. Ramlow has been duly

appointed as administrator of the decedent's estate, in accordance with the Letters of Administration

issued by the Surrogate's Court. Further, while it is within the Court's power to dismiss this action,

pursuant to CPLR §205 plaintiffs would be entitled to immediately re-file their complaint following

such a dismissal.

CPLR §205 provides in pertinent part as follows:

(a) New action by plaintiff. If an action is timely commenced and is terminated in any
other manner than by a voluntary discontinuance, a failure to obtain personal
jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute
the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies,
and the cause of action survives, his or her executor or administrator, may commence
a new action upon the same transaction or occurrence or series of transactions or
occurrences within six months after the termination provided that the new action

-2-

would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

In this instance, the decedent who died on November 11, 2017, executed a Last Will and Testament naming plaintiff, William Ramlow, as Executor. On May 15, 2018, Mr. Ramlow executed a Petition for Probate and Letters Testamentary which specifically states that decedent was a resident of Sapphire Nursing Home and that the proposed Executor wishes to have the estate join in a class action law suit against said institution. The complaint was filed more than two months later on July 31, 2018 and Letters were issued on September 18, 2018.

Therefore, in the interests of judicial economy, the complaint shall not be dismissed as Mr. Ramlow is now duly appointed as administrator of the Estate of Adeline Ramlow, and plaintiffs would be permitted to re-file the complaint in the event of a dismissal, pursuant to CPLR 205 (*see Carrick v Central Gen. Hasp., supra*, 51 NY2d at 251-52, "It has been held ... that a dismissal arising from the failure of a condition precedent to the right to bring suit is not a final judgment upon the merits for purposes of CPLR 205").

Defendants also argue that the complaint should be dismissed pursuant to CPLR §3013. Defendants allege that plaintiffs failed to sufficiently state a claim for violation of Public Health Law§2801-d.

CPLR §3013 provides: "Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense." "The pleadings are the formal statements by the parties of the material facts which constitute their respective claims and defenses" (84 N.Y. Jur 2d, Pleading §1). Notably, "[p]arties must generally be granted wide

-3-

latitude in framing their pleadings so as to raise and have determined every question affecting their interest in the subject matter of the litigation" (84 N.Y. Jur 2d, Pleading §1). "As long as the pleading may be said to [give notice to the other side], in whatever terminology it chooses, this [pleading requirement dictated by CPLR 3013] is satisfied." (Patrick M. Connors, 2013 Practice Commentaries, McKinney's Cons Laws of NY, CPLR C3013:2) "The test is entirely sui generis." (*Id.*) Indeed, one of the very reasons the CPLR was adopted was "to make pleadings less rigid." (Siegel, N.Y. Prac § 208, [6th ed Dec. 2018 Update])

Here, plaintiffs have filed a 21-page Complaint consisting of 84 paragraphs alleging defendants' violations of state and federal statutes that mandate minimum staffing requirements which were not met, resulting in injury to the plaintiffs. Plaintiffs specifically set forth instances where plaintiffs and residents of the nursing home would ask for help with going to the bathroom but, because of insufficient staffing, would receive no assistance for hours. Plaintiffs also attached as an exhibit to the complaint the NYS Department of Health Report of a survey completed on January 29, 2018 which specifically notes that the facility did not ensure that sufficient nursing staff were available to provide the services necessary to attain the highest practicable physical, mental and psychological well-being of the residents. The report identified several incidents in which the shortage of nurses and aides led to medication delays and problems with hygiene, incontinence care and proper nutrition. The allegations alleging a violation of Public Health Law §2801-d are sufficiently pleaded.

Rather than submit opposition papers to their dismissal motion, defendants file a separate motion to strike plaintiffs' class action allegations and to sever the claims into individual actions.

-4-

Pursuant to CPLR §902, a motion to determine whether a class action may be maintained is to be made within 60 days after the time to serve the responsive pleading has expired. In light of the pending motions, defendants' time to serve their responsive pleading has not expired. Accordingly, the 60 day period in which plaintiffs have to move for class action certification has not yet begun. Normally, a decision on the propriety of certifying a class follows a motion and hearing under CPLR §902 (*see Bernstein v Kelso & Co.*, 231 AD2d 314 [1st Dept 1997] [Dismissal of class action allegations prior to service of an answer and pre-certification discovery premature]). However, courts have also held that "a motion to dismiss may be made before a motion to determine the propriety of the class and a hearing under CPLR §902 where it appears conclusively from the complaint and from affidavits that, as a matter of law, there was no basis for class action relief"]) [internal quotation marks omitted]). The requirements for class certification, as set forth in CPLR §901, are:

"a. One or more members of a class may sue or be sued as representative parties on behalf of all if:

"1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

"2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

"3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"4. the representative parties will fairly and adequately protect the interest of the class; and

"5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

These requirements are otherwise known, respectively, as numericity, commonality, typicality, adequacy of representation, and superiority. While the issue is not decided herein, the Court notes that the "prerequisites" for declaring a class action are, at least, arguably present under

-5-

the circumstances.

The proposed class encompasses "[a]ll persons who reside, or resided, at the Facility from September 1, 2017 to the present." (Complaint at ¶52) Defendants have not disputed that allegation that the Facility has approximately 120 beds and is operating at least a 90% occupancy rate, making joinder of resident impracticable. Plaintiffs' claim regarding defendants' violation of DOH rules affecting residents predominate over individual questions. The claims of plaintiffs are typical of the claims of the class and plaintiffs can fairly and adequately protect the interest of the class. Finally, at this early stage of the proceeding, it appears that a class action will be superior to other available methods for the fair and efficient adjudication of the controversy.

Accordingly, it is hereby

**ORDERED** that defendants' motions are denied; and it is further

**ORDERED** that the defendants shall serve their answer within thirty (30 ) days from the date this Decision and Order is uploaded to NYSCEF; and it is further

**ORDERED** parties shall appear for a preliminary conference on March 20,  2019 at 9:00 a.m.

This order shall constitute the decision of this Court.

Dated: February 11, 2019          ENTER
       Goshen, New York

HON. SANDRA B. SCIORTINO, J.S.C.

TO: *Counsel of Record via NYSCEF*

-6-

# Exhibit D

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 82 of 134 PageID #: 722

To commence the statutory time
for appeals as of right (CPLR 5513 [a]),
you are advised to serve a copy of this
order, with notice of entry, upon all parties.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
--------------------------------------------------------------------------X
**WILLIAM JENACK, as Attorney-in-Fact for MARY
RICE and WILLIAM RAMLOW, as Administrator of the
Estate of ADELINE RAMLOW, individually and on behalf
of all others similarly situated,**

                       Plaintiffs,

    -against-

**GOSHEN OPERATIONS LLC d/b/a SAPPHIRE
NURSING AND REHAB AT GOSHEN, RICHARD
PLATSCHEK, ESTHER FARKOVITS, MACHLA
AMRAMCZYK and ROBERT SHUCK,**

                     Defendants.
--------------------------------------------------------------------------X
**SCIORTINO, J.**

**DECISION AND ORDER
INDEX NO.:  EF008129-2018
Motion Date:  08/15/2019
Sequence No.  4**

      The following papers numbered 1 to 30 were read on this motion by plaintiffs for an order

(a) certifying this action as a class action and defining the class; (b) appointing plaintiffs William

Jenack and William Ramlow as the class representatives; (c) directing defendants to provide

plaintiffs with a class list; and (d) appointing plaintiff counsel as counsel for the class:

PAPERS                                                 NUMBERED

Notice of Motion / Affirmation (Frei-Pearson) / Exhibits A - F /
      Memorandum of Law / Witness Affidavits (13)           1 - 22
Affirmation in Opposition (Albani) / Exhibits A - D             23 - 27
Reply Affirmation (Frei-Pearson) / Exhibit 1 / Memorandum of Law    28 - 30[1]

---

    [1]Plaintiffs additionally filed four witness affidavits on August 20, 2019, after the return date of
the motion. While the affidavits were included with the working copy of plaintiff's reply which was
submitted to the Court on or about August 14, 2019, they were not served on opposing counsel until they
were electronically filed on August 20. The affidavits have not been considered.

Case 1:19-cv-03541-FB-JRC  Document 36-5  Filed 11/04/19  Page 83 of 134 PageID #: 723

Upon the foregoing papers, the motion is granted.

Plaintiffs bring this putative class action alleging that defendants provided unsafe and inadequate care in a nursing home facility in violation of Public Health Law § 2801-d. By Decision and Order dated February 11, 2019, defendants' motions for an order dismissing the complaint (Seq. #1) and for an order striking the pleadings of class certification and severing the claims of the individual plaintiffs (Seq. #2) were denied. By Decision and Order dated August 21, 2019, plaintiffs' motion for an order directing the entry of plaintiffs' Proposed ESI Discovery and Production Protocol (ESI protocol) and plaintiffs' Proposed Order for the Production and Exchange of Confidential and Protected Health Information (PHI order) was granted. The PHI order and ESI protocol both were so ordered that date.

By Notice of Motion filed on May 13, 2019, plaintiffs seek an order *inter alia* certifying this action as a class action. Plaintiffs assert that the proposed class satisfies the statutory requirements set forth in Civil Practice Law and Rules section 901. Plaintiffs further contend that the factors the Court must consider pursuant to Civil Practice Law and Rules section 902 weigh in favor of class certification. Defendants oppose the motion, asserting that plaintiffs have submitted insufficient evidence to meet the standards for class certification.

With the exception stated in Note 1, *supra*, the Court has fully considered the submissions of the parties.

### Legal Standards

Civil Practice Law and Rules section 901(a) provides five prerequisites to certification of a class action:

1.    The class is so numerous that joinder of all members... is impracticable;

2

2.  There are questions of law or fact common to the class which predominate over any questions affecting only individual members;

3.  The claims or defenses of the representative parties are typical of the claims or defenses of the class;

4.  The representative parties will fairly and adequately protect the interests of the class; and

5.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Section 901(b) provides that "unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action." Plaintiffs bring the instant action pursuant to Public Health Law section 2801-d, which sets a minimum measure of recovery. Section 2801-d(4) specifically authorizes damages recoverable pursuant to that section to be recovered in a class action.

An action may be maintained as a class action only if the prerequisites set by section 901 have been satisfied. If the Court so finds, it must then proceed to consider the discretionary factors listed in section 902:

1.  The interest of members of the class in individually controlling the prosecution or defense of separate actions;

2.  The impracticability or inefficiency of prosecuting or defending separate actions;

3.  The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

4.  The desirability or undesirability of concentrating the litigation of the claim in the particular forum;

5.  The difficulties likely to be encountered in the management of a class action.

"Whether a lawsuit qualifies as a class action matter is a determination made upon a review of the statutory criteria as applied to the facts presented; it ordinarily rests within the sound discretion of the trial court" (*Small v. Lorillard Tobacco Co.*, 94 NY2d 43, 52 [1999]). The requirements of Civil Practice Law and Rules Article 9 are to be liberally construed in favor of the granting of class

3

INDEX NO. EF008129-2018
RECEIVED NYSCEF: 09/17/2019

certification (*Globe Surgical Supply v. GEICO Ins. Co.*, 29 AD3d 129 [2d Dept 2008]). The Court's inquiry into the merits "is limited to a determination as to whether on the surface there appears to be a cause of action which is not a sham" (*Super Glue Corp. v. Avis Rent A Car Sys.*, 132 AD2d 604, 607 [2d Dept 1987]).

### Discussion

<u>Section 901 Prerequisites</u>

The Court finds that the statutory prerequisites for certification of the class are met in this matter. It is undisputed that defendants' facility consists of approximately 120 beds and operates at 90 percent occupancy or more. Joinder of all persons who were residents of the facility during the applicable period is impracticable. The proposed class exceeds the numerosity threshold contemplated by the legislature and recognized by courts (*Borden v. 400 E. 55th St. Assoc., L.P.*, 24 NY3d 382 [2014]).

Plaintiffs in their moving papers presented affidavits of numerous witnesses attesting to the harms suffered by residents due to the alleged understaffing of the facility. Plaintiffs' claims relating to violations of the Public Health Law and Deapartment of Health regulations predominate in this matter. "It is predominance, not identity or unanimity, that is the linchpin of commonality" (*City of New York v. Maul*, 14 NY3d 499, 514 [2010]). "The fact that questions peculiar to each individual may remain after resolution of the common questions is not fatal to the class action" (*Friar v. Vanguard Holding Corp.*, 78 AD2d 83, 98 [2d Dept 1980]).

The claims of the named plaintiffs and proposed class representatives are typical of the claims of the class. Plaintiffs' claims arise "from the same practice or course of conduct that [gives] rise to the remaining claims of other class members and [are] based upon the same legal theory"

4

(*Friar*, 78 AD2d at 99). "It is not necessary that the claims of the named plaintiff[s] be identical to those of the class" (*Super Glue Corp.*, 132 AD2d at 607).

Plaintiffs and their counsel will fairly and adequately protect the interests of the class. Nothing in the papers before the Court suggests that the interests of the named plaintiffs may be adverse to those of the remaining members of the class. Defendants question plaintiffs' motive, asserting that plaintiffs have outstanding bills at the facility. Defendants cite no authority for the proposition that this creates a conflict of interest. The Court's research revealed no such authority. Further, plaintiff counsel has prosecuted numerous class actions, including matters alleging violations of Public Health Law section 2801-d.

A class action is superior to other available methods. "The very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" (*Globe Surgical Supply*, 59 AD3d at146, *quoting Amchem Prods., Inc. V. Windsor*, 521 US 591, 617 [1997]). The applicable statute fixes a plaintiff's damages at 25 percent of the daily per patient Medicaid reimbursement rate. There is little or no incentive for members of the class to bring individual actions.

The discretionary factors set forth in Civil Practice Law and Rules section 902 weigh heavily in favor of class certification. As the Third Department observed in a Public Health law section 2801-d action:

> Presumably, aged and infirm nursing home residents are not interested in individually controlling the prosecution of the action, prosecuting separate actions would be inefficient and impractical, no other litigation concerning this controversy is currently in progress, it is desirable to concentrate the litigation in the county where the facility is located, and there are no apparent difficulties in managing this class.

(*Fleming v. Barnwell Nursing Home & Health Facilities*, 309 AD2d 1132, 1134 [3d Dept 2003]).

5

The statutory prerequisites set forth in Civil Practice Law and Rules section 901 are met in this matter, and the discretionary factors set forth in section 902 weigh in favor of certification of the class. Defendants' opposition to the instant motion essentially asks the Court to conduct a thorough investigation of the merits of plaintiffs' claims. However, such is not the Court's function on a motion for class certification. Plaintiffs papers are sufficient to satisfy the Court that "on the surface there appears to be a cause of action which is not a sham" (*Super Glue Corp.*, 132 AD2d at 607).

Accordingly, it is hereby ORDERED that plaintiffs motion is in all respects granted; and it is further

ORDERED that the following class is hereby certified pursuant to Civil Practice Law and Rules Article 9: all persons who reside, or resided, at the subject facility from September 1, 2017 through the present; and it is further

ORDERED that defendants shall provide plaintiffs with a class list within 15 days of the entry of this Decision and Order, including mailing addresses, telephone numbers, and e-mail address where available, to permit plaintiffs to provide the necessary notice to members of the class; and it is further

ORDERED that the firm of Finkelstein, Blankinship, Frei-Pearson and Garber, LLP is appointed Class Counsel.

The parties shall appear for conference on September 30, 2019 at 10:00 a.m.

The foregoing constitutes the Decision and Order of the Court.

Dated: September 10, 2019
      Goshen, New York

ENTER:

HON. SANDRA B. SCIORTINO, J.S.C.

6

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 88 of 134 PageID #: 728

TO:   Counsel of Record
      <u>VIA NYSCEF</u>

**7**

# Exhibit E



# Public Health and Health Planning Council

## Project # 131092 E
### Shorefront Operating, LLC d/b/a Waterfront Rehabilitation and Health Care Center

*County:* **Kings County**
*Purpose:* **Establishment**

*Program:* **Residential Health Care Facility**
*Acknowledged:* **March 1, 2013**

## Executive Summary

### Description

Shorefront Operating, LLC, an existing limited liability company, is seeking approval to become the new operator of Shorefront Jewish Geriatric Center, a 360-bed not-for-profit residential health care facility (RHCF) with an offsite adult day health care program (ADHCP) located in Brooklyn.  The RHCF is to be renamed Waterfront Rehabilitation and Health Care Center.  The ADHCP is not being transferred to the applicant.  The current operator is considering closure of that program.

The executed asset purchase agreement is between Shorefront Jewish Geriatric Center, Inc. and Shorefront Operating, LLC. The operation is being purchased for $18,000,000. Ownership of the operation before and after the requested change is as follows:

Current
Shorefront Jewish Geriatric Center, Inc., not-for-profit corporation

Proposed
Shorefront Operating, LLC

| Name | % Ownership |
|---|---|
| Leah Friedman | 10.0% |
| Rochel David | 10.0% |
| David Rubinstein | 10.0% |
| Avi Philipson | 10.0% |
| Esther Farkovits | 10.0% |
| Deena Hersh | 10.0% |
| Joel Zupnick | 25.0% |
| Shaindy Berko | 10.0% |
| Berish Rubinstein | 2.5% |
| Bruchy Singer | 2.5% |

The executed real estate purchase agreement is between Shorefront Jewish Geriatric Center, Inc. and Shorefront Realty, LLC.  The real property is being purchased for $32,000,000.  Ownership of the real property before and after the requested change is as follows:

Current
Shorefront Jewish Geriatric Center, Inc., not-for-profit corporation.

Proposed
Shorefront Realty, LLC

| Name | % Ownership |
|---|---|
| Leah Friedman | 10.0% |
| Rochel David | 10.0% |
| David Rubinstein | 10.0% |
| Benjamin Landa | 20.0% |
| Philipson Family, LLC | 10.0% |
| Cheskel Berkowitz | 25.0% |
| Schlesinger Family Trust | 10.0% |
| Berish Rubinstein | 2.5% |
| Brucha Singer | 2.5% |

Esther Farkovits and Berish Rubenstein presently have ownership interests in the following Nursing Homes: Nassau Extended Care Facility, a 280-bed RHCF, located in Hempstead, New York; Park Avenue Extended Care Facility, a 240- bed RHCF, located in Long Beach, New York; Throgs Neck Extended Care Facility, a 205-bed RHCF, located in the Bronx; and Townhouse Extended Care Center, a 280-bed RHCF, located in Uniondale, New York.

Esther Farkovits also presently has ownership interest in Little Neck Care Center, a 120-bed RHCF, located in Little Neck, New York.

Berish Rubenstein also presently has ownership interest in Bay Park Center for Nursing and Rehab, a 480-bed RHCF, located in Bronx, New York.

**DOH Recommendation**
Contingent Approval

**Need Summary**
Shorefront Jewish Geriatric Center's utilization was 97.63% in 2011, which exceeds that for both Kings County and the New York City region.  The change in ownership will result in a name change, to Waterfront Rehabilitation and Health Care Center, upon project approval. There will be no change in beds or services.

**Program Summary**
No negative information has been received concerning the character and competence of the proposed applicants identified as new members.

No changes in the program or physical environment are proposed in this application.  No administrative services or consulting agreements are proposed in this application.

**Financial Summary**
The purchase price for the operation is $18,000,000 and the real estate purchase price is $32,000,000. The applicant will provide equity of $5,000,000 and a bank loan of $45,000,000.

Budget:
| | |
|---|---|
| Revenues | $44,153,000 |
| Expenses | 43,130,800 |
| Net Income | $ 1,022,200 |

Subject to the noted contingencies, it appears that the applicant has demonstrated the capability to proceed in a financially feasible manner; and contingent approval is recommended.

# Recommendations

**Health Systems Agency**
There will be no HSA recommendation of this application.

**Office of Health Systems Management**
Approval contingent upon:
1. Submission of a commitment signed by the applicant which indicates that, within two years from the date of the council approval, the percentage of all admissions who are Medicaid and Medicare/Medicaid eligible at the time of admission will be at least 75 percent of the planning area average of all Medicaid and Medicare/Medicaid admissions, subject to possible adjustment based on factors such as the number of Medicaid patient days, the facility's case mix, the length of time before private paying patients became Medicaid eligible, and the financial impact on the facility due to an increase in Medicaid admissions. [RNR]
2. Submission of a plan to continue to enhance access to Medicaid residents. At a minimum, the plan should include, but not necessarily limited to, ways in which the facility will:
    - Reach out to hospital discharge planners to make them aware of the facility's Medicaid Access Program.
    - ommunicate with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility.
    - Identify community resources that serve the low-income and frail elderly population who may eventually use the nursing facility, and inform them about the facility's Medicaid Access policy.
    - Submit an annual report for two years to the DOH, which demonstrates substantial progress with the implementation of the plan. The plan should include but not be limited to:
        o Infomation on activities relating to a-c above; and
        o Documentation pertaining to the number of referrals and the number of Medicaid admissions; and
        o Other factors as determined by the applicant to be pertinent.
    The DOH reserves the right to require continued reporting beyond the two year period.  [RNR]
3. Submission of a programmatically acceptable name for the facility.  [LTC]
4. Submission of a photocopy of the applicant's executed Second Amendment to Amended and Restated Operating Agreement, acceptable to the Department.  [CSL]
5. Submission of an original affidavit from the applicant, acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to the article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility.  [BFA]
6. Submission of an executed loan commitment for not more than 50% of the applicable working capital, acceptable to the Department.  [BFA]
7. Submission of an executed promissory note, acceptable to the Department.  [BFA]
8. Submission of a commitment, acceptable to the Department, for a permanent mortgage from a recognized lending institution at a prevailing rate of interest.  Included with the submitted permanent mortgage commitment, must be a sources and uses statement and debt amortization schedule, for both new and refinanced debt.  [BFA]

Approval conditional upon:
1. The project must be completed within two years from the Public Health and Health Planning Council recommendation letter.  Failure to complete the project with in the prescribed time shall constitute an abandonment of the application by the applicant and an expiration of the approval.  [PMU]
2. Certification of the CMS mandated sprinkler system by the Metropolitan Area Regional Office.  [LTC]

**Council Action Date**
**February 13, 2014**

## Need Analysis

**Background**

Shorefront Operating, LLC seeks approval to enter into an asset purchase agreement with Shorefront Jewish Geriatric Center, a 360-bed residential health care facility located at 3015 West 29th Street, Brooklyn, 11224, in Kings County. The new owners also propose to change the name to Waterfront Rehabilitation and Health Care Center.

**Analysis**

Shorefront's utilization was higher than Kings County and the New York City region for 2009, 2010, and 2011, as shown in Table 1:

*Table 1: Shorefront Center for Rehabilitation and Nursing Care /Kings County/ NYC Region Occupancy*

| Facility/County/Region | 2009 | 2010 | 2011 |
|---|---|---|---|
| Shorefront  Jewish Geriatric Center | 97.92% | 98.05% | 97.63% |
| Kings County | 93.68% | 93.55% | 94.64% |
| NYC region | 95.01% | 94.88% | 94.76% |

There is currently an unmet need of 7,649 beds in the New York City region, but RHCF bed occupancy for the five boroughs remains below the 97 percent planning optimum.  However, occupancy at Shorefront has consistently been above 97 percent.

*Table 2: RHCF Need – NYC*

| | |
|---|---|
| **2016 Projected Need** | 51,071 |
| **Current Beds** | 43,343 |
| **Beds Under Construction** | 79 |
| **Total Resources** | 43,422 |
| **Unmet Need** | 7,649 |

**Access**

Regulations indicate that the Medicaid patient admissions standard shall be 75% of the annual percentage of all Medicaid admissions for the long term care planning area in which the applicant facility is located. Such planning area percentage shall not include residential health care facilities that have an average length of stay of 30 days or fewer. If there are four or fewer residential health care facilities in the planning area, the applicable standard for a planning area shall be 75% of the planning area percentage of Medicaid admissions, or 75 percent of the Health Systems Agency area Medicaid admissions percentage whichever is less. In calculating such percentages, the Department will use the most current data which have been received and analyzed by the Department.  An applicant will be required to make appropriate adjustments in its admission polices and practices so that the proportion of its own annual Medicaid patients admissions is at least 75% of the planning area percentage or Health Systems Agency percentage, whichever is applicable.

Shorefront Jewish Geriatric Center was below the 75 percent planning average for 2009 and 2010. The facility reported Medicaid admissions of 6.82 percent and 14.30 percent in 2009 and 2010, respectively. The 75 percent planning averages for Kings County for these years were 14.97 percent (2009) and 27.7 percent (2010).

**Conclusion**

Shorefront's occupancy rate of 97.63% indicates that approval of this application will help maintain a needed resource for the Brooklyn community.

**Recommendation**
**From a need perspective, contingent approval is recommended.**

# Programmatic Analysis

**Background**

|  | Existing | Proposed |
|---|---|---|
| Facility Name | Shorefront Jewish Geriatric Center | Seagate Rehabilitation and Health Care Center |
| Address | 3015 West 29th Street Brooklyn, NY. 11224 | Same |
| RHCF Capacity | 360 | Same |
| ADHC Program Capacity | N/A | Same |
| Class of Operator | Not-For-Profit Corporation | Limited Liability Company |
| Operator | Shorefront Jewish Geriatric Center, Inc. | Shorefront Operating, LLC<br><br>Managing Members:<br>Joel Zupnick          25.0%<br>Esther Farkovits     10.0%<br>Avi Philipson        10.0%<br><br>Members<br>Leah Friedman        10.0%<br>Rochel David         10.0%<br>David Rubinstein     10.0%<br>Deena Hersh          10.0%<br>Shaindy Berko        10.0%<br>Berish Rubinstein     2.5%<br>Brucha Singer         2.5% |

**Character and Competence – Background**

Facilities Reviewed

Nursing Homes

| North Westchester Restorative Therapy and Nursing Center | 12/2010 to 09/2011 |
|---|---|
| Bay Park Center for Nursing and Rehabilitation | 05/2007 to present |
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |

Licensed Home Care Services Agency (LHCSA)

| Pella Care, LLC | 01/2005 to present |
|---|---|
| Parent Care Home Care, LLC | 01/2005 to present |

Individual Background Review

Joel Zupnick is employed as the vice president of HHCNY, Inc., a healthcare staffing agency, and as the vice president of Specialty Rx, Inc., a pharmaceutical company. Mr. Zupnick also serves as the chief financial officer for Pella Care, LLC, a licensed home care services agency.  He discloses the following health facility ownership interests:

| North Westchester Restorative Therapy and Nursing Center | 12/2010 to 09/2011 |
|---|---|
| Pella Care, LLC  (LHCSA) | 01/2005 to present |

Esther Farkovits is currently unemployed.  She was previously a yoga instructor at the Lucille Roberts gym from February 2005 to October 2006.  Ms. Farkovits discloses the following ownership interests in health facilities:

| | |
|---|---|
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |

Avi Philipson is currently unemployed and discloses no employment history.  Avi Philipson discloses no ownership interests in health facilities.

Leah Friedman is employed in human resources at Confidence Management Systems, a housekeeping services company, located in Linden, New Jersey.  Ms. Friedman discloses no ownership interests in health facilities.

Rochel David is employed in human resources at Confidence Management Systems, a housekeeping services company, located in Linden, New Jersey.  Ms. David discloses no ownership interests in health facilities.

David Rubinstein lists his current employment as the administrator of Garden State Health Care Administrators, an insurance company based in Brooklyn, New York and as the owner/operator of United Health Administrators, an insurance company also based in Brooklyn, New York.  Mr. Rubinstein discloses no ownership interests in health facilities.

Deena Hersh is currently unemployed and discloses no employment history.  She discloses no ownership interests in health facilities.

Shaindy Berko is currently unemployed.  She was previously an eighth grade teacher at the United Talmudical Academy of Boro Park from 2010 to 2011.  Ms. Berko discloses no ownership interests in health facilities.

Berish Rubinstein lists his current employment as the Director of Human Resources at Prompt Nursing Employment, an employment agency located in Woodmere, New York.  Berish Rubinstein discloses the following health facility ownership interest:

| | |
|---|---|
| Bay Park Center for Nursing and Rehabilitation | 05/2007 to present |

Brucha Singer lists her current employment as bookkeeper and accountant at County Agency of New York, Inc., a professional employer organization located in Brooklyn, New York.  She is also employed in clerical duties at the Southside Agency, a staffing agency also located in Brooklyn, New York.  Brucha Singer discloses the following ownership interest:

| | |
|---|---|
| Parent Care Home Care LLC | 01/2005 to present |

## Character and Competence - Analysis
No negative information has been received concerning the character and competence of the applicants.

A review of the Bay Park Center for Nursing and Rehabilitation for the period identified above revealed the following:

- The facility was fined $4,000 pursuant to a Stipulation and Order issued March 2, 2011 for surveillance findings on December 18, 2009. Deficiencies were found under 10 NYCRR 415.12 -Quality of Care: Highest Practicable Potential and 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition Status.
- The facility was fined $18,000 pursuant to a Stipulation and Order issued May 30, 2012 for surveillance findings on February 16, 2011.  Deficiencies were found under 10 NYCRR 415.4(b)(1)(i) – Definition Free From Abuse; 10 NYCRR 415.4(b) – Development of Abuse

Policies; 10 NYCRR 415.12(h)(2) – Quality of Care: Accidents; 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition; and 10 NYCRR 415.26(c)(1)(iv) – Nurse Aide Competency.

It was determined by the Department of Health Nursing Home Surveillance staff that the citations under 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition, on the above stipulation and orders were not identical violations and were adequately resolved with the facility's plan of correction.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the time period identified above results in a conclusion of substantially consistent high level of care since there were no repeat enforcements.

A review of the North Westchester Restorative Therapy and Nursing Center, Little Neck Care Center, Nassau Extended Care Facility, Park Avenue Extended Care Facility, Throgs Neck Extended Care Facility, and the Townhouse Extended Care Facility for the time period identified above reveals that a substantially consistent high level of care has been provided since there were no enforcements.

A review of the licensed home care services agencies Pella Care, LLC and Parent Care Home Care, LLC for the time periods identified above reveals that a substantially consistent high level of care has been provided since there were no enforcements.

**Project Review**
No changes in the program or physical environment are proposed in this application.  Shorefront Jewish Geriatric Center submitted a Certificate of Need in January 2011 to renovate and refurbish its nursing units along with the installation of a sprinkler system mandated by the Centers for Medicare and Medicaid Services (CMS).  The project was approved by the Public Health and Health Planning Council in December 2011.  Prior to the proposed change of ownership of the facility, the operating board determined it would not proceed and formally withdrew the project in August 2013. A separate notice of construction was submitted to the Department to complete the CMS mandated sprinkler system.  It is recommended that the applicant should consider the need to renovate and refurbish areas of the nursing unit to create a more homelike environment that recognizes the characteristics of the nursing home residents.

As mentioned above, the facility has installed a sprinkler system in accordance to the CMS 2013 sprinkler mandate.  However, the Department of Health's surveillance unit will need to ensure that the installation of the sprinkler system has met CMS requirements.

**Conclusion**
No negative information has been received concerning the character and competence of the proposed applicants identified as new members.

No changes in the program or physical environment are proposed in this application.  No consulting or administrative services agreements are proposed in this application.

**Recommendation:**
**From a programmatic perspective, contingent approval is recommended.**

# Financial Analysis

## Asset Purchase Agreement

The change in operational ownership will be effectuated in accordance with an executed asset purchase agreement, the terms of which are summarized below:

| | |
|---|---|
| Date: | September 24, 2012 |
| Seller: | Shorefront Jewish Geriatric Center, Inc. |
| Buyer: | Shorefront Operating, LLC |
| Assets Transferred: | The business and operation of the facility; the lease; furniture, fixtures and equipment; inventory and supplies; assignable contracts, licenses and permits; resident funds; security deposits and prepayments; menus, policies and procedure manuals, phone numbers, financial books and records; resident and employee records; Medicare and Medicaid provider numbers. |
| Excluded Assets: | Personal property; marketable securities; retroactive rate increases; appeal proceeds relating to periods prior to closing. |
| Assumed Liabilities: | Those relating to transferred assets. |
| Purchase Price: | $18,000,000 with a $2,000,000 down payment upon execution of agreement with the remainder at closing. |

The applicant, as a contingency of approval, must provide an original affidavit, which is acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to Article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility. Currently, there are no outstanding Medicaid overpayment liabilities relating to HCRA surcharges and obligations.

## Lease Agreement

Facility occupancy is subject to an executed lease agreement, the terms of which follow:

| | |
|---|---|
| Date: | February 19, 2013 |
| Lessor: | Shorefront Realty, LLC |
| Lessee: | Shorefront Operating, LLC |
| Term: | 35 years with one renewal term of 10 years |
| Rental: | Annual rent equal to debt service on lessee's mortgage plus $2,450,000 per year supplemental rent to increase to $2,695,000 on fifth anniversary date of lease and increase 2% each year after. |
| Other: | Lessee pays insurance, taxes, maintenance and utilities |

## Operating Budget

Following is a summary of the submitted operating budget for the RHCF, presented in 2013 dollars, for the first year subsequent to change in ownership:

| | Total |
|---|---|
| Revenues: | |
| Medicaid | $28,128,000 |
| Medicare | 12,650,000 |
| Private Pay/Other | 3,375,000 |
| Total Revenues | $44,153,000 |
| | |
| Expenses: | |
| Operating | $38,496,000 |
| Capital | 4,634,800 |
| Total Expenses | $43,130,800 |

| Net Income | $ 1,022,200 |
|---|---|

| Utilization (patient days) | 128,000 |
|---|---|
| Occupancy | 97.4% |

The following is noted with respect to the submitted RHCF operating budget:
- The capital component of the Medicaid rate is based on the return of, and return on, equity reimbursement methodology.
- Expenses include lease rental.
- Medicaid rates are based on 2013 Medicaid pricing rates with no trend.
- Medicare and private pay revenues are based on current payment rates.
- Breakeven occupancy is projected at 95.2%.
- Utilization by payor source is expected as follows:

| Medicaid | 75.0% |
|---|---|
| Medicare | 18.0% |
| Private Pay | 7.0% |

**Capability and Feasibility**
The applicant will satisfy the purchase price of $18,000,000 for the operation and $32,000,000 for the reality from a $45,000,000 bank loan at 4% over 30 years with the remaining $5,000,000 in members' equity.  A letter of interest has been submitted from Greystone on behalf of the applicant.  A draft promissory note has been submitted by the applicant, whereas Shorefront Operating, LLC promises to pay Shorefront Realty, LLC $16,000,000 at 4% interest over twenty years.

Working capital requirements are estimated at $7,188,467, based on two months of the first year expenses, of which $3,594,234 will be satisfied from the proposed members' net worth and the remaining $3,594,233 from a bank loan (5 year term at 6%).  A letter of interest has been supplied by Greystone for the working capital loan.  An affidavit from each applicant member, which states that he or she is willing to contribute resources disproportionate to ownership percentages, has been provided by the proposed members.  BFA Attachment A is the net worth of proposed members.

The submitted budget indicates that a net income of $1,022,200 would be maintained during the first year following change in ownership.  Staff has noted that the 2012 historical costs contain additional expenses of $401,000 due to Hurricane Sandy and legal fees associated with the sale of Shorefront.  It should also be noted that the first year budget does not reflect the current operator's administrative overhead paid to the parent company, Metropolitan Jewish Health System. The first year budget is more reflective of 2011 overall utilization with a conservative approach to increased Medicaid patients. The budget appears reasonable.

Staff notes that with the expected 2014 implementation of managed care for nursing home residents, Medicaid reimbursement is expected to change from a state-wide price with a cost-based capital component payment methodology to a negotiated reimbursement methodology.  Facility payments will be the result of negotiations between the managed long term care plans and the facility.   At this point in time, it cannot be determined what financial impact this change in reimbursement methodology will have on this project.

BFA Attachment B presents the pro-forma balance sheet of Shorefront Operating, LLC.  As shown, the facility will initiate operation with $5,063,000 members' equity.   It is noted that assets include $16,500,000 in goodwill, which is not an available liquid resource, nor is it recognized for Medicaid reimbursement purposes.  Thus, members' equity would be negative $11,437,000.

Review of BFA Attachment C, financial summary of Shorefront Geriatric Center, indicates that the facility has maintained positive working capital and equity positions and has generated an average net loss of $141,813 for the period shown.  The facility has experienced an average occupancy of 97.87% for the period shown.

Review of BFA Attachment D, financial summary of affiliated RHCFs, indicates the following facilities had operational losses in 2011 and/or 2012.  Bay Park Center had a 2011 net operational loss due to the implementation of the new reimbursement methodology not accounted for by management.  Little Neck Care Center had a 2011 and 2012 net operational loss due to costs associated with closing on the purchase of the facility from the prior owner.  The facility has steadily improved operations since the new owners have improved census.  Park Avenue Facility had a 2011 net operational loss due to a retroactive rate reduction in their adult day care.  Throgs Neck had a 2011 net operational loss due to additional expenses for third party loans.  Townhouse Extended care had 2012 and 2011 net operational losses due to a reserve for potential uncollectible accounts receivables.

Based on the preceding, and subject to the noted contingencies, it appears that the applicant has demonstrated the capability to proceed in a financially feasible manner, and approval is recommended.

**Recommendation**
**From a financial perspective, contingent approval is recommended.**

| Attachments |
|:---:|

| | |
|---|---|
| BFA Attachment A | Net Worth of Proposed Members |
| BFA Attachment B | Pro-forma Balance Sheet, , LLC |
| BFA Attachment C | Financial Summary, Shorefront Geriatric Center |
| BFA Attachment D | Financial Summary of affiliated Nursing Homes |

Project #131092
BFA Attachment B

**BALANCE SHEET**
**SHOREFRONT OPERATING LLC**
**PROJECTED**          REVISED 5/22/2013
**OPENING DAY**

### ASSETS

| | |
|---|---|
| CASH | 7,200,000 |
| ACCOUNTS RECEIVABLE | |
| INVENTORIES | 3,000 |
| PREPAID EXP & OTHER | 460,000 |
| **TOTAL CURRENT ASSETS** | 7,663,000 |

| | | |
|---|---|---|
| EQUIPMENT | 1,500,000 | |
| GOODWILL | 16,500,000 | |
| **TOTAL FIXED ASSETS** | **18,000,000** | purchase price |

OTHER ASSETS

**TOTAL ASSETS**          **$25,663,000**

### LIABILITIES

| | | |
|---|---|---|
| CURRENT PORTION LONG TERM DEBT | 533,000 | |
| LOAN PAYABLE | 3,600,000 | |
| ACCRUED & OTHER LIABILITIES | 1,000,000 | payroll & taxes |
| **TOTAL CURRENT LIABILITIES** | **5,133,000** | |

| | | |
|---|---|---|
| TOTAL LONG TERM DEBT | **15,467,000** | 16MILL@4% 240 MOS |
| TOTAL LIABILITIES | **20,600,000** | |
| EQUITY | **5,063,000** | |
| TOTAL LIABILITIES & EQUITY | **$22,063,000** | |

Project #131092
BFA Attachment C

## Financial Summary- Shorefront Jewish Geriatric Center

|  | FISCAL PERIOD ENDED | | |
|---|---|---|---|
|  | Draft | | |
|  | 12/31/12 | 12/31/11 | 12/31/10 |
| ASSETS - CURRENT | $19,403,837 | $22,780,923 | $29,526,059 |
| ASSETS - FIXED AND OTHER | 35,961,033 | 37,231,462 | 39,105,780 |
| LIABILITIES - CURRENT | 13,312,312 | 10,647,189 | 19,985,725 |
| LIABILITIES - LONG-TERM | 18,592,000 | 23,968,094 | 24,263,860 |
| EQUITY | $23,460,558 | $25,397,102 | $24,382,254 |
| INCOME | $52,712,212 | $55,966,992 | $43,987,313 |
| EXPENSE | 54,969,543 | 54,068,121 | 44,063,293 |
| NET INCOME | ($2,257,331) | $1,898,871 | ($75,980) |
| NUMBER OF BEDS | 360 | 360 | 360 |
| PERCENT OF OCCUPANCY (DAYS) | 97.92% | 97.63% | 98.05% |
| PERCENT OCCUPANCY (DAYS): | | | |
| MEDICAID | 71.2% | 71.3% | 73.4% |
| MEDICARE | 11.1% | 11.9% | 10.5% |
| PRIVATE/OTHER | 17.7% | 16.8% | 16.1% |

| MEDICAID RATE BREAKDOWN: | 2013 | 2012 | 2011 |
|---|---|---|---|
| OPERATING | $261.54 | $258.32 | $251.59 |
| CAPITAL | 27.47 | 27.48 | 31.49 |
| TOTAL | $289.01 | $285.80 | $283.08 |

CON# 131092
BFA Attachment D

| **Bay Park Center** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $8,941,861 | $8,736,423 | $9,823,048 |
| Fixed Assets | 5,444,603 | 4,269,078 | 4,735,017 |
| Total Assets | 14,386,464 | 13,005,501 | $14,558,065 |
| Current Liabilities | 10,690,389 | 16,679,330 | 16,236,097 |
| Long Term Liabilities | 5,029,215 | 4,882,957 | 4,630,847 |
| Total Liabilities | $15,719,604 | $21,562,287 | $20,866,944 |
| Working Capital Position | ($1,748,528) | ($7,942,907) | ($6,413,049) |
| Net Assets | ($1,333,140) | ($8,556,786) | ($6,308,879) |
| Operating Revenues | $52,296,270 | $50,844,469 | $55,217,275 |
| Operating Expenses | 49,343,624 | 52,942,376 | 54,392,744 |
| Operating Net Income | $2,952,646 | ($2,097,907) | $824,531 |

| **Little Neck Nursing Home** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | NA | $3,505,124 | NA |
| Fixed Assets | NA | 3,174,800 | NA |
| Total Assets | NA | $6,679,924 | NA |
| Current Liabilities | NA | 3,519,751 | NA |
| Long Term Liabilities | NA | 3,024,231 | NA |
| Total Liabilities | NA | 6,543,982 | NA |
| Working Capital Position | NA | ($14,627) | NA |
| Net Assets | NA | $135,942 | NA |
| Operating Revenues | $11,425,784 | $10,049,249 | NA |
| Operating Expenses | 11,555,310 | 11,317,151 | NA |
| Operating Net Income | ($129,526) | ($1,267,902) | NA |

| **Nassau Extended Care** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $9,182,360 | $7,502,010 | $8,954,923 |
| Fixed Assets | 18,039,496 | 18,559,425 | 17,453,694 |
| Total Assets | $27,221,856 | $26,061,435 | $26,408,617 |
| Current Liabilities | 6,953,687 | 6,007,623 | 6,336,774 |
| Long Term Liabilities | 5,783,758 | 6,521,087 | 6,967,910 |
| Total Liabilities | 12,737,445 | 12,528,710 | 13,304,684 |
| Working Capital Position | $2,228,673 | $1,494,387 | $2,618,149 |
| Net Assets | $14,484,411 | $13,532,725 | $13,103,933 |
| Operating Revenues | $31,357,570 | $31,838,896 | $31,945,892 |
| Operating Expenses | 30,254,684 | 31,410,304 | 31,628,885 |
| Operating Net Income | $1,102,886 | $428,592 | $317,007 |

CON# 131092
BFA Attachment D (Continued)

| **Park Avenue Facility** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $6,534,276 | $6,406,660 | $7,705,175 |
| Fixed Assets | 15,693,338 | 15,232,521 | 14,505,397 |
| Total Assets | $22,227,614 | $21,639,181 | $22,210,572 |
| Current Liabilities | 5,828,963 | 5,098,963 | 5,195,019 |
| Long Term Liabilities | 5,852,462 | 6,570,804 | 6,847,125 |
| Total Liabilities | 11,681,425 | 11,669,767 | 12,042,144 |
| Net Assets | $10,546,189 | $9,969,414 | $10,168,428 |
| Working Capital Position | $705,313 | $1,307,697 | $2,510,156 |
| Operating Revenues | $26,820,883 | $26,172,207 | $25,872,102 |
| Operating Expenses | 25,993,108 | 26,371,221 | 25,861,931 |
| Operating Net Income | $827,775 | ($199,014) | $10,171 |

| **Throgs Neck** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $4,019,543 | $3,694,355 | $3,527,193 |
| Fixed Assets | 10,717,202 | 11,459,630 | 11,273,132 |
| Total Assets | $14,736,745 | $15,153,985 | $14,800,325 |
| Current Liabilities | 5,281,573 | 5,805,286 | 5,182,176 |
| Long Term Liabilities | 4,635,335 | 5,184,522 | 5,507,867 |
| Total Liabilities | 9,916,908 | 10,989,808 | 10,690,043 |
| Net Assets | $4,819,837 | $4,164,177 | $4,110,282 |
| Working Capital Position | ($1,262,030) | ($2,110,931) | ($1,654,983) |
| Operating Revenues | $22,723,772 | $22,083,569 | $22,301,778 |
| Operating Expenses | 21,317,610 | 22,192,071 | 22,166,725 |
| Operating Net Income | $1,406,162 | ($108,502) | $135,053 |

| **Townhouse Extended Care** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $9,305,901 | $7,686,006 | $8,264,226 |
| Fixed Assets | 13,009,041 | 12,938,708 | 12,730,577 |
| Total Assets | $22,314,942 | $20,624,714 | $20,994,803 |
| Current Liabilities | 8,317,288 | 6,310,183 | 6,194,200 |
| Long Term Liabilities | 10,214,720 | 10,236,392 | 10,484,329 |
| Total Liabilities | 18,532,008 | 16,546,575 | 16,678,529 |
| Net Assets | $3,782,934 | $4,078,139 | $4,316,274 |
| Working Capital Position | $988,613 | $1,375,823 | $2,070,026 |
| Operating Revenues | $32,345,384 | $33,597,464 | $33,035,848 |
| Operating Expenses | 32,640,589 | 33,835,599 | 32,739,475 |
| Operating Net Income | ($295,205) | ($238,135) | $296,373 |

# Exhibit F



# Department of Health

# Public Health and Health Planning Council

## Project # 152177-E
## TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center

**Program:** Residential Health Care Facility
**Purpose:** Establishment

**County:** Bronx
**Acknowledged:** September 21, 2015

## Executive Summary

### Description

TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center (The Plaza), a New York limited liability company, requests approval to be established as the new operator of Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, Bronx (JHL, Bronx), a 744-bed Article 28 residential health care facility (RHCF) located at 100 West Kingsbridge Road, Bronx (Bronx County).  The facility currently operates a 100-slot adult day health care program (ADHCP) onsite, which is not part of the proposed sale. JHL, Bronx will transfer the license of the ADHCP to the license of the Jewish Home Lifecare, Manhattan Division (JHL, Manhattan). The ADHCP will remain operational at the current site under an agreement with the proposed buyers for up to 24 months, while an appropriate site in the Bronx for the ADHCP is sought by JHL Manhattan.  The facility also operates a Long Term Home Health Care Program that will close prior to the change in ownership.  Upon the change in ownership, the facility will transition from a voluntary/not-for-profit corporation to a proprietary facility.  There will be no change in certified beds or in RHCF services other than as noted.

On July 7, 2015, Jewish Home Lifecare (parent entity) and JHL, Bronx (operations and real estate sellers) entered into an Asset Purchase Agreement (APA) with SentosaCare, LLC for the sale of the operations and real estate associated with the RHCF.  The total purchase price for the operations and real estate is $110,000,000 apportioned as follows: $22,000,000 for the operations and $88,000,000 for the real estate.

On September 10, 2015, SentosaCare, LLC entered into two Assignment and Assumption Agreements, whereby the RHCF operations were assigned to TCPRNC, LLC and the real estate was assigned to TCPRNC Real Estate, LLC.  There is a relationship between TCPRNC, LLC and TCPRNC Real Estate, LLC in that the entities have common members.  The applicant will lease the premise from TCPRNC Real Estate, LLC.

Ownership of the operations before and after the requested change is as follows:

| Current Owner Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, Bronx | |
|---|---|
| Member | % |
| Jewish Home Lifecare (nfp) | 100% |

| Purchaser SentosaCare, LLC | |
|---|---|
| Members | % |
| Bent Philipson | 50% |
| Benjamin Landa | 50% |

| Proposed Owner via Assignment TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center | |
|---|---|
| Members | % |
| Leopold Friedman | 25.0% |
| Esther Farkovits | 25.0% |
| Avi Philipson | 12.5% |
| Raquel Philipson | 12.5% |
| Bernard Fuchs | 15.0% |
| Bescar, LLC* | 10.0% |

*Bescar, LLC members are Regina Weinstock (20%), Meryl Maybruch (20%), Barbara Gold (20%), Benjamin Fishoff (20%) and Abraham Fishoff (20%); therefore, each Bescar, LLC member will have 2% ownership interest in TCPRNC, LLC.  Bescar, LLC also has 10% ownership interest in TCPRNC Real Estate, LLC, resulting in a 2% ownership interest per Bescar, LLC member in the realty entity.

**OPCHSM Recommendation**
Contingent Approval

**Need Summary**
There will be no changes to beds upon approval of this application.  Facility occupancy was 96.8% in 2011, 97.5% in 2012, and 99.0% in 2013 with 18 vacant beds.  Occupancy is expected to remain near or exceed the Department's planning optimum going forward with the new operator.

**Program Summary**
No negative information has been received concerning the character and competence of the proposed applicants.  No changes in the program or physical environment are proposed in this application.  The applicant has stated there will be no administrative services or consulting agreements.

**Financial Summary**
SentosaCare, LLC will acquire the operating and real estate interests of the RHCF for a total purchase price of $110,000,000 and will then assign the operating interests to TCPRNC, LLC and the real estate interests to TCPRNC Real Estate, LLC.  The purchase price will be paid with $22,000,000 equity from the proposed members of TCPRNC, LLC and TCPRNC Real Estate, LLC.  The remaining $88,000,000 will be financed as follows: a $17,600,000 loan to TCPRNC, LLC for the RHCF operations and a $70,400,000 loan to TCPRNC Real Estate, LLC for the real estate.  The terms for both loans are identical, with interest at 5.5% for ten-year terms and 25-year amortizations.  HHC Finance has provided letters of interest for the respective loans.  Applicant member Bernard Fuchs (operations/realty loans) and SentosaCare members Benjamin Landa and Bent Philipson (realty loan) have provided affidavits to fund the balloon payments for the respective operating and realty financings, if acceptable terms are not available at the time of refinancing.

There are no project costs associated with this proposal.  The operating budget is as follows:

| | |
|---|---|
| Revenues | $97,388,000 |
| Expenses | $95,635,000 |
| Gain/(Loss) | $ 1,753,000 |

# Recommendations

**Health Systems Agency**
There will be no HSA recommendation for this project.

**Office of Primary Care and Health Systems Management**
**Approval contingent upon:**
1. Submission of a commitment for a permanent mortgage for the real estate portion of the project to be provided from a recognized lending institution at a prevailing rate of interest, acceptable to the Department of Health.  This is to be provided within 120 days of approval of state hospital code drawings and before the start of construction.  Included with the submitted permanent mortgage commitment must be a sources and uses statement and a debt amortization schedule, for both new and refinanced debt.   [BFA]
2. Submission of a commitment for a permanent mortgage for the operations portion of the project to be provided from a recognized lending institution at a prevailing rate of interest, acceptable to the Department of Health.  This is to be provided within 120 days of approval of state hospital code drawings and before the start of construction.  Included with the submitted permanent mortgage commitment must be a sources and uses statement and a debt amortization schedule, for both new and refinanced debt.   [BFA]
3. Submission of an executed working capital loan commitment, acceptable to the Department of Health.  [BFA]
4. Submission of a commitment signed by the applicant which indicates that, within two years from the date of the council approval, the percentage of all admissions who are Medicaid and Medicare/Medicaid eligible at the time of admission will be at least 75 percent of the planning area average of all Medicaid and Medicare/Medicaid admissions, subject to possible adjustment based on factors such as the number of Medicaid patient days, the facility's case mix, the length of time before private paying patients became Medicaid eligible, and the financial impact on the facility due to an increase in Medicaid admissions. [RNR]
5. Submission of a plan to continue to enhance access to Medicaid residents. At a minimum, the plan should include, but not necessarily be limited to, ways in which the facility will:
   a. Reach out to hospital discharge planners to make them aware of the facility's Medicaid Access Program;
   b. Communicate with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility; and
   c. Identify community resources that serve the low-income and frail elderly population who may eventually use the nursing facility, and inform them about the facility's Medicaid Access policy. [RNR]
6. Submission of a commitment, signed by the applicant, to submit annual reports to the DOH, for at least two years, demonstrating substantial progress with the implementation of the plan. These reports should include, but not be limited to:
   a. Describing how the applicant reached out to hospital discharge planners to make them aware of the facility's Medicaid Access Program;
   b. Indicating that the applicant communicated with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility;
   c. Identifying the community resources that serve the low-income and frail elderly population that have used, or may eventually use, the nursing facility, and confirming they were informed about the facility's Medicaid Access policy.
   d. Documentation pertaining to the number of referrals and the number of Medicaid admissions; and
   e. Other factors as determined by the applicant to be pertinent.
   The DOH reserves the right to require continued reporting beyond the two year period. [RNR]
7. Submission of a plan, acceptable to the Department, for the disposition of the Long Term Home Health Care Program (LTHHCP).  The plan must demonstrate that the handling of the programs adheres to statutory requirements and results in a safe and orderly transition of any program participants.  [LTC]

8. Submission of Articles of Organization of Bescar, LLC, acceptable to the Department.   [CSL]
9. Submission of Articles of Organization of Kennedy RH Holdings, LLC, acceptable to the Department. [CSL]
10. Submission of Articles of Organization of Philipson Family, LLC, acceptable to the Department. [CSL]
11. Submission of an Operating Agreement of TCPRNC LLC, acceptable to the Department.  [CSL]
12. Submission of an Operating Agreement of TCPRNC Real Estate LLC, acceptable to the Department. [CSL]
13. Submission of an Operating Agreement of Bescar LLC, acceptable to the Department. [CSL]
14. Clarification as to whether or not TCPRNC LLC will have a Shared Services Agreement with Sentosacare LLC.   [CSL]
15. Submission of an executed copy of the Assignment and Asusmption Agreement between Jewish Home LifeCare, Harry and Jeanette Weinberg Campus, Bronx and Sentosacare LLC.  [CSL]
16. Submission of a fully executed Title Affidavit, Limited Guarantee, and Bargain and Sale Deed. [CSL]
17. Submission of a Certificate of Assumed Name for TCPRNC, LLC, acceptable to the Department. [CSL]
18. Submission of Amended Articles of Organization of TCPRNC, LLC, acceptable to the Department. [CSL]

**Approval conditional upon:**
1. The project must be completed within three years from the date of the Public Health and Health Planning Council recommendation letter.  Failure to complete the project within the prescribed time shall constitute an abandonment of the application by the applicant and an expiration of the approval. [PMU]


**Council Action Date**
**February 11, 2016**

# Need Analysis

## Project Description
TCPRNC, LLC, seeks approval to become the established operator of Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, an existing 744-bed Article 28 residential health care facility (RHCF), located at 100 West Kingsbridge Road, Bronx, 10468, in Bronx County.

## Analysis
There is currently a need for 8,824 beds in the New York City Region as indicated in the following table:

**RHCF Need – New York City Region**

| 2016 Projected Need | 51,071 |
|---|---|
| Current Beds | 42,151 |
| Beds Under Construction | 96 |
| Total Resources | 42,247 |
| Unmet Need | 8,824 |

The overall occupancy for the New York City Region is 93.5% for 2013 as indicated in the following chart:



Jewish Home Lifecare Bronx
Facility vs. County and Region

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* |
|---|---|---|---|---|---|---|---|
| Facility | 97.3% | 97.1% | 96.8% | 97.5% | 99.0% | 101.4% | 97.6% |
| Bronx Co. | 96.0% | 95.8% | 94.3% | 95.9% | 95.4% | 95.3% | 95.2% |
| NYC Region | 94.9% | 95.4% | 94.8% | 94.8% | 93.5% | 94.6% | 95.0% |

*unaudited, facility reported data

## Access
Regulations indicate that the Medicaid patient admissions standard shall be 75% of the annual percentage of all Medicaid admissions for the long term care planning area in which the applicant facility is located. Such planning area percentage shall not include residential health care facilities that have an average length of stay 30 days or fewer. If there are four or fewer residential health care facilities in the planning area, the applicable standard for a planning area shall be 75% of the planning area percentage of Medicaid admissions, or of the Health Systems Agency area Medicaid admissions percentage, whichever is less. In calculating such percentages, the Department will use the most current data which have been received and analyzed by the Department.

An applicant will be required to make appropriate adjustments in its admission policies and practices so that the proportion of its own annual Medicaid patient's admissions is at least 75% of the planning area percentage or the Health Systems Agency percentage, whichever is applicable.

JHL, Harry & Jeanette Weinberg's Medicaid admissions of 33.3% in 2012 and 24.7% in 2013 did not meet or exceed the Bronx County 75% rates of 35.8% and 29.8% in 2012 and 2013, respectively, and will be required to follow the contingency plan as noted.

**Conclusion**
Approval of this application will result in maintaining a necessary community resource in Bronx County.

**Recommendation**
**From a need perspective, contingent approval is recommended.**

## Program Analysis

### Facility Information

| | Existing | Proposed |
|---|---|---|
| Facility Name | The New Jewish Home Lifecare, Harry and Jeanette Weinberg Campus | The Plaza Rehab and Nursing Center |
| Address | 100 West Kingsbridge Road Bronx, NY. 10468 | Same |
| RHCF Capacity | 816 | Same |
| ADHC Program Capacity | 100 | 0 |
| Type of Operator | Corporation | Limited Liability Company |
| Class of Operator | Voluntary / Not-for-profit | Proprietary |
| Operator | The New Jewish Home Lifecare, Harry and Jeanette Weinberg Campus, Bronx | TCPRNC LLC<br><br>Membership:<br>  Esther Farkovits          25.0%<br>  \*Leopold Friedman        25.0%<br>  Bernard Fuchs              15.0%<br>  \*Avi Philipson             12.5%<br>  Raquel Philipson          12.5%<br>  Bescar, LLC                <u>10.0%</u><br>    \*Benjamin Fishoff  20.0%<br>    Meryl Maybruch    20.0%<br>    Barbara Gold       20.0%<br>    Regina Weinstock 20.0%<br>    Abraham Fishoff  <u>20.0%</u><br>                              100.0%<br>                           <u>100.0%</u><br><br>\*Managing Member |

**Character and Competence - Background**

**Facilities Reviewed**

Nursing Homes

| | |
|---|---|
| Bay Park Center for Nursing and Rehab | 12/2009 to present |
| Bensonhurst Center for Rehabilitation and Healthcare | 01/2012 to present |
| Brooklyn Gardens Nursing and Rehabilitation Center | 10/2014 to present |
| Dewitt Rehabilitation and Nursing Center | 06/2015 to present |
| Eastchester Rehabilitation and Healthcare Center | 01/2006 to present |
| Hendon Garden Nursing and Rehabilitation Center | 11/2014 to present |
| Hopkins Center for Rehabilitation and Healthcare | 03/2011 to present |
| Hudson Pointe at Riverdale Center for Rehabilitation & Healthcare | 01/2006 to 8/2010 |
| Little Neck Care Center | 04/2011 to 1/2013 |
| Nassau Extended Care Facility | 07/2001 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Peninsula Nursing and Rehabilitation Center | 01/2013 to present |
| Sapphire Center for Rehabilitation and Nursing of Central Queens | 01/2015 to present |
| Seagate Rehabilitation and Nursing Center | 12/2014 to present |
| South Shore Rehabilitation and Nursing Center | 04/2014 to present |
| Split Rock Nursing and Rehabilitation Center | 09/2002 to present |
| The Hamptons Center for Rehabilitation and Nursing | 05/2008 to present |
| The Pavilion at Queens for Rehabilitation and Nursing | 01/2015 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Center for Rehabilitation and Nursing | 07/2004 to present |
| The Citadel Rehab and Nursing Center | 02/2015 to present |
| The Villages of Orleans Health and Rehabilitation Center | 01/2015 to present |
| White Plains Center for Nursing | 07/2004 to present |

Licensed Home Care Services Agency

| | |
|---|---|
| Ultimate Care, LLC | 2/2010 to present |

**Individual Background Review**

**Esther Farkovits** currently resides in Israel and lists no employment at present.  Ms. Farkovits discloses the following health facility ownerships:

| | |
|---|---|
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Seagate Rehabilitation and Health Care Center | 12/2014 to present |
| South Shore Rehabilitation and Nursing Center | 03/2014 to present |
| The Citadel Rehab and Nursing Center | 11/2015 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |
| White Plains Center for Nursing | 07/2011 to present |

**Leopold Friedman** is the Chief Executive Officer, since 2006, of Advanced Care Staffing, Inc., a healthcare staffing agency.  Mr. Friedman discloses the following health facility ownership interests:

| | |
|---|---|
| Brooklyn Gardens Nursing & Rehabilitation Center | 07/2014 to present |
| DeWitt Rehabilitation and Nursing Center | 07/2015 to present |
| Hendon Garden Nursing and Rehabilitation Center | 11/2014 to present |
| Peninsula Nursing and Rehabilitation Center | 01/2013 to present |
| The Citadel Rehab and Nursing Center | 02/2015 to present |
| Ultimate Care, Inc.          (LHCSA) | 02/2010 to present |

Mr. Friedman has received Public Health and Health Planning Council approval to operate Brooklyn Gardens Dialysis Center (D&TC), Highland View Care Center (receiver since 02/03/2015), and Cassena Care Dialysis at Peninsula (D&TC).  The applicant has not closed on these purchases.

**Bernard Fuchs** lists his employment as the principal to Platinum Management (NY) LLC, a hedge fund investment company located in New York, New York.  He is also the CEO and Chief Investment Officer of Tiferes Investors LLC, an investment company located in Lawrence, New York.  Mr. Fuchs discloses the following health facility ownership interests:

| | |
|---|---|
| Bensonhurst Center for Rehabilitation and Healthcare | 01/2012 to present |
| Hudson Pointe at Riverdale Center for Nursing and Rehabilitation | 01/2006 to 08/2010 |
| Hopkins Center for Rehabilitation and Healthcare | 03/2011 to present |
| Sapphire Center for Rehabilitation and Nursing of Central Queens | 01/2015 to present |
| The Villages of Orleans Health and Rehabilitation Center | 01/2015 to present |
| The Pavilion at Queens for Rehabilitation and Nursing | 01/2015 to present |

Mr. Fuchs has also received Public Health and Health Planning Council approval to operate  Greene Meadows Nursing and Rehabilitation Center.  The applicant has not closed on this purchase.

**Avi Philipson** is a student in Israel.  Mr. Philipson will serve as the managing member of TCPRNC, and has disclosed the following health facility ownership interest:

| | |
|---|---|
| Seagate Rehabilitation and Nursing Center (managing member) | 12/2014 to present |

**Raquel Philipson** is a student.  Ms. Philipson has no management experience with a health facility or agency, nor does she have any health facility ownership interests.

**Benjamin Fishoff** is retired.  Mr. Fishoff is the managing member of BESCAR, LLC, and has disclosed the following health facility ownership interests:

| | |
|---|---|
| Bay Park Center for Nursing and Rehab | 12/2009 to present |
| Eastchester Rehabilitation and Healthcare Center | 1/2013 to present |
| Golden Gate Rehabilitation and Health Care Center | 1974-2001 |
| The Hamptons Center for Rehabilitation and Nursing | 05/2008 to present |

**Meryl Maybruch** is employed as an acquisitions curator for the Kaufman Holocaust Education Center in Brooklyn.  Ms. Maybruch has disclosed 3.8% membership interest in Eastchester Rehabilitation and Healthcare Center.

**Abraham Fishoff** is the owner of City Lights, a real estate company in Brooklyn.  Mr. Fishoff has a 2.4% interest in Eastchester Rehabilitation and Healthcare Center.

**Barbara Gold** has no employment history.  Ms. Gold has a 2.4% interest in Eastchester Rehabilitation and Healthcare Center.

**Regina Weinstock** is employed by Sentosa Care LLC as an accounts payable administrator.  Ms. Weinstock has disclosed that she was previously employed by Split Rock Nursing and Rehabilitation Center, and that the company changed its name to Sentosa. Ms. Weinstock has disclosed the following health facility ownership interests:

| | |
|---|---|
| Eastchester Rehabilitation and Healthcare Center (4.00%) | 09/2002 to present |
| Split Rock Nursing and Rehabilitation Center (8.00%) | 09/2002 to present |

## Character and Competence - Analysis

No negative information has been received concerning the character and competence of the above applicants.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the period identified above reveals:

- The facility was fined $4,000 pursuant to Stipulation and Order NH-11-009 for surveillance findings on December 18, 2009.  Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The facility was fined $18,000 pursuant to Stipulation and Order NH-12-30 for surveillance findings on February 16, 2011.  Deficiencies were found under 10 NYCRR 415.4(b)(1)(i) Definition Free from abuse; 10NYCRR 415.4(b) Development of Abuse Policies; 10NYCRR

415.12(h)(2) Quality of Care Accidents; 10NYCRR 415.12(i)(1) and 415.26(c)(1)(iv) Nurse Aide Competency.
- The nursing home paid a CMP of $25,740 for Immediate Jeopardy on July 20, 2010.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of operations for Eastchester Rehabilitation and Healthcare Center for the period identified above reveals:
- The facility was fined $2,000 pursuant to Stipulation and Order NH-08-047 for surveillance findings on January 15, 2008.  Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The facility was fined $2,000 pursuant to a Stipulation and Order for surveillance findings on August 20, 2012.  Deficiencies were found under 10 NYCRR 415.13(h)(1)(v) Transfer and Discharge Requirements, Orientation for Transfer/Discharge.

A review of operations for Eastchester Rehabilitation and Healthcare Center for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

 A review of operations for Hopkins Center for Rehabilitation and Healthcare for the period identified above reveals:
- The facility was fined $4,000 pursuant to Stipulation and Order NH-12-037 issued August 24, 2012 for surveillance findings on April 11, 2011.  Deficiencies were found under 10 NYCRR (h)(1)(2) – Quality of Care: Accidents and 10 NYCRR 415.26 – Administration.
- The facility was fined $10,000 pursuant to a Stipulation and Order for surveillance findings on February 29, 2012.  Deficiencies were found under 10 NYCRR 415.3(c)(I)(ii)  Right to Refuse; Formulate Advanced Directives.

A review of operations for Hopkins Center for Rehabilitation and Nursing for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of Nassau Extended Care Facility for the period identified above reveals the following:
- The facility was fined $6,000 pursuant to Stipulation and Order NH-14-007 issued September 19, 2014 for surveillance findings on August 24, 2011.  Deficiencies were found under 10 NYCRR 415.4(b) Prohibit abuse/Neglect/Mistreatment, 10 NYCRR 415.5 (a) Dignity, and 10 NYCRR 415.26 Administration.
- The facility was fined $2,000 pursuant to a Stipulation and Order issued January 5, 2016 for surveillance findings on October 15, 2012.  Deficiencies were found under 10 NYCRR 415.12(c)(1) Pressure Sores.

A review of surveillance activity for Nassau Extended Care Facility for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of Split Rock Rehabilitation and Health Care Center for the period identified above revealed the following:
- The facility was fined $6,000 pursuant to Stipulation and Order NH-07-24 issued for surveillance findings on December 5, 2005.  Deficiencies were found under 10 NYCRR 415.4(b) Resident Behavior and Faculty Practices: Staff Treatment of Residents, 10 NYCRR 415.11(c) Resident Assessment and Care Planning: Comprehensive Care Plans and 10 NYCRR 415.12(k)(6) Quality of Care: Special Needs.

A review of surveillance activity for Split Rock Rehabilitation and Health Care Center for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of The Hamptons Center for Rehabilitation and Nursing for the period identified above revealed the following:

- The facility was fined $4,000 pursuant to a Stipulation and Order NH-10-065 for surveillance findings on September 16, 2009.  Deficiencies were found under 10 NYCRR 415.12(h)(1)(2) – Quality of Care: Accidents and Supervision and 415.26 – Administration.
- The facility was fined $10,000 pursuant to a Stipulation and Order NH-11-031 for surveillance findings on July 30, 2010.  Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The nursing home paid a CMP of $6,853.46 for Immediate Jeopardy on September 16, 2009.

A review of surveillance activity of The Hamptons Center for Rehabilitation and Nursing for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of operations Bensonhurst Center for Rehabilitation and Healthcare, Brooklyn Gardens Nursing and Rehabilitation Center, Dewitt Rehabilitation and Nursing Center, Hendon Garden Nursing and Rehabilitation Center, Hudson Pointe at Riverdale Center for Rehabilitation and Healthcare, Little Neck Nursing Home, Park Avenue Extended Care Facility, Peninsula Nursing and Rehabilitation Center, Seagate Rehabilitation and Health Care Center, Sapphire Center for Rehabilitation and Nursing of Central Queens, South Shore Rehabilitation and Nursing Center, Throgs Neck Extended Care Facility, The Pavilion at Queens for Rehabilitation and Nursing, Townhouse Center for Rehabilitation and Nursing, The Citadel Rehab and Nursing Center, The Villages of Orleans Health and Rehabilitation Center and White Plains Center for Nursing for the time period indicated above results in a conclusion of substantially consistent high level of care since there were no enforcements.

A review of Ultimate Care LLC (LHCSA) for the periods identified earlier, results in a conclusion of substantially consistent high level of care since there were no enforcements.

**Project Review**
No changes in the program or physical environment are proposed in this application.  The applicant has indicated there will be no administrative services or consulting agreements with Sentosa Care LLC or any other company.  It is also noted that the proposed ownership includes family members of the principals of Sentosa Care LLC, and individuals who are directly employed by Sentosa Care.  The purchase of Jewish Home will be made by Sentosa Care and conveyed to the respective operating and real estate entities.

The applicant has disclosed that Sentosa Care LLC contracts for administrative services with the following nursing homes, which are owned by the proposed members of The Plaza Rehab and Nursing Center:

Bay Park Center for Nursing and Rehabilitation;
Eastchester Rehabilitation and Health Care Center;
Nassau Extended Care Center;
Park Avenue Extended Care Facility;
Seagate Rehabilitation and Nursing Center;
The Hamptons Center for Rehabilitation and Nursing;
Throgs Neck Extended Care Facility;
Townhouse Center for Rehabilitation and Nursing;
White Plains Center for Nursing.

The members of TCPRNC Real Estate LLC, the proposed real estate owner are as follows, and listed for disclosure purposes only.

Bescar, LLC
Kennedy RH Holdings LLC
 Joel Edelstein
 Israel Fruend
 Bernard Fuchs
 Gerald Fuchs
 Tova Fuchs
Leopold Friedman

Benjamin Landa
Philipson Family, LLC
  Bent Philipson
  Deborah Philipson

The applicant has indicated that the existing Jewish Home adult day health care program will not be part of the sale agreement, with the ADHCP to be operated by New Jewish Home Lifecare, Bronx at the current site for up to 24 months.  Subsequently an application will be filed to transfer the program to the operating certificate of New Jewish Home Lifecare Manhattan Division.  The operator will then relocate the ADHCP to a new site in the Bronx.

The applicant has also indicated the New Jewish Home long term home health care program is not part of the sale, and a closure plan will be submitted shortly.

## Conclusion

No negative information has been received concerning the character and competence of the proposed applicants.  All health care facilities are in substantial compliance with all rules and regulations.  Although the ownership structure does not appear to be transparent, the individual background review indicates the applicants have met the standard to provide a substantially consistent high level of care as set forth in Public Health Law §2801-a(3).

## Recommendation
**From a programmatic perspective, contingent approval is recommended.**

## Financial Analysis

### Asset Purchase Agreement

The applicant submitted an executed Asset Purchase Agreement for the change in ownership of the operations and real estate related to JHL, Bronx.  The agreement will be effectuated upon Public Health and Health Planning Council approval of this application.  The terms of the agreement are summarized below:

| | |
|---|---|
| Date: | July 7, 2015 |
| Seller: | Jewish Home Lifecare, Harry and Jeanette Weingerg Campus, Bronx |
| Purchaser: | SentosaCare, LLC |
| Purchased Assets (operations): | All of Sellers' rights, title and interest in all assets owned by seller used in nursing home operations other than the excluded assets. |
| Excluded Assets (operations): | Cash and Cash equivalents as of the closing date, accounts receivable generated for services provided prior to the effective date, any litigation by sellers and proceeds relating to business prior to the effective date, seller's and nursing home's cash on hand at effective date (other than trust funds and residents' deposits), bank account, seller's minute books and records, tax records and tax returns, accounting records and general ledger or other books of account.  All retroactive rate increases and/or lump sum payments resulting from services rendered before the effective date, all proceeds of any appeals (for rate revisions and PRI adjustments addressed to Medicare or Medicaid programs) relating to periods prior to the effective date.  All tradenames, trademarks and service marks, copyrights, symbols, logos, domain names, email addresses and other business names that are proprietary to the seller, all goodwill associated with the facility name, all material bearing the current operator's name or trademark. |

| Liabilities Assumed (operations): | All liabilities for warranty obligations (express, implied or statutory) relating to any goods installed, sold leased or licensed or any services rendered or for returns of goods sold prior to closing. |
|---|---|
| Purchased Assets (real estate): | All seller's right, title and interest in and to the real property, buildings and improvements located at 100 West Kingsbridge Road, Bronx, New York |
| Liabilities Assumed (real estate): | None |
| Purchase Price: | $22,000,000 (Operations) $88,000,000 (Real Estate) |
| Payment of Purchase Price: | $110,000,000 Total Price Less: APA deposit of $5,250,00 and proposal deposit of $250,000 $104,500,000 Balance due at Closing |

The purchase price inclusive of both the operations and real estate is proposed to be satisfied as follows:

| | |
|---|---|
| Members' Equity (Cash) | $22,000,000 |
| Operations Loan (10-year term, 25-year amortization, 5.5% interest) | $17,600,000 |
| Real Estate Loan (10-year term, 25-year amortization, 5.5% interest) | $70,400,000 |
| Total | $110,000,000 |

HHC Finance has provided letters of interest for the operations and real estate loans at the stated terms.

Applicant member Bernard Fuchs (operations/realty loans) and SentosaCare members Benjamin Landa and Bent Philipson (realty loan) have provided affidavits to fund the balloon payments for the respective operating and realty financings, if acceptable terms are not available at the time of refinancing.

BFA Attachment A is the net worth summary for the proposed members' of TCPRNC, LLC, which shows sufficient assets to cover the equity requirements overall.  Bernard Fuchs has provided a disproportionate share affidavit to cover potential equity shortfalls of the other members.

BFA Attachment B is the net worth summary for the proposed members' of TCPRNC Real Estate, LLC, which shows sufficient assets to cover the equity requirements.  Benjamin Landa has provided a disproportionate share affidavit to cover potential equity shortfalls of the other members.

The applicant submitted an original affidavit, which is acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to Article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility.  Currently, the facility has no outstanding Medicaid liabilities or assessments.

## Assignment and Assumption Agreements
The applicant submitted executed Assignment and Assumption Agreements for the transfer of the Asset Purchase Agreement, as shown below:

**Operations**

| Date: | September 10, 2015 |
|---|---|
| Assignor: | SentosaCare, LLC |
| Assignee: | TCPRNC, LLC |
| Assets Transferred: | All rights and obligations under the Asset Purchase Agreement with Jewish Home Lifecare Effective July 7, 2015 in respect to the operating assets and a portion of the deposit in the amount of $1,000,000. |
| Liabilities Transferred: | All of the Assignor's liabilities and obligations related to the operating assets under the agreement. |

**Real Estate**

| Date: | September 10, 2015 |
|---|---|
| Assignor: | SentosaCare, LLC |
| Assignee: | TCPRNC Real Estate LLC |
| Assets Transferred: | All rights and obligations under the Asset Purchase Agreement with Jewish Home Lifecare  Effective July 7, 2015 in respect to the real estate assets and a portion of the deposit in the amount of $4,500,000. |
| Liabilities Transferred: | All of the Assignor's liabilities and obligations related to the real estate assets under the agreement. |

## Lease Agreement

The applicant submitted an executed lease agreement, as summarized below:

| Date: | September 16, 2015 |
|---|---|
| Premises: | A 744-bed RHCF located at 100 Kingsbridge Road, Bronx (438,000 sq. ft.) |
| Lessor: | TCPRNC Real Estate, LLC |
| Lessee: | TCPRNC, LLC |
| Term: | 35 years |
| Rental: | $9,387,111 annually or ($782,259 per month or $21.43 per sq. ft.) |
| Provisions: | Lessee pays for all taxes, utilities, insurance and maintenance fees (Triple Net) |

With the change from a voluntary to a proprietary facility, the capital reimbursement methodology will be changed to reflect interest and amortization.  The facility however, does not have a mortgage as the facility is leased from a related entity, which is charging rent based on interest and amortization owed on the mortgage loan, plus an additional $4,200,000 per year based on the market value of the property.

The lease arrangement is a non-arm's length agreement.  The applicant has submitted an affidavit attesting that there is a relationship between the landlord and tenant through common ownership. Letters from two NYS realtors have been provided attesting to the reasonableness of the per square foot rental.

## Operating Budget

The applicant provided an operating budget, in 2015 dollars, for year one subsequent to acquisition, summarized below:

|  | Current Year | | Year One | |
|---|---|---|---|---|
|  | Per Diem | Total | Per Diem | Total |
| Revenues |  |  |  |  |
| Medicaid (Inpatient) | $308.21 | $75,206,000 | $326.33 | $76,941,000 |
| Medicare Inpatient | $549.20 | $14,439,000 | $577.81 | $14,678,000 |
| Private Pay/Other (Inpatient) | $347.71 | $1,782,000 | $376.41 | $1,864,000 |
| Other Operating Revenue* |  | $3,905,000 |  | $3,905,000 |
| Medicaid (Outpatient) |  | $6,740,000 |  | $0 |
| Total |  | $102,072,000 |  | $97,388,000 |
|  |  |  |  |  |
| Expenses |  |  |  |  |
| Operating | $370.00 | $101,907,000 | $318.34 | $84,719,000 |
| Capital | $24.25 | $6,680,000 | $41.02 | $10,916,000 |
| Total | $394.25 | $108,587,000 | $359.36 | $95,635,000 |
|  |  |  |  |  |
| Net income/(loss) |  | ($6,515,000) |  | $1,753,000 |
|  |  |  |  |  |
| Utilization (patient days) |  | 275,428 |  | 266,129 |
| Occupancy |  | 98% |  | 98% |

*Other revenue consists of $2,500,000 of dietary services provided to affiliated entities of the current operator, and $1,405,000 of miscellaneous revenue sources including vending machines, purchase discounts, cable TV and telephone income, rental income, and dividends.

The following is noted with respect to the submitted operating budget:
- Revenue assumptions are based on the historical experience of the current operator.
  - ✓ The Medicaid rate for year one is based on the proposed 2016 operating rate and the estimated 2016 capital per diem. The capital per diem includes the 2014 costs plus estimates for real estate taxes and return on equity.
  - ✓ The increases in the Medicare and Private Pay rates is due to the inclusion of the Part D revenue prior period adjustment.
- Expense assumptions for year one are based on the historical experience of the current operator, with consideration of the following:
  - ✓ Property rental replaces real property and movable equipment depreciation and interest expense (an increase of $4.3 million dollars).
  - ✓ Parent Company Overhead has been reduced by $9.1 million dollars.
  - ✓ Operating expenses were adjusted to reflect 2014 bed reductions and trended 2% from the 2014 actual expenses (a decrease of $3.9 million dollars).
- Utilization assumptions are based on the 2014 historical experience of the facility (98%).  The applicant has projected that the facility will maintain this occupancy rate.
- Utilization by payor source for Year One and Year Three is expected as follows:

| | Current Year | Years One & Three |
|---|---|---|
| Medicaid | 88.59% | 88.59% |
| Medicare | 9.55% | 9.55% |
| Private Pay/Other | 1.86% | 1.86% |
| Total | 100.00% | 100.00 |

- Breakeven utilization in year one is projected at 96.24%.

**Capability and Feasibility**
There are no project costs associated with this application.

The total purchase price of $110,000,000 with be funded with $22,000,000 equity from the members of TCPRNC, LLC and TCPRNC Real Estate, LLC, a $17,600,000 loan for the operations and a $70,400,000 loan for the real estate at the above stated terms.  Letters of interest for the financings have been provided.

Working capital requirements are estimated at $15,939,167 based on two months of Year One expenses. The applicant will provide $16,000,000 toward working capital, which is $60,833 over the estimated requirement to be funded, via $8,000,000 from members' equity with the remaining $8,000,000 to be financed via a loan at 5.5% interest for a three-year term.  HHC finance has provided a letter of interest for the working capital financing.  BFA Attachment A is the net worth summary for the proposed members of TCPRNC, LLC, which shows sufficient liquid assets overall to cover the equity requirements of the application.   Bernard Fuchs has provided a disproportionate share affidavit to cover any potential equity shortfalls of the other members.   BFA Attachment A shows that Mr. Fuchs has sufficient liquid resources available.

BFA Attachment B is the net worth summary for the proposed members of TCPRNC Real Estate, LLC, which shows sufficient liquid assets to cover all aspects of the application.   Benjamin Landa has provided a disproportionate share affidavit to cover any potential equity shortfalls of the other members. BFA Attachment B shows that Mr. Landa has sufficient liquid resource available.

BFA Attachment C is the pro-forma balance sheet of TCPRNC, LLC, which indicates positive members' equity of $8,000,000.  It is noted that assets include $17,600,000 in goodwill, which is not an available liquid resource, nor is it recognized for Medicaid reimbursement purposes.  If goodwill is eliminated, the net asset position is a negative members' equity of $9,600,000.  The negative member's equity will be covered by the operator.  As shown in BFA Attachment A, the operator has sufficient liquid resources available to cover this shortfall.

BFA Attachment D is the pro-forma balance sheet of TCPRNC Real Estate, LLC, which indicates positive members' equity of $17,600,000.

The submitted budget projects a net income of $1,753,000 for Year One. The budget is reasonable.

The applicant states that their business model does not include flexibility to transition to a Value Based Payment System, but noted that they are willing to participate in any future Value Based Payment initiatives.  The current project's revenue assumptions are based on the facility's historical rate data for Medicare and Private Pay.  While the Medicaid revenue assumptions are based on the facility's historical rate data plus the estimated real estate taxes and return of equity.

A transition of nursing home (NH) residents to Medicaid managed care is currently being implemented statewide.  Under the managed care construct, Managed Care Organizations (MCOs) will negotiate payment rates directly with NH providers.  A department policy, as described in the "Transition of Nursing Home Benefit and Population into Managed Care Policy Paper," provided guidance requiring MCOs to pay the benchmark Medicaid FFS rate, or a negotiated rate acceptable to both plans and NH, for three years after a county has been deemed mandatory for NH population enrollment.  As a result, the benchmark FFS rate remains a viable basis for assessing NH revenues through the transition period.

BFA Attachment E is the 2013-2014 certified and the internal financial statements for JHL, Bronx as of October 31, 2015, which shows the facility had an average positive net asset position, an average negative working capital position and generated an average net loss of $6,372,987 for the period.  The negative work capital and net loss positions are due to inefficiencies in current operations, which included extremely high accounts payable, liabilities to third parties and salaries.  The issues will be addressed and corrected by the proposed operators.

BFA Attachment G is the 2013-2014 certified and the 2015 internal financial summaries of the members' affiliated nursing homes.  As shown, the facilities have maintained a positive net asset position, positive working capital and a positive income from operations for the period shown, with the exception of White Plains, Bay Park, The Hampton Center, Southshore Healthcare, Peninsula Nursing and Throgs Neck, which were due to vacation and sick time accrual, a prior year Medicaid adjustment, above average spending in the ancillary services and a reduction in the private pay census.  In order to fix the ancillary spending the facilities moved to greater centralization of services to achieve better economies of scale and reduce the overall costs of operations.  The facilities are following the current market trends related to the patient census and working on new strategies to attract other payors such as long-term care insurance.

Based on the preceding, the applicant has demonstrated the capability to proceed in a financially feasible manner.

**Recommendation**
**From a financial perspective, contingent approval is recommended.**

| Attachments | |
| --- | --- |
| BFA Attachment A | Net Worth - Proposed Members of TCPRNC, LLC |
| BFA Attachment B | Net Worth - Proposed Members of TCPRNC Real Estate, LLC |
| BFA Attachment C | Pro-forma Balance Sheet of TCPRNC, LLC |
| BFA Attachment D | Pro-forma Balance Sheet of TCPRNC Real Estate, LLC |
| BFA Attachment E | 2012-2014 certified and 2015 internal Financial Summary for Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, Bronx |
| BFA Attachment F | Affiliated RHCF Ownership of Proposed Members of TCPRNC, LLC |
| BFA Attachment G | 2012-2014 certified and the 2015 internal financial summaries Proposed Members Affiliated  Nursing Homes |
| BFA Attachment H | Ownership of the real estate before and after the requested change |
| LTC Attachment A | Quality Measures and Inspection Report |

# Exhibit G

**CMS Ratings for**
**SEAGATE REHABILITATION AND NURSING CENTER**
**(Fed. Prov. No. 335513)**

| Time Period | Overall Staffing Rating | RN Staffing Rating |
|---|---|---|
| 2013Q1 | 1 | 2 |
| 2013Q2 | 1 | 2 |
| 2013Q3 | 1 | 2 |
| 2013Q4 | 2 | 3 |
| 2014Q1 | 2 | 3 |
| 2014Q2 | 2 | 3 |
| 2014Q3 | 2 | 3 |
| 2014Q4 | 1 | 2 |
| 2015Q1 | 1 | 2 |
| 2015Q2 | 1 | 2 |
| 2015Q3 | 1 | 2 |
| 2015Q4 | 1 | 1 |
| 2016Q1 | 1 | 1 |
| 2016Q2 | 1 | 1 |
| 2016Q3 | 1 | 1 |
| 2016Q4 | 1 | 1 |
| 2017M1 | 1 | 1 |
| 2017M2 | 1 | 1 |
| 2017M3 | 1 | 1 |
| 2017M4 | 1 | 1 |
| 2017M5 | 1 | 1 |
| 2017M6 | 1 | 1 |
| 2017M7 | 1 | 1 |
| 2017M8 | 1 | 1 |
| 2017M9 | 1 | 1 |
| 2017M10 | 1 | 1 |
| 2017M11 | 1 | 1 |
| 2017M12 | 1 | 1 |
| 2018M1 | 1 | 1 |
| 2018M2 | 1 | 1 |
| 2018M3 | 1 | 1 |
| 2018M4 | 1 | 2 |
| 2018M5 | 1 | 2 |
| 2018M6 | 1 | 2 |
| 2018M7 | 1 | 1 |
| 2018M8 | 1 | 1 |
| 2018M9 | 1 | 1 |
| 2018M10 | 1 | 2 |
| 2018M11 | 1 | 2 |
| 2018M12 | 1 | 2 |
| 2019M1 | 1 | 2 |
| 2019M2 | 1 | 2 |
| 2019M3 | 1 | 2 |
| 2019M4 | 1 | 1 |
| 2019M5 | 1 | 1 |
| Source: https://data.medicare.gov/data/archives/nursing-home-compare | | |

# Exhibit H

Case 1:19-cv-03541-FB-JRC  Document 36-5  Filed 11/04/19  Page 123 of 134 PageID #: 763



# How N.Y.'s Biggest For-Profit Nursing Home Group Flourishes Despite a Record of Patient Harm

The state's "character-and-competence" reviews are supposed to weed out operators with histories of violations and fines — but regulators don't always act on the full story.

by Allegra Abramo and Jennifer Lehman, special to ProPublica, Oct. 27, 2015, 8 a.m. EDT



*Allegra Abramo for ProPublica*

Charlie Stewart was looking forward to getting out of the nursing home in time for his 60th birthday. On his planned release day, in late 2012, the Long Island facility instead called Stewart's wife to say he was being sent to the hospital with a fever.

When his wife, Jeanne, met him there, the stench of rotting flesh made it difficult to sit near her husband. The small wounds on his right foot that had been healing when Stewart entered the nursing home now blackened his entire shin.

"When I saw it at the hospital ... I almost threw up," Jeanne Stewart said. "It was disgusting. I said, 'It looks like somebody took a match to it.' "

Doctors told Stewart the infection in his leg was poisoning his body. To save his life, they would have to amputate above the knee.

Stewart had spent about six weeks recovering from a diabetic emergency at Avalon Gardens Rehabilitation & Health Care Center on Long Island. The nursing home is one of several in a group of for-profit homes affiliated with SentosaCare, LLC, that have a record of repeat fines, violations and complaints for deficient care in recent years.

Despite that record, SentosaCare founder Benjamin Landa, partner Bent Philipson and family members have been able to expand their nursing home ownerships in New York, easily clearing regulatory reviews meant to

be a check on repeat offenders. SentosaCare is now the state's largest nursing home network, with at least 25 facilities and nearly 5,400 beds.

That unhindered expansion highlights the continued weakness of nursing home oversight in New York, an investigation by ProPublica found, and exposes gaps in the state's system for vetting parties who apply to buy shares in homes.

State law requires a "character-and-competence" review of buyers before a change in ownership can go through. To pass muster, other health care facilities associated with the buyers must have a record of high-quality care.

The decision maker in these deals is the state's Public Health and Health Planning Council, a body of appointed officials, many from inside the health care industry. The council has substantial leverage to press nursing home applicants to improve quality, but an examination of dozens of transactions in recent years show that power is seldom used.

Moreover, records show that the council hasn't always had complete information about all the violations and fines at nursing homes owned by or affiliated with applicants it reviewed. That's because the Department of Health, which prepares character-and-competence recommendations for the council, doesn't report them all.

The department's assessments of Landa and other owners of SentosaCare homes have routinely found that the facilities provided a "substantially consistent high level of care" – the standard owners must meet to receive council approval.

Yet the agency's assessments in 15 separate ownership applications since 2013 did not mention at least 20 federal fines paid by the group's homes, records show. In more than a dozen cases, the department reported "no repeat violations," even when a SentosaCare home had been cited multiple times for the same serious deficiency.

Many of the nursing home deals ProPublica reviewed received a go-ahead despite rules saying they "shall not be" approved when facilities have repeat violations that put residents at risk. Under a narrow interpretation of the rules, however, the department still recommends approval if violations aren't strictly identical or were promptly addressed.

SentosaCare's owners or associates weren't the only applicants to get incomplete vetting, but the council has had repeated opportunities to scrutinize their records. Landa, Philipson or relatives bought shares in a dozen homes in 2013 and 2014, records show.

Advocates for nursing home patients say that instead of a backstop, New York's approval process has become a rubber stamp.

"The law establishes mechanisms for at least a moderate review of an applicant's character and competence," said Richard Mollot, director of the Long Term Care Community Coalition in New York. "The failure to provide complete information on a provider's past performance fundamentally undermines the review process."

Mollot's group published a recent report saying the Health Department has one of the nation's lowest rates of citing nursing home operators for deficiencies in care. New York is also among a minority of states that don't

mandate minimum staffing ratios, even though research shows a strong link between nursing staff and residents' well-being.



*Charlie Stewart with his wife, Jeanne, and their cat, Maris. (Allegra Abramo for ProPublica)*

Thirteen of SentosaCare's homes (though not Avalon Gardens) have Medicare's bottom score for nurse staffing. Inspection reports also show that at least seven residents have wandered away from the SentosaCare affiliated facilities in recent years — including one who froze to death in 2011. Inspectors and prosecutors have found that staff falsified records in some cases. Dozens of patients at SentosaCare homes have experienced long delays before receiving necessary care; some ended up in hospitals.

The Stewarts said the staff at Avalon Gardens showed "no sense of urgency" when they complained about missed meals, soiled sheets and unanswered call bells. Even though nurses dressed the wound on Charlie's leg daily, and a doctor checked it each week, no one warned them about its worsening condition, the Stewarts said.

Dr. Kris Alman, a retired endocrinologist who reviewed Stewart's medical records and photographs at ProPublica's request, said that the two quarter-sized lesions on his foot when he was admitted to Avalon Gardens could not have "become what it did overnight." That the condition "progressed as far as it did, with him coming in septic and needing an above-the-knee amputation, was inexcusable," Alman said.

Landa's attorney and business partner, Howard Fensterman, declined to comment on Stewart's case for reasons of patient privacy. Fensterman defended Avalon Gardens and other SentosaCare facilities, however, saying that when inspectors have found problems, the homes quickly addressed them and secured state approval of correction plans.

Fensterman also said that SentosaCare does not have "ownership or control" over the facilities in its network and only contracts with them to provide administrative and rehabilitation consulting, regulatory advice and purchasing services. Records show, however, that Landa and Philipson, or family members, have ownership stakes or directorships in nearly all of SentosaCare's facilities. Fensterman also co-owns 14 nursing homes with Landa in several states, including one SentosaCare home.

Fensterman is a former member of the state health council, as is Landa, who entered the nursing home business in the late 1980s and emerged as one of the sector's biggest players over the next decade. Landa, Philipson or family members now hold stakes in at least 33 nursing homes in New York and an equal number in nine other states.

In 2013, the latest year for which state data is available, homes under the SentosaCare umbrella paid the company more than $11.5 million for financial, staffing and other services, and spent nearly $630,000 with Fensterman's law firm.

––––––––––––––––––––––––––––

The nation's $137 billion nursing home industry has made major improvements since the landmark 1987 federal Nursing Home Reform Act imposed mandates to combat abuse and neglect. But the industry, which draws heavily on taxpayer funding via Medicare and Medicaid, still struggles to provide safe care for many.

One-third of Medicare patients suffered preventable harm within a month of being admitted to nursing homes for short-term rehabilitation, according to a 2014 study by the Department of Health and Human Services' inspector general. The harm cost Medicare $2.8 billion for hospitalizations alone in 2011, the study estimated.

New York spends about $13 billion each year on the state's 627 nursing homes, which collectively care for more than 100,000 residents. The Department of Health is charged with day-to-day oversight of safety, but patient advocates say the agency lacks the staff and expertise to do the job adequately.

SentosaCare homes, which took in nearly $538 million from Medicare and Medicaid in 2013, aren't the only facilities in the state with repeat violations and low staffing, and several of the company's homes have above-average ratings on Medicare's Nursing Home Compare web site, which rates them with one to five stars. (State-by-state inspection reports can be searched on ProPublica's Nursing Home Inspect, which also lists deficiencies by severity level.)

But federal data through August shows that 11 of SentosaCare's homes exceeded the state average of 24 violations over the past three years, and three had double that number.

## SentosaCare's New York Nursing Homes

Medicare rates nursing homes on a scale of 1 (bottom performers) to 5 stars (best). Here are ratings for the homes currenty listed as part of SentosaCare's network in New York. See what's in the ratings.

| Home | City | Beds | Overall Score | Health Inspection | Nurse Staffing | Quality |
|------|------|------|---------------|-------------------|----------------|---------|
| Avalon Gardens Rehabilitation & Health Care Center | Smithtown | 353 | 2 | 1 | 4 | 2 |
| Bay Park Center for | Bronx City | 480 Beds | Overall Score | Health Inspection | Nurse Staffing | 5 Quality |

| Home | City | Beds | Overall Score | Health Inspection | Nurse Staffing | Quality |
|---|---|---|---|---|---|---|
| [Nursing and Rehabilitation] | | | | | | |
| Brookhaven Nursing and Rehabilitation Center | Far Rockaway | 298 | 3 | 2 | 2 | 5 |
| Eastchester Rehabilitation and Health Care Center | Bronx | 200 | 4 | 4 | 3 | 3 |
| Forest Hills Care Center | Forest Hills | 100 | 4 | 4 | 1 | 5 |
| Garden Care Center | Franklin Square | 150 | 2 | 2 | 1 | 5 |
| Golden Gate Rehabilitation and Health Care Center | Staten Island | 238 | 4 | 4 | 2 | 2 |
| Grace Plaza Nursing and Rehabilitation Center | Great Neck | 214 | 4 | 4 | 2 | 4 |
| Little Neck Care Center | Little Neck | 120 | 5 | 5 | 1 | 5 |
| Nassau Extended Care Facility | Hempstead | 280 | 2 | 3 | 1 | 4 |
| New Surfside Nursing Home | Far Rockaway | 183 | 2 | 2 | 1 | 5 |
| Park Avenue Extended Care Facility | Long Beach | 240 | 5 | 5 | 1 | 5 |
| Parkview Care and Rehab Center | Massapequa | 169 | 1 | 1 | 1 | 4 |
| Pathways Nursing & Rehabilitation Center | Niskayuna | 112 | 4 | 3 | 4 | 4 |
| Rockville Skilled Nursing & Rehabilitation Center | Rockville Centre | 66 | 3 | 2 | 4 | 4 |
| Seagate Rehabilitation and Nursing Center | Brooklyn | 360 | 3 | 4 | 1 | 4 |
| South Point Home | Island Park | 185 | | | | 2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Plaza Nursing & Rehabilitation Center | | | | | | |
| South Shore Rehabilitation and Nursing Center | Freeport | 100 | 4 | 3 | 2 | 5 |
| Spring Creek Rehabilitation and Nursing Care Center | Brooklyn | 188 | 1 | 2 | 1 | 2 |
| The Grove at Valhalla Rehabilitation and Nursing Center | Valhalla | 160 | 4 | 4 | 3 | 4 |
| The Hamptons Center for Rehabilitation and Nursing | South Hampton | 280 | 3 | 3 | 2 | 2 |
| Throgs Neck Extended Care Facility | Bronx | 205 | 4 | 5 | 1 | 4 |
| Townhouse Center For Rehabilitation & Nursing | Uniondale | 280 | 1 | 3 | 1 | 1 |
| White Plains Center for Nursing Care | White Plains | 88 | 3 | 2 | 4 | 4 |
| Woodmere Rehabilitation and Health Care Center | Woodmere | 336 | 1 | 1 | 3 | 4 |

Sources: Centers for Medicare & Medicaid Services data as of Oct. 1, 2015; Nursing Home Inspect

The most critical nursing home deficiencies are known as "immediate jeopardy" violations — incidents or conditions that have caused or are likely to cause the "serious injury, harm, impairment, or death" of patients. Less than 6 percent of all New York homes were cited for four or more immediate-jeopardy violations in recent years.

By comparison, Avalon Gardens was cited for 10 immediate-jeopardy violations in the three years ending in August, the third-highest number in the state for that period. Two other SentosaCare homes — Woodmere Rehabilitation & Health Care Center and South Point Plaza Nursing and Rehabilitation Center — each have been cited for four.

Elopements — where residents leave the premises without the knowledge of a home's operators — have been a repeat problem for Avalon and

Woodmere, where SentosaCare co-owner Philipson has been listed as longtime managing partner.

Two days before Thanksgiving in 2011, a group of Woodmere residents walked to a nearby school for a holiday lunch. When aides took a head count, one of the 19 residents, a 55-year-old with dementia named Dennis Buckham, was missing.

Buckham wasn't found until four days later, face down on a Brooklyn sidewalk, frozen and without a pulse. He died of cardiac arrest and hypothermia, according to the chief medical examiner's report cited in the Department of Health investigation.

Fensterman said Woodmere overhauled its policies and procedures, and that the state signed off on an official plan of correction. Two years later, however, a 64-year-old Woodmere resident with schizophrenia left a secure unit 10 times over three months. Staffers found her in the basement and at the front door, but according to the state's report, the home did not investigate, change her care plan or conduct a doctor-ordered psychiatric evaluation.

About a month later, the woman walked past a security guard and was found in the road. Fensterman said no harm resulted, the home fired the security guard who let the resident slip out, and the state again approved a correction plan.

Residents also wandered from Avalon Gardens in 2011 and 2013, state inspection reports show. In all, at least seven residents wandered away from SentosaCare facilities between 2011 and 2014, according to state inspection reports.

The reports also document dozens of cases of delayed treatment at SentosaCare homes. At Woodmere in 2012, staffers failed to promptly send four patients to the hospital, two of whom died. Two years later, a resident at Parkview Care and Rehabilitation Center in Nassau County suffered from a collapsed lung for four days while staff failed to check results from a chest X-ray or assess his breathing or vital signs.

Fensterman said that each SentosaCare home is distinct. "There is no pattern of delayed treatment among facilities," he said, "as each facility cited had separate issues, which in no way relate to each other." He said the Health Department found the incidents to be isolated and that all were corrected.

On multiple occasions, state inspectors discovered that staff at SentosaCare facilities tried to cover up lapses in care — allegedly lying about elopements or the failure to spot bedsores, for example. After a 2012 investigation by New York Attorney General Eric Schneiderman, the administrator of The Hamptons Center for Rehabilitation and Nursing, a SentosaCare home in Suffolk County, pled guilty to falsifying records after a resident wandered away and was found walking on the highway five hours later. The administrator was sentenced to a $2,500 fine and probation.

In June, after another investigation by Schneiderman's office, four Woodmere nurses were arrested for falsely signing off on forms saying they had checked on a resident who fell three times in a week and ended up hospitalized. Three pleaded guilty to misdemeanors; the fourth case is pending.

Researchers and patient advocates say that insufficient staffing is one of the biggest contributors to poor outcomes for nursing home residents. The issue is important enough that the federal Centers for Medicare and Medicaid Services (CMS) tracks staffing and has determined that less than 4.1 hours of total daily nursing care per long-term resident increases the risk of bed sores, weight loss and other types of harm to patients.

"Direct bedside nursing home staff is probably the most important factor in nursing home care — end of story," said Dr. Michele Bellantoni, clinical director of geriatrics at the Johns Hopkins School of Medicine.

Only three SentosaCare homes meet the 4.1-hour threshold, however. Six provide less than three hours of daily nursing care per resident, according to data the facilities self-report to CMS.

Fensterman said CMS' overall staff ratings are not a good measure for comparing homes because they don't reflect the different nursing needs of homes' patients or high scores on other quality measures. As an example, he cited Park Avenue Extended Care, another SentosaCare facility, which CMS rated with one star on staffing but five stars for health quality, which tracks data such as how often patients get bedsores or infections.

On the other end of the scale is Avalon, with nearly 45 percent more complaints and double the number of complaint-related citations per 100 beds than the averages found in New York homes. In its most recent inspection, this past June, Avalon was cited for 21 deficiencies. Among them: Eight residents received medications up to three hours late because the facility did not have sufficient nursing staff.

Tom Bennett, 60, spent about a month in short-term rehabilitation at Avalon Gardens in 2013. Obesity and a back injury made it impossible for the Long Island man to get out of bed. In an interview, he said he didn't receive regular sponge baths and sometimes sat in his own feces for hours because no one was available to help.

"They were all over-worked. They were telling me, you know, we just don't have enough help to take care of everybody," Bennett said. "And you can hear the buzzers going off constantly — *meep, meep, meep, meep*. And the aides are just like running from room to room to room."

Fensterman declined to comment about Bennett's situation. State records list SentosaCare partners Landa and Philipson as co-owners of Avalon Gardens, each with an interest of more than 30 percent. In 2013, the home reported paying $1 million to SentosaCare for services and $90,000 to Fensterman's firm.

Although New York doesn't mandate minimum staffing ratios, federal law says homes must have "sufficient staff" to "attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."

Patient advocates say that vague standard is one reason that the state rarely cites homes for insufficient staffing. Health Department officials, in response to an email asking about the agency's citation rate, also noted the lack of specific minimum staffing rules.

Avalon Gardens and a second SentosaCare home, South Point Plaza Nursing and Rehabilitation Center on Long Island, were among only 29 cited specifically for insufficient staffing in the past three years.

Patient advocates say lack of staff is one of the most common complaints from residents and that state inspectors should be following federal guidance, which instructs them to look for staffing issues "whenever quality of care problems have been discovered."

Advocacy groups and the state's biggest nurses' union have pushed for mandatory staffing ratios, and "safe-staffing" bills have been introduced in the New York Legislature for at least a decade, according to the office of Assemblyman Richard Gottfried, D-Manhattan, the health committee chairman. Hospitals and nursing homes have objected, saying the mandates would be too costly.

Mollot said that while legislating a staffing floor would help, the key is whether the Health Department does more to police the problem. If a new staffing law "just becomes another requirement that's not enforced," he said, "what good is it?"

---

When nursing home ownership changes hands in New York, character-and-competence reviews are supposed to provide an important checkpoint.

State law gives the Public Health and Health Planning Council the power to bar new owners or directors based on the compliance record of any facility they are "affiliated" with. "If some bad actor wanted to buy a new nursing home," said Susan Regan, a lawyer who spent 18 years on council, "we could say no."

Except the council seldom says "no."

ProPublica's review of Health Department and council records did not turn up any nursing home ownership applications within the last five years that were rejected because of lapses in patient care. In most cases, the council — 24 volunteers appointed by the governor — follows the department's recommendations.

Although the department's reviews summarize past violations and fines at an applicant's related facilities, they typically conclude there is a "substantially consistent high quality of care." Regulations say applicants "shall not" receive such a finding if a facility's violations were "recurrent or were not promptly corrected."

But the council doesn't always get a look at the complete record.

Thanks to home purchases and shuffling of ownership shares, Landa, Philipson, their family members and other owners of SentosaCare facilities have come up for council reviews a dozen times since 2013. In addition to omitting mention of at least 20 federal fines paid by SentosaCare homes, the department's reviews reported "no repeat violations" a dozen times when there had been multiple citations for the same problems.

Since 2011, Woodmere has been cited and fined several times for the same class of violations that put residents in immediate jeopardy, including giving unnecessary medications and failing to protect residents from falls. The home paid more than $80,000 in federal fines, which are shared with the state. In 2013, the federal government also temporarily halted payments for new admissions at Woodmere, a stiff penalty for homes with ongoing problems.

None of those actions was noted in character-and-competence summaries provided to council members on at least three occasions in 2013 and 2014, when Landa, Philipson and others associated with Woodmere applied to buy shares of other nursing homes. Instead, the department wrote that Woodmere had "no enforcements" or made no mention of the home.

In each case, the department recommended approval, and the council voted in favor without any objections. Records list Landa as a director and Philipson as the managing partner of Woodmere. Fensterman, who served on the council from 2010 until 2014, recused himself from votes involving business partners and clients.

When SentosaCare's South Point Plaza was part of reviews in 2013 and 2014, the department also said it had "no repeat enforcements," even though the home had been cited and fined more than once for residents having pressure sores. Although three state fines were noted, an additional $90,000 in federal fines and one Medicare payment denial were not included in the reviews.

Asked about the omissions, the department initially said its character-and-competence process includes federal investigations and fines. In a later statement, it said federal fines are not currently included, but that its policy is being reviewed. The agency began listing them in council papers in February, it said in an email, but only "for informational purposes."

A review of dozens of health council applications shows that the department doesn't always flag serious violations if there was no state fine, or if the amount isn't finalized. The state did not settle $18,000 in fines for elopements at Woodmere and Avalon until last month, more than two years after the incidents. Recent character-and-competence reviews did not mention pending fines or report that the elopements had occurred.

About a year ago, the department began appending copies of its website pages on citations and quality ratings to council review documents. A list of deficiencies and their severity isn't always included.

Concerning what it counts as a repeat enforcement, the agency said that while some violations may fall in the same category, they are not necessarily the same. That is consistent with its reviews, which sometimes note that violations were not "identical."

Mollot said it was "extremely alarming" that violations and fines might be omitted.

In interviews, three former or current council members expressed uncertainty about what standards apply in character-and-competence reviews. With dozens of projects and ownership changes to vote on at each monthly meeting, council members must rely on the department's information to do their jobs.

For many of her years on the council, Regan chaired the establishment committee, which reviews applications to buy or build facilities. Members would often ask for more details about applicants' histories, she said, "but what you do about it is difficult." Operators argue that they have paid their fines and corrected deficiencies, she said, or that repeat violations were not connected.

"I would argue, you know what, if you're in business to find every opportunity to game the standards, and do the minimum, and give the

shoddiest care you can possibly give while still getting out from under the deficiency, it should raise a question of whether you should hold a license," Regan said.

Arthur Levin, a current establishment committee member, said that he and others are increasingly asking the Health Department for information about quality of care, not just violations, especially for dialysis centers. Levin is director of the Center for Medical Consumers and the council's lone representative from a patient group.

"At the very least, let it be the basis of a question to an applicant: 'What are you going to do to do better?' " Levin said.

Three years ago, the council recommended changes to character-and-competence reviews as part of a regulatory overhaul requested by Gov. Andrew Cuomo. Among the proposals was one to give the department and council more discretion to disqualify applicants for patterns of violations across multiple facilities affiliated with an applicant.

"When a proposed owner or trustee presents affiliations with a health care facility or agency that has a pattern of, or multiple, enforcements, or a sub-standard quality record, there should be a presumption of disqualification which may be rebutted in limited circumstances," says the recommendation, which is still on the shelf.

Recent versions of the safe-staffing bill would expand character-and-competence reviews to consider not only staffing but worker safety violations like those that resulted in 13 citations and $24,600 in fines to Avalon Gardens in 2013.

---

In his short stay at Avalon Gardens, Charlie Stewart remembers waiting for hours for help getting from his bed to the toilet. One time, when no one answered the call bell, he started yelling, he said. Still no one came. Eventually he decided to crawl across the floor to the bathroom rather than soil the bed.

"When you need help and it's not coming, you know, your reality changes immediately," said Stewart. "It's not nice feeling helpless. And several times in that place, I gotta say, I felt like I was helpless."

On multiple occasions, Stewart said, no one brought him dinner, even though he needed to eat regularly because of his diabetes. His wife, Jeanne, said she thought pain medications were making him forgetful. But he kept calling. "I might have been drugged, but I know I wasn't fed, 'cause I'm starving," he recalls telling his wife.

Fensterman said privacy laws prohibited SentosaCare from responding to specific questions about Stewart's care.

Jeanne said she called the Health Department while Charlie was still at Avalon to complain about the missed meals and lack of help getting to the bathroom. When a representative finally called back to follow up on her complaint, she told the caller she was sitting next to her husband in the hospital as he recovered from an amputation.

A few weeks later, she said, a letter arrived saying the state hadn't substantiated the initial complaint. Furious, Jeanne threw it away.

Case 1:19-cv-03541-FB-JRC   Document 36-5   Filed 11/04/19   Page 134 of 134 PageID #: 774

Today, Stewart is learning how to walk up stairs on his prosthetic leg. Jeanne limits the hours in her job at a grocery store so she can care for her husband. She still finds the episode difficult to talk about.

"I felt more could have been done sooner," she said of her husband's care. "And it just shouldn't have gotten as far as it did."

Charlie Stewart agreed. "That's what I sincerely wish — that this doesn't happen to anybody else."

*Allegra Abramo is a freelance writer and photographer living in Seattle. Jennifer Lehman is a writer living in New York City.*



*"I felt more could have been done sooner," Jeanne said of her husband's care. "And it just shouldn't have gotten as far as it did." (Allegra Abramo for ProPublica)*