# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WALTER CHOW, as Administrator of the Estate of LEROY CHOW, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>SHOREFRONT OPERATING LLC d/b/a SEAGATE REHABILITATION AND NURSING CENTER; SHAINDY BERKO; ROCHEL DAVID; LEAH FRIEDMAN; DEENA LANDA; ESTHER FARKOVITZ; AVI PHILIPSON; BERISH RUBINSTEIN; DAVID RUBINSTEIN; BRUSCHA SINGER; JOEL ZUPNICK; SHOREFRONT REALTY LLC; SENTOSACARE, LLC; and DOES 1-25,<br><br>      Defendants. | Civil Action<br>No. 1:19-cv-03541-FB-JRC<br><br>**SECOND AMENDED<br>CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

   Plaintiffs Rita Skolkin, Anthony Lanni, as Administrator of the Estate of Vincenzo Lanni, and Walter Chow, as Administrator of the Estate of Leroy Chow, individually and on behalf of all others similarly situated (also referred to as "Patients," "Residents," or the "Class"), by and through their undersigned attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for their class action complaint, allege, based on personal knowledge as to their own actions and upon information and belief and investigation of counsel as to those of others, as follows:

## NATURE OF THE ACTION

   1.  Plaintiffs bring this class action against Shorefront LLC d/b/a Seagate Rehabilitation and Nursing Center; Shaindy Berko; Rochel David; Leah Friedman; Deena Landa; Esther Farkovits; Avi Philipson; Berish Rubinstein; David Rubinstein; Bruscha Singer; Joel Zupnick; Shorefront Realty LLC; SentosaCare, LLC; Bent Phillipson; Ben Landa; and Does 1-25 (collectively, "Defendants") -- the owners and operators of Seagate Rehabilitation and

Nursing Center, a nursing home located at 3015 W 29th Street, Brooklyn, New York (the "Facility") -- on behalf of themselves and a class of similarly situated nursing home patients who were victimized by unsafe and inadequate care in the Facility. Defendants' unlawful conduct violates Section 2801-d of New York's Public Health Law ("PHL").[1]

2. Defendants are entrusted to provide care to the elderly and infirm nursing home patients in their custody. Unfortunately, Defendants have betrayed and continue to betray that trust. For example, Defendants fail to sufficiently staff the Facility. Throughout their operation of the Facility, Defendants have failed to staff a sufficient number of nurses and aides, thereby depriving the Facility's residents of the level of care required under New York and federal law.[2] Among many other shocking failures, this understaffing caused Defendants to fail to provide the correct dosage of medications at the prescribed times, fail to regularly wash and change patients, serve patients inappropriate meals, force patients to clean the Facility walls with caustic chemicals causing severe skin peeling, put patients on heavy narcotics resulting in some patients suffering from brain metabolic injury, and refuse patients their clothing and medication upon discharge.

---

[1] PHL § 2801-d provides a cause of action by residents against nursing homes that deprive them of "any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation." *See* PHL 2801-d(1).

[2] *See* 10 N.Y.C.R.R. § 415.13 (mandating that a nursing facility "shall provide sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident"); 42 U.S.C. § 1396r(b)(4)(C)(i)(I) (mandating that a nursing facility "must provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents"); 42 U.S.C. § 1395i-3(b)(4)(A)(i) (mandating that a nursing facility must provide "nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident").

3. Unsurprisingly, the Nursing Home Compare website operated by the federal Centers for Medicare & Medicaid Services ("CMS") shows that the Facility currently receives a rating of one star ("much below average") out of a five star scale in staffing, further evidencing the lack of adequate care and staffing at the Facility.[3]

4. As the Facility has approximately 360 beds and is operating at a high occupancy rate (above 95%),[4] there are many other residents currently languishing in an unsafe and inadequate nursing home.

5. Accordingly, Plaintiffs, individually and on behalf of the Class, asserts claims against Defendants for violation of PHL § 2801-d and seek monetary damages in an amount to be determined at trial, statutory damages in accordance with PHL § 2801-d(2), and injunctive relief prohibiting further wrongful conduct, as well as any other available relief at law or in equity.

## PARTIES

**Plaintiffs**

6. Plaintiff Walter Chow sues on behalf of the Estate of Leroy Chow, his brother, who was a resident of the Facility from approximately February 2015 until his release in August 2016.

7. Leroy Chow passed away on December 27, 2017.

---

[3] *See* Nursing Home Compare Profile for the Facility (available at https://www.medicare.gov/NursingHomeCompare/profile.html#profTab=-1&ID=335513) (accessed July 5, 2019) (copy annexed as Exhibit 1).

[4] *See* New York State Department of Health profile for the Facility (available at https://profiles.health.ny.gov/nursing_home/view/150691) (accessed July 5, 2019) (copy annexed as Exhibit 2).

8.      On May 13, 2019, the Kings County Surrogate's Court issued Letters of Temporary Administration appointing Walter Chow administrator of Leroy Chow's estate (copy annexed as Exhibit 3).

9.      Walter Chow is a citizen and resident of Kings County, New York.

10.     Plaintiff Anthony Lanni sues on behalf of the Estate of Vincenzo Lanni, his father, who was a resident of the Facility from approximately September 2019 to approximately January 2020.

11.     Vincenzo Lanni passed away on March 21, 2020.

12.     Mr. Lanni has applied for the issuance of Letters of Temporary Administration appointing Anthony Lanni as administrator of Vincenzo Lanni's estate, and he anticipates that such application will shortly be granted.

13.     Plaintiff Anthony Lanni is a citizen and resident of Brooklyn, New York.

14.     Plaintiff Rita Skolkin, who is a current resident of the Facility and has been since approximately 2013, sues on her own behalf.

15.     Plaintiff Rita Skolkin is a citizen and resident of Brooklyn, New York.

**Defendants**

16.     Defendant Shorefront Operating LLC d/b/a Seagate Rehabilitation and Nursing Center ("Shorefront Operating") is a New York limited liability company with its principal place of business in Kings County, New York.  At all relevant times, Shorefront Operating has been the licensed operator of the Facility.  Shorefront Operating provides an address for service by the New York State Department of State of 20 Franklin Place, Woodmere, New York 11598.

17.     Defendants Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits (a/k/a Esther Farkovitz a/k/a Esther Landa), Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, and Joel Zupnick (the "Individual Defendants") are controlling

4

persons of the Facility pursuant to PHL § 2808-a(2).[5]   The Individual Defendants each hold

membership interests in Shorefront Operating LLC.[6]   At all relevant times, the Individual

Defendants each had a direct ownership interest in the Facility as well as the ability, acting either

alone or in concert with others with ownership interests in the operation of the Facility, to direct

or cause the direction of the management or policies of the Facility.

18.     Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Avi Philipson,

Berish Rubinstein, David Rubinstein, Bruscha Singer, and Joel Zupnick are citizens and

residents of New York State.  Esther Farkovits is a citizen and resident of the nation of Israel.

19.     Defendant Shorefront Realty LLC ("Shorefront Realty") is a New York limited

liability company with its principal place of business in Kings County, New York.  Shorefront

Realty is a controlling person of the Facility pursuant to PHL § 2808-a.  Shorefront Realty owns

the property occupied by the Facility and receives rent payments from Shorefront Operating LLC

for the use of the property.[7]   Moreover, there is a significant overlap in the ownership of

Shorefront Realty and Shorefront Operating.[8]   Indeed, Shorefront Realty provides an address for

service by the New York State Department of State of 20 Franklin Place, Woodmere, New York

---

[5] PHL § 2808-a provides that "a 'controlling person' of a residential health care facility shall be deemed to mean any person who by reason of a direct or indirect ownership interest (whether of record or beneficial) has the ability, acting either alone or in concert with others with ownership interests, to direct or cause the direction of the management or policies of said facility."

[6] *See* https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2014-01-30/docs/131092_e.pdf (accessed July 5, 2019) (copy annexed as Exhibit 4).

[7] *See* Exhibit 4.

[8] Rochel David, Leah Friedman, Berish Rubinstein, Brucha Singer, David Rubinstein, Cheskel Berkowitz, Benjamin Landa, the Schlesinger Family Trust, and Philipson Family, LLC each hold membership interests in Shorefront Realty LLC.  *See* Exhibit 4.

11598, the same address as Shorefront Operating.  At all relevant times, Shorefront Realty has

had at least an indirect and/or beneficial ownership interest in the operation of the Facility as

well as the ability, acting either alone or in concert with others with ownership interests in the

operation of the Facility, to direct or cause the direction of the management or policies of the

Facility.

20.     Defendant SentosaCare, LLC ("SentosaCare") is a New York limited liability

company with its principal place of business in Nassau County, New York.  SentosaCare is a

controlling person of the Facility pursuant to PHL § 2808-a.  SentosaCare provides

administrative services to the Facility.[9]  Moreover, there is a significant overlap in the ownership

of SentosaCare, Shorefront Realty, and Shorefront Operating.[10]  Indeed, the "proposed operator"

of the Facility was initially "Shorefront Operating LLC c/o SentosaCare, LLC,"[11] and

SentosaCare even provides an address for service by the New York State Department of State of

---

[9] *See* State of New York Public Health and Health Planning Council Committee Day Agenda for January 28, 2016, Exhibit 6, Project #152177-E at p.10 (available at https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2016-01-28/docs/exhibits.pdf) (disclosing that "Sentosa Care LLC contracts for administrative services with the following nursing homes . . . : Bay Park Center for Nursing and Rehabilitation; Eastchester Rehabilitation and Health Care Center; Nassau Extended Care Center; Park Avenue Extended Care Facility; Seagate Rehabilitation and Nursing Center") (last visited July 5, 2019) (relevant portion of which is annexed as Exhibit 5).

[10] The principals of SentosaCare are Bent Philipson and Benjamin Landa.  Bent Philipson is Avi Philipson's father, and Avi Phillipson is an owner of Shorefront Operating. Benjamin Landa is Deena Landa and Esther Farkovits' father, and they are also owners of Shorefront Operating. Moreover, Benjamin Landa is an owner of Shorefront Realty, which has an ownership interest in the Facility, and Bent Philipson is a controlling member of Philipson Family, LLC, which is also an owner of Shorefront Realty.

[11] *See* Summary Information page for Project Number 131092 on the New York State Department of Health Certificate of Need system (available athttps://www.health.ny.gov/facilities/cons/nysecon/) (visited October 31, 2018) (copy annexed as Exhibit 6).

20 Franklin Place, Woodmere, New York 11598, the same address as Shorefront Operating and

Shorefront Realty.  At all relevant times, SentosaCare has had at least an indirect and/or

beneficial ownership interest in the operation of the Facility as well as the ability, acting either

alone or in concert with others with ownership interests in the operation of the Facility, to direct

or cause the direction of the management or policies of the Facility.

21.     Defendant Bent Philipson and Defendant Ben Landa are the two principals of

SentosaCare LLC.  Defendant Philipson and Defendant Landa are personally liable under PHL §

2808-a.  Both Defendant Philipson and Defendant Landa also have a direct or indirect ownership

interest in the Facility.

22.     In addition to the defendants identified with particularity, Plaintiffs allege all

claims against Does 1-25, with addresses and names unknown, who are other persons that have

owned, operated, or controlled the Facility during the relevant period.

**JURISDICTION AND VENUE**

23.     This Court has original subject-matter jurisdiction over this proposed class action

pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act

("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class

action in which the proposed plaintiff class is comprised of at least 100 members, any member of

a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign

state, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and

costs.  The total claims of individual members of the proposed Class (as defined herein) are well

in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

24.     Further, Defendants argued in their removal petition dated June 17, 2019, "[t]his

action is a civil action removable to this Court pursuant to 28 U.S.C. §§ 1331, 1367, and 1441(a).

This Court has original jurisdiction over this action because it arises under the laws of the United

7

States.  Plaintiff[s'] claims depend on the definition, interpretation and application of the federal Nursing Home Reform Act.  The Complaint also contains repeated allegations concerning the federal Centers for Medicare & Medicaid Services ("CMS"), part of the federal Department of Health and Human Services, regarding a CMS reporting site and associated ratings and the interpretations of those ratings . . . To the extent some of Plaintiff[s'] claims do not depend on the definition, interpretation and application of federal law, this Court has supplemental jurisdiction over these other claims because they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367."  *Chow v. Shorefront Operation LLC*, Ind. No. 523769/2018, NYSCEF No. 35 (N.Y. Sup. Ct. Kings Cty.).

25.     This Court has personal jurisdiction over the parties because Plaintiffs and several of the Defendants reside in the State of New York.  Additionally, Defendants have conducted and do conduct substantial business in this State, including through operation of the Facility; have had systematic and continuous contacts with this State, including through operation of the Facility; and have agents and representatives that can be found in this State, including through operation of the Facility.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.  Defendants operated the Facility in this District.  Furthermore, Plaintiffs and several of the Defendants reside within this District.

## FACTUAL BACKGROUND

I.   **The Nursing Home Crisis Leads To Legislation Granting Patients A Right To Bring Class Actions Against Operators For Improper Care And To Federal Databases Tracking Nursing Home Ratings.**

27.   In an effort to protect the vulnerable nursing home population, ensure that their rights are enforced, and provide them with a form of legal recourse which would not otherwise be economically feasible, the New York State Legislature enacted PHL §§ 2801-d and 2803-c.

28.   Predating the enactment of PHL §§ 2801-d and 2803-c, "the public's confidence in the State's ability to protect its most defenseless citizens, the aged and infirm, had been destroyed by a series of dramatic disclosures highlighting the abuses of nursing home care in their State." *See* Governor's Memoranda, Nursing Home Operations, McKinney's 1975 Session Laws of New York, p.1764.  In Governor Carey's letter to the Legislature accompanying the bills for PHL §§ 2801-d and 2803-c, he stated that these bills were "designed to deal directly with the most serious immediate problems which have been uncovered with respect to the nursing home industry."[12]  The Sponsor's Memorandum relating to PHL § 2803-c and the transcripts of the Senate debates indicate that the purpose of the statute was to establish certain minimum standards for the care of nursing home patients.  *See* Governor's Bill Jacket for Chapter 648 of the Laws of 1975; Senate Debate Transcripts, 1975, Chapter 648 Transcripts, pp.4521, 4525.  The term "residential health care facility" was intentionally used by the Legislature in an effort to curb abuses in the nursing home industry.[13]

---

[12] *Morisett v. Terence Cardinal Cooke Health Care Ctr.*, 8 Misc.3d 506, 509 (Sup. Ct. N.Y. Cnty. 2005).

[13] *See Town of Massen v. Whalen*, 72 A.D.2d 838 (3rd Dep't 1979).

29.     The Commission's Summary Report specifically indicated that PHL § 2801-d creates a cause of action for a patient of a facility which deprived the patient "of rights or benefits created for his well-being by federal or state law or pursuant to contract" which resulted in injury to the patient.  The Commission stated that this statute "introduce[s] a degree of equality between nursing homes and their otherwise vulnerable and helpless patients and, through private litigation brought by patients either in individual or class action lawsuit, provides a supplemental mechanism for the enforcement of existing standards of care."

30.     The Legislative Memorandum "Nursing Home–Health Care Facilities–Actions by Patients" relating to PHL § 2801-d observes that nursing home patients "are largely helpless and isolated," that many are "without occasional visitors," and that "[m]ost cannot afford attorneys," and therefore the bill provides nursing home patients "with increased powers to enforce their rights to adequate treatment and care by providing them with a private right of action to sue for damages and other relief and enabling them to bring such suits as class actions."  *See* McKinney's Session Laws of New York, 1975 pp.1685-86.  That memorandum states that the proposed PHL § 2801-d "creates incentives which would encourage private non-governmental parties (*i.e.*, plaintiffs' attorneys) to help protect the rights of nursing home patients."  *Id.*

31.     This statutory cause of action was created as an additional remedy, separate and distinct from other available traditional tort remedies.[14]

32.     In addition, in the wake of an emphasized focus on the adequacy of care provided by skilled nursing home facilities, in December of 2008, the Centers for Medicare & Medicaid Services ("CMS") enhanced its Nursing Home Compare public reporting site to include a set of

---

[14] *See Kash v. Jewish Home & Infirmary of Rochester, N.Y. Inc.*, 61 A.D.3d 146, 150 (4th Dep't 2009).

quality ratings for each nursing home that participates in Medicare or Medicaid.  The primary

goal of this rating system is to provide residents and their families with an easy way to assess

nursing home quality, in order to make meaningful distinctions between high and low

performing nursing homes.  The rating system features an overall five-star rating based on

facility performance in three areas, each of which has its own five-star rating: (1) health

inspections, which is measured based on outcomes from State health inspections; (2) staffing,

which is a measure based on the nursing home's aggregate staffing demand (based ultimately on

the residents' Minimum Data Set ("MDS") -- a set of metrics used to determine for each resident

the amount of staffing needed) and staffing supply (based on payroll records for Registered

Nurse ("RN"), Licensed Practitioner Nurse ("LPN"), and nurse aide hours per resident per day);

and (3) quality measures.[15]

33.     This class action seeks to address the injustices that caused the Legislature to

enact PHL § 2801-d.  As alleged in more detail below, Defendants have violated and continue to

violate their statutory obligations by failing to provide, among other things, adequate staffing,

supervision, treatment, hygiene, and medical attention to the Class.

**II.     Ben Landa And Bent Philipson Were The Architects
Of The Purchase And Profitization Of The Seagate Facility
And Real Property, Acquired A Direct And Indirect Interest
In The Home, And They Exercise Operational Control Of The Facility.**

34.     Previously known as the Shorefront Jewish Geriatric Center and operated by the

not-for-profit corporation Shorefront Jewish Geriatric Center, Inc., the Facility was sold in

---

[15] *See* Centers for Medicare & Medicaid Services, "Design for Nursing Home Compare Five-Star Quality Rating System: Technical User's Guide" (July 2018 ed.) (the "CMS Technical Guide") (available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/usersguide.pdf) (last visited August 28, 2018).

December 2014 to two entities -- owned almost entirely by the same parties -- in a deal worth $50,000,000.00.  Defendant Shorefront Realty LLC purchased the Facility's real estate for $32,000,000.00, and defendant Shorefront Operating LLC purchased the Facility's operations for $18,000,000.00.  Subsequent to the sale, Shorefront Operating LLC made lease payments to Shorefront Realty LLC for use of the Facility.  Mortgage financing of approximately $45,000,000.00 was provided by Greystone Funding Corporation.  As part of the sale, the name under which the Facility operates was changed to Seagate Rehabilitation and Nursing Center. Also as part of the sale, Shorefront Operating, LLC contracted with SentosaCare, LLC to provide various administrative and resident care services to the Facility.  Defendants informed the New York Department of Health that they expected an annual net income (exclusive of profits taken by the owners of Shorefront Realty LLC) of approximately $1,000,000.00.

35.      Ben Landa initiated and facilitated the sale with Sam Schlesinger.  The two identified the Shorefront Jewish Geriatic Center as a good acquisition target.  Mr. Schlesinger arranged a meeting for the CEO of Shorefront Jewish Geriatic, himself, and Ben Landa.  The three met and agreed on the purchase price of $50,000,000.

36.      Mr. Landa planned the purchase of the home with a combination of financing and cash equity.  Mr. Landa and Mr. Schlesinger gathered investors, all of whom were either family, friends, or existing business associates.  Shaindy Berko, for example, is Mr. Schlesinger's daughter.  Mr. Landa also paid for the capital contribution of his own daughters, Deena Hersh Landa and Esther Farkovitz, so that they could both be ten percent owners of Shorefront Operating LLC.  Mr. Landa also approached Bent Philipson, a long-time business partner, to join in the purchase and operation of the Facility.  Mr. Bent Philipson then involved his son, Avi Philipson.  Mr. Landa dealt with Mr. David Zahler, who facilitated gifts of ownership to his own

daughters, Leah Friedman and Rochel David.  Mr. Landa approached David Rubinstein and Mr.
Berkowitz, who looped in Joel Zupnick.  Mr. Landa approached Nuchem Singer, whose wife,
Brucha Singer, became an investor.  These investors gathered approximately $5,000,000 and
financed the remaining amount through a mortgage with Greystone.

37.     These investors, now the Defendants, elected to split up the Facility and the land
into separate entities, valuing amongst themselves the real estate at $18,000,000 and the Facility
business at $30,000,000.

38.     Shorefront Operations LLC has three managing members, one of whom is Avi
Phillipson, son of Bent Phillipson, and another is Esther Farkovits, daughter of Mr. Landa.

39.     As a result of a lease approved by Ben Landa and his long-time business partner's
son Avi Phillipson, the Defendants funneled substantial money out of the Facility into the real
estate business.  Indeed, the profit on rent payments, over and above the amount needed to pay
the principle and interest on the Greystone Mortgage, is more than $2.5 million, an amount that
is more than double the profit Defendants chose to disclose to the New York Department of
Health and that increases every year.

40.     The Defendants outsourced much of the management of the Facility to
SentosaCare, which Ben Landa led as CEO and Bent Philipson led as COO.  To that end, Mr.
Landa and Mr. Phillipson hired Eli Grinspan as a regional administrator with responsibilities that
included the management and operation of the Seagate Facility.  Mr. Grinspan reports to Mr.
Landa and Mr. Philipson, and in turn Mr. Grinspan hires and directs the head administrator at the
Seagate Facility.  Meanwhile, Mr. Landa and Mr. Philipson provide "management consulting"
services to the Facility at the price of $15,000 per month each as a "Management Fee."  Mr.
Landa testified in his deposition on January 21, 2022 that Shorefront Operating pays Mr. Landa

and Mr. Philipson approximately $15,000 per month for their management consulting services. *See* Rough Transcript of the Deposition of Benjamin Landa at 148:7-17.  The Facility pays these "management fees" to Mr. Landa and Mr. Philipson in connection with various operations at the Facility, including but not limited to labor relation issues, hiring of Facility administrative staff (including Manny Kaufman, the head administrator at the Facility), recommendations regarding how to affect CMS star ratings, and reimbursement issues.

41.     In other words, Mr. Landa and Mr. Phillipson hire and control the regional administrator responsible for operations at Seagate, who in turn hires the Seagate administrator who then makes payments, the amount of which was not negotiated at arms-length, to Mr. Landa and Mr. Phillipson from the operational profits of the Facility, payments approved by the managing members of Shorefront Operations LLC, two of whom are the son and daughter of Mr. Landa and Mr. Phillipson.

42.     According to the SentosaCare operating agreement, Mr. Bent Philipson is a direct 1% owner of the Facility.  Mr. Landa confirmed that Bent Philipson was an owner of the Facility and exercised control over operations.  *See* Landa Tr. 12:8-15 ("Q: So Mr. Philipson was an owner of Seagate Rehab and Nursing Center, the facility itself, correct?  . . .  A: At some point."); *id*. at 24:5-17 ("Q: I'm just trying to understand who made the decision to contract with Milenia Care to provide the administrative services that you described?  Somebody must have made that decision.  I'm just trying to understand who it was.  A: Mr. Philipson who is one of the owners of the operations made that decision.  Q: Di you and Mr. Philipson negotiate the fees that Milenia Care charges Seagate for those services? . . . A: Mr. Philipson negotiated those fees."); *id*. at 25:6-11 ("A: So Mr. Philipson decided to use Milenia Care because he was one of the owners of the operating facility. . . ."); *id*. at 30:23-31:2 ("Q: And who was [Mr. Grinspan's]

direct employer during that time?  A: He reported to Mr. Philipson at Seagate and he reported to me in Spring Creek, Eastchester and Golden Gate."); *id*. at 31:18-32:15 ("Q: So Mr. Philipson ultimately had the responsibility for directing Mr. Grinspan and, therefore, the administration and operations of the Seagate facility? . . . A: Either Mr. Philipson or Joel Zupnick because Joel Zupnick was a managing member of the Seagate facility.  More likely than not he dealt with Mr. Grinspan in Seagate.  Q: Mr. Philipson also had authority to direct Mr. Grinspan?  . . . A: When he was on the license only. . . . Q: And when you say on the license, you mean one of the direct owners of the Seagate facility?  A: Correct.").

43.     Indeed, Mr. Landa and Mr. Philipson maintained such control over the Facility that those who worked in the Facility identified Mr. Landa and Mr. Philipson owners and employers of the Facility.  Mr. Grinspan testified at his July 27, 2020 deposition that "[Mr. Philipson] was one of the owners of the facility . . . ."  *See Deposition of Eli Grinspan Transcript* ("Grinspan Tr.") 37:21-23.  Mr. Grinspan testified that he spoke with both Mr. Philipson and Mr. Ben Landa with respect to the administration of the Facility.  Grinspan Tr. 44:16-22 ("Q: So the only owner of the facility that you ever talked to with respect to Seagate was Mr. Philipson? . . . A: No.  Q: Who else did you talk to?  A: Ben Landa.").

44.     Mr. Grinspan testified that Mr. Philipson and Mr. Landa are both owners of SentosaCare and owners of Shorefront Operating LLC.  Grinspan 52:8-14 ("A: Some of the owners who are owners of Sentosa Care are also owners of Seagate or Shorefront."  Q: . . . so Mr. Philipson and Mr. Landa are both owners of Sentosa Care and owners of Shorefront Operating?  A: Yes.").  Mr. Grinspan reported to Mr. Landa and Mr. Philipson.  Grinspan Tr. 55:24-56:4 ("A: Both Mr. Landa and Mr. Philipson were people I reported to.  Mr. Philipson assigned me to Seagate to be the regional manager.  That is all the information I know.  As far as

I'm concerned, they were my bosses and they were the owners."). Mr. Grinspan testified that he followed the orders of Mr. Philipson and Mr. Landa. Grinspan Tr. 59:5-24 ("Q: If Mr. Philipson or Mr. Landa had given you specific directions with respect to the operations of Seagate, you would have been required to follow those, correct? A: Yes. Q: So, for example, if they say, "I want you to go double the staffing over what we have today", you would be required to do that, correct? . . . A: Yes. Q: And similarly, if they said, 'you have to reduce staffing', you would be required to do that as well? A: Yes. Q: Because they have ultimate control over the operations of the facility? . . . A: They are my employer, my boss.").

45.     Mr. Grinspan testified that Mr. Landa or Mr. Philipson made the decisions regarding whether to use vendors and which vendors to use. Grinspan Tr. 73:8-15 ("Q: So is it fair to say then that somebody, other than you, made the decision as to whether or not to use Specialty RX to provide pharmaceutical services? A: Yes. Q: And would that have been either Mr. Philipson or Mr. Landa? A: Yes."). Mr. Grinspan testified that Mr. Landa and Mr. Philipson hire the administrators of the Facility. Grinspan Tr. 81:11-17 ("Q: . . . [W]ho hired the administrators during the time you were at Seagate? A: Me. Q: Did Mr. Philipson or Mr. Landa participate in the decisions as to which administrator to hire?"). A: Yes.").

46.     Manny Kaufman, the current administrator of the Facility, confirmed that he reported to and took direction from Mr. Eli Grinspan. *See* Kaufman Tr. 13:18-22 ("Q: Okay. And Mr. Grinspan sometimes gave you specific direction with respect to running the nursing home; is that correct? . . . A: Yes."); *id*. at 15:5 ("Q: Okay. Who hired you? A: Mr. Grinspan."); *id*. at 158:11-17 ("Q: I asked, is it fair to say that you were e-mailing with Mr. Grinspan regarding the staff and the care that they provided to residents? Is that fair to say? A: That was part . . . of the concern.").

### III.    The Facility Is Unsafe And The Conditions
To Which Its Patients Are Subjected Violate Numerous Statutes.

47.    Conditions at the Facility have been and continue to be unsafe and violative of applicable laws, rules, and regulations, and the care provided to Vincenzo Lanni, Rita Skolkin, Leroy Chow, and the Class has been and continues to be inadequate.

48.    Defendants failed and continue to fail to promote the care for the Facility's residents in a manner that maintains or enhances each resident's dignity and respect in full recognition of their individuality and in contravention of applicable federal and New York State laws, rules, and regulations.

49.    Among other failures, Defendants failed and continue to fail to provide sufficient nursing staff to provide the nursing and related services necessary to attain and maintain the highest practicable physical and psycho-social well-being of the Patients.  A resident's right to sufficient staffing is one of the most important rights protected by New York and federal statutes.[16]

50.    The Facility is administered by SentosaCare, LLC.  As early as October 2015, local news media reported that staffing levels among SentosaCare administrated nursing homes were egregiously low.[17]

51.    Indeed, the Facility currently receives a rating of one star ("much below average") out of a five star scale in staffing from the Nursing Home Compare website operated by CMS.[18]

---

[16] *See* 10 N.Y.C.R.R. § 415.13; 42 U.S.C. § 1396r(b)(4)(C)(i)(I); 42 U.S.C. § 1395i-3(b)(4)(A)(i).

[17] *See* https://www.propublica.org/article/new-york-for-profit-nursing-home-group-flourishes-despite-patient-harm (accessed July 8, 2019) (copy annexed as Exhibit 7).

[18] *See* Exhibit 1.

CMS's star ratings for staffing reflect the relationship of a facility's reported staffing levels to its expected staffing levels (determined by looking at the number of residents and their reported medical conditions).[19]  A one-star or two-star rating indicates that the Facility has actual staffing levels below the expected staffing levels, based on the needs of the residents.[20]  Defendants here have failed to adequately staff the Facility for years; during every quarter beginning in 2013 to the present, the Facility has received one and two star ratings for overall staffing and RN staffing.[21]

52.     Defendants' failure to properly staff the Facility is particularly egregious because understaffing is one of the primary causes of inadequate care and often unsafe conditions in nursing facilities.  Numerous studies have shown a direct correlation between inadequate staffing and serious care problems including, but not limited to, a greater likelihood of falls, pressure sores, significant weight loss, incontinence, and premature death.  Although the dangers caused by understaffing are common knowledge in the nursing home industry, Defendants nonetheless chose not to provide adequate staffing levels.

53.     In addition, Defendants failed and continue to fail to provide each patient with the appropriate food.  For example, Leroy Chow, who was a diabetic, was often served inappropriate meals laden with sugars and heavy in carbohydrates.  The Facility staff served meat sliced too large to Plaintiff Skolkin, putting her at risk of choking.

---

[19] *See* CMS Technical Guide at 1 ("The staffing measures are derived from data submitted each quarter through the Payroll-Based Journal System (PBJ), along with daily resident census derived from Minimum Data Set, Version 3.0 (MDS 3.0) assessments, and are case-mix adjusted based on the distribution of MDS 3.0 assessments by Resource Utilization Groups, version IV (RUG-IV group).") & 7-12.

[20] *Id.* at 9-12.

[21] *See* Exhibit 8 (compiling historical CMS ratings for staffing for the Facility).

54.     Defendants have subjected the Facility residents to indignities and other harms that directly resulted and continue to result from inadequate nurse staffing levels at the Facility, including but not limited to: infrequent and inadequate turning and repositioning; no response or long response times to call lights; failure to provide adequate showers; lack of assistance with grooming and bathing; inadequate attention to toileting needs, resulting in Leroy Chow, Vincenzo Lanni and the Class remaining in their own urine and fecal matter for extended periods of time; lack of assistance with eating; failure to provide fluids as needed; lack of assistance with dressing; and being confined to their beds without removal for long periods.  Indeed, Plaintiffs have found no nurses or doctors present on the floor for hours at a time or indeed for an entire evening.

55.     For example, in October of 2015, Leroy Chow was forced by the staff at the Facility to clean the Facility walls himself using caustic chemicals, resulting in his suffering severe skin peeling.  Also while a resident at the Facility, Leroy Chow developed three huge pre-cancerous polyps that were left unattended for almost a year.  He was also discovered by family members to be sitting in a public area in urine soaked clothing, apparently having needed to have been changed for hours.  Because of the lack of sufficient staff, he was constantly given the incorrect dosage of medication.

56.     Leroy's meals were often inappropriate for a diabetic.  The Facility staff served him meals with high amounts of carbohydrates and sugar.  In August 2016, when he was due to be released from the Facility, he was placed on heavy narcotics in order to deter his discharge. He suffered brain metabolic injury due to the heavy narcotics and was refused his clothing and medication upon release.

57.     Indeed, there were several instances where Leroy Chow or another resident would ask for help -- for example, with going to the bathroom -- while sitting out in open area, right in front of the nurses' station, but would receive no assistance for hours.  As a result, Leroy Chow and other residents were left to sit in their own waste, increasing their risk of developing a urinary tract infections ("UTI").

58.     Plaintiff Skolkin has repeatedly fallen and suffered extensive contusions and bruising in the Facility as a result of the Facility's understaffing.  Some of these falls caused injury to her ankles.  Plaintiff Skolkin tore her ligaments in some of these falls.  She required stitches at the hospital as a result of at least two of these falls.  Consequent to the falls, Plaintiff Skolkin cannot shower herself and requires assistance from Facility staff.  But there is not enough staff to assist Plaintiff Skolkin.

59.     The Facility staff rarely administers Plaintiff Skolkin's medication on time.  This is detrimental to Plaintiff Skolkin's health.

60.     The Facility staff sometimes neglect to provide Plaintiff Skolkin her medication at all.  This neglect forces Plaintiff Skolkin, at 85-years-old, to track down a staff member and beg for her medication.

61.     The Facility staff fail to maintain adequate supply of Plaintiff Skolkin's medication.  Oftentimes, the Facility staff cannot provide Plaintiff Skolkin her medication because the Facility failed to order the medication from its medical supplier.

62.     The Facility staff sometimes fail to administer correct dosage of her medication to Plaintiff Skolkin.

63.     When Plaintiff Skolkin asks the Facility staff for assistance, sometimes the staff tell her that they are too busy to help.

64.     Plaintiff Skolkin washes her own laundry because the Facility staff too often lose her clothing.

65.     Facility staff serve meals late to Plaintiff Skolkin.  The food is cold and is of low nutritional value.  Sometimes the food causes Plaintiff Skolkin to vomit or regurgitate.  Plaintiff Skolkin has complained to the Facility multiple times but the food does not improve.

66.     Facility staff repeatedly confessed to Plaintiff Anthony Lanni that the Facility was inadequately staffed.

67.     Near the end of Vincenzo Lanni's stay, Plaintiff Lanni found his father in the Facility extremely ill and in desperate need of medical attention, with extremely swollen feet and exhibition of incoherence.  But the Facility staff did not act upon the medical emergency.  Facility staff did nothing to ensure that Vincenzo Lanni was transferred to hospital care in a timely fashion.  Plaintiff Lanni called 911 himself, but the prolonged delay caused by Facility understaffing was detrimental to Vincenzo's treatment and he suffered during that delay.  A hospital doctor informed Plaintiff Lanni that had Vincenzo not gone to the hospital, he would have died.

68.     Plaintiff Lanni repeatedly found his father sitting in a soiled diaper for hours at a time due to the Facility staff's failure to properly toilet his father or to change the diaper in a timely manner.  Plaintiff Lanni attempted to track down staff to change his father's diaper but often could not find any available staff to provide care.  Vincenzo Lanni developed rashes as a result of the prolonged periods of sitting in his own waste in soiled diapers.

69.     The Facility staff often failed to provide meals in a timely manner to Vincenzo Lanni.

70.     Plaintiff Lanni also found that the Facility's stench is severe and a result of the Facility staff's failure to maintain cleanliness in the home and in the patients.

71.     Plaintiff Lanni heard various residents in the Facility calling out for help.  But Facility staff rarely attended to the cries for help.

72.     As a result of Defendants' inadequate care, Plaintiffs sustained personal injuries and endured conscious pain and suffering.

73.     Upon information and belief, as a result of Defendants' inadequate care, the other members of the Class have sustained physical injuries and endured conscious pain and suffering.

74.     Defendants' inadequate care also injured Plaintiffs and the other members of the Class by placing them at an increased risk of harm.

75.     And Defendants' failure to satisfy their obligations pursuant to federal and New York law -- particularly the obligation to provide sufficient staffing -- economically injured Leroy Chow and the other members of the Class by depriving them of the benefit of the services for which they paid Defendants -- namely, a nursing home with, at the least, staffing sufficient to satisfy the requirements of New York and federal law.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated.[22]  The Class is defined as:

---

[22] PHL § 2801-d explicitly provides for these statutory claims to be brought as a class action. *See* PHL § 2801-d(4) (providing that "[a]ny damages recoverable pursuant to this section, *including minimum damages as provided by subdivision two of this section*, may be recovered in any action which a court may authorize to be brought as a class action" (emphasis added)).  PHL § 2801-d(2) provides that "compensatory damages shall be assessed in an amount sufficient to compensate such patient for such injury, but in no event less than twenty-five percent of the daily per-patient rate of payment established for the residential health care facility under section twenty-eight hundred seven of this article or, in the case of a residential health care facility not

> All persons who reside, or resided, at the Facility from November 27, 2015, to the present.

77.     Plaintiffs reserve the right to amend the above definitions, or to propose other or additional classes, in subsequent pleadings and/or motions for class certification.

78.     Plaintiffs, either in her own capacity or as an administrator of an estate, are members of the Class.

79.     Excluded from the Class are: (i) Defendants; any entity in which Defendants have a controlling interest; the officers, directors, and employees of Defendants; and the legal representatives, heirs, successors, and assigns of Defendants; (ii) any judge assigned to hear this case (or any spouse or family member of any assigned judge); (iii) any juror selected to hear this case; (iv) claims for personal injury and wrongful death; and (v) any and all legal representatives of the parties and their employees.

80.     This action seeks to enjoin Defendants from understaffing the Facility, failing to disclose understaffing at the Facility, and making misleading promises about staffing at the Facility.  In addition, this action seeks recovery -- including statutory minimum damages -- from the Defendants for injuries resulting from Defendants' failure to meet their contractual, statutory, and regulatory obligations.

81.     Plaintiffs and the Class satisfy the requirements for class certification for the following reasons:

82.     **Numerosity of the Class.**  At this time, Plaintiffs do not know the exact number of members of the Class, but the number is estimated to be in the hundreds, if not thousands. Therefore, the members of the Class are so numerous that their individual joinder is

---

having such an established rate, the average daily total charges per patient for said facility, for each day that such injury exists."

impracticable.  The precise number of persons in the Class and their identities and addresses may be ascertained from Defendants' records.  If deemed necessary by the Court, members of the Class may be notified of the pendency of this action.

83.    **Common Questions of Fact and Law.**  There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

a.    Whether Defendants violated or violate New York laws, including, but not limited to, PHL 2801-d, by depriving any patient of the Facility of any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule, or regulation, or by any applicable federal statute, code, rule, or regulation during the Class Period;

b.    Whether Defendants violated or violate New York laws, including, but not limited to, PHL 2803-c, by failing to provide any patient of the Facility with adequate and appropriate medical care, failing to provide courteous, fair and respectful care and treatment, and failing to ensure every patient was free from mental and physical abuse during the Class Period;

c.    Whether Defendants failed or fail to employ an adequate number of qualified personnel to carry out all of the functions of the Facility in violation of PHL 2801-d and 2803-c;

d.    Whether Defendants' decision to understaff the Facility violated or violates any right(s) of residents as set forth in PHL 2801-d and 2803-c;

e.    Whether Defendants' decision to understaff the Facility and failure to provide adequate and appropriate medical care violated or violates any right(s) of residents as set forth in the Patients' Bill of Rights pursuant to PHL 2803-c;

f.    Whether Defendants' conduct violated or violates sections 31.19(a) and 16.19(a) of the New York Mental Hygiene Law;

g.    Whether Defendants' conduct violated or violates section 415 of the New York Code Rules and Regulations, including but not limited to subsections 415.3, 415.5, 415.12, 415.13, 415.14, 415.15, and 415.26; and

h.    Whether Defendants' conduct violated or violates the federal Nursing Home Reform Act, codified at 42 U.S.C. §§ 1395i-3(a)-(h) & 1396r(a)-(h) and at 42 C.F.R. §§ 483.15, 483.20, 483.25, 483.30, 483.40, 483.60, & 483.75.

84.   **Typicality.**  The claims of Plaintiffs are typical of the claims of the proposed Class because Plaintiffs' claims are based upon the same legal theories and same violations of New York State and federal law.  Plaintiffs' grievances, like the proposed Class members' grievances, all arise out of the same business practices and course of conduct by Defendants. Further, Plaintiffs' damages arise out of a pattern of uniform and repetitive business practices conducted by Defendants.

85.   **Adequacy.**  Plaintiffs will fairly and adequately represent the Class on whose behalf this action is prosecuted.  Their interests do not conflict with the interests of the Class.

86.   Plaintiffs and their chosen attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP ("FBFG"), are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this Complaint so as to be able to assist in its prosecution.  Indeed, FBFG has been appointed as lead counsel in several complex class actions across the country and has secured numerous favorable judgments in favor of its clients.  FBFG's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class members.  Finally, FBFG possesses the financial resources necessary to ensure that the litigation will not be hampered by a lack of financial capacity and is willing to absorb the costs of the litigation.

87.   **Superiority.**  A class action is superior to any other available methods for adjudicating this controversy.  The proposed class action is the surest way to fairly and expeditiously compensate so large a number of injured persons, to keep the courts from becoming paralyzed by hundreds -- if not thousands -- of repetitive cases, and to reduce transaction costs so that the injured Class members can obtain the most compensation possible.

88.     Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a.   Absent a class action, Class members will suffer continuing, ever-increasing damages; violations of Class members' rights will continue without remedy; and the Facility will continue to remain understaffed, resulting in the mistreatment and improper care of Patients at the Facility.

b.   It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.  Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

c.   When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class.  This will promote global relief and judicial efficiency in that the liability of Defendants to all Class members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

d.   A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions.  If Class members are forced to bring individual suits, the transactional costs, including those incurred by Defendants, will increase dramatically, and courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with the identical fact patterns and the same legal issues.  A class action will promote a global resolution, and will promote uniformity of relief as to the Class members and as to Defendants.

e.   This lawsuit presents no difficulties that would impede its management by the Court as a class action.  The class certification issues can be easily determined because the Class includes only the residents of the Facility, the legal and factual issues are narrow and easily defined, and the Class membership is limited.  The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive.  The identity of the Class members can be identified from Defendants' records, such that direct notice to the Class members would be appropriate.

89.     In addition, the prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class.

90.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from understaffing, whereas another might not. Additionally, individual actions could be dispositive of the interests of members of the Classes who are not parties to such actions.

## FIRST CAUSE OF ACTION

## PUBLIC HEALTH LAW § 2801-d

91.     Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

92.     At all relevant times, Shorefront Operating conducted business as the licensed operator of the Facility, located at 3015 W 29th Street, Brooklyn, NY 11224.

93.     At all relevant times, Shorefront Operating had possession and control of the Facility.

94.     At all relevant times, Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Shorefront Realty LLC, SentosaCare, LLC, and Does 1-25 have each had an ownership interest in the operations of the Facility and the ability, acting either alone or in concert with others with ownership interests, to direct or cause the direction of the management or policies of the Facility, and are thus controlling persons of the Facility pursuant to PHL § 2808-a.

95.     At all relevant times, the Facility has operated as a residential health care facility as defined in PHL § 2801(3).  The Facility provides nursing care to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health-related service, and is thus a nursing home as defined in PHL § 2801(2).

96.     Accordingly, Defendants are subject to the provisions of PHL §§ 2801-d and 2803-c, as well as the rules and regulations set forth in sections 31.19(a) and 16.19(a) of the New York Mental Hygiene Law, section 415 of the New York Code Rules and Regulations, and the federal Nursing Home Reform Act.  These rules and regulations impose various obligations on Defendants, including, among others, a duty to adequately staff the Facility.

97.     Plaintiffs and the Class entered the Facility for care, treatment, supervision, management, and/or rehabilitation.

98.     Plaintiffs and the Class were under the exclusive care, custody, control, treatment, rehabilitation, supervision, and management of Defendants.

99.     During the period of Plaintiffs' and the Class's residency in the Facility, Defendants, through their officers, employees, agents, and staff, violated PHL § 2801-d by depriving Plaintiffs and the Class of rights or benefits created or established for their well-being by the terms of a contract(s) and/or by the terms of state and federal statutes, rules, and regulations.

100.     During Plaintiffs' and the Class's residency, they sustained personal injuries and suffered mental anguish as a result of Defendants' failure to meet their contractual, statutory, and regulatory obligations, particularly the obligation to adequately staff the Facility.

101.     During Plaintiffs' and the Class's residency at the Facility, the Facility subjected the residents to indignities and other harms that directly resulted and result from inadequate staffing levels at the Facility, including but not limited to: infrequent and inadequate turning and repositioning; no response or long response times to a call light; failure to provide adequate showers; lack of assistance with grooming and bathing; inadequate attention to toileting needs requiring residents to remain in their own urine and fecal matter for extended periods of time;

lack of assistance with eating; failure to provide fluids as needed; lack of assistance with dressing; and being confined to their bed without removal for long periods.

102.     Plaintiffs and their family complained to the Facility's staff regarding the neglectful, improper, and/or inadequate care and treatment of Plaintiffs and the other members of the Class.

103.     As a result of the foregoing acts and/or omissions, Defendants deprived Plaintiffs and the Class of their rights in violation of PHL § 2801-d.

104.     Defendants' deprivation of Plaintiffs' and the Class's rights in violation of PHL § 2801-d substantially contributed to, created, and/or caused Plaintiffs' and the Class's injuries. These injuries include, but are not limited to: being subjected to an increase risk of harm; being forced to undergo unnecessary medical treatment; incurring medical expense; suffering disfigurement, disability, mental anguish, and pain; suffering loss of enjoyment of life; and suffering a loss of the benefit of the bargain for which they contracted with Defendants -- namely, a residency at a nursing home with, at the least, staffing sufficient to satisfy the requirements of New York and federal law.

105.     Defendants' responsibilities and obligations to Plaintiffs and the Class are non-delegable, and thus Defendants have direct and/or vicarious liability for violations, deprivations, and infringements of such responsibilities and obligations by any person or entity under Defendants' control, direct or indirect, including their employees, agents, consultants, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools, or caused by Defendants' policies, whether written or unwritten, or their common practices.

106.     All acts and omissions committed by employees and agents of Defendants were pervasive, omnipresent events that occurred and continued throughout Plaintiffs' residency and

the other members of the Class's residency at the Facility, and were such that supervisors, administrators, and managing agents of Defendants knew, or should have been aware, of them.

107.     Pursuant to PHL § 2801-d(2), Plaintiffs and the Class seek compensatory damages in an amount sufficient to compensate each Patient for his or her injury, but in no event less than twenty-five percent of the daily per-patient rate of payment established for the Facility under PHL § 2807, or, in the event the Facility does not have an established rate, the average daily total charges per patient for the Facility, for each day that such injury existed.

108.     Plaintiffs seek injunctive relief.  Plaintiffs request the Court issue an order directing the Facility to implement sufficient staffing pursuant to its obligations under state and federal law.

109.     In addition to damages suffered by Plaintiffs and the Class as the result of the deprivation of their rights as nursing home residents, justice requires that Plaintiffs and the Class recover attorney's fees pursuant to PHL § 2801-d(6), punitive damages pursuant to PHL § 2801-d(2), and costs.

110.     Moreover, pursuant to PHL § 2808-a(1), as controlling persons of the Facility, Shaindy Berko, Rochel David, Leah Friedman, Deena Landa, Esther Farkovits, Avi Philipson, Berish Rubinstein, David Rubinstein, Bruscha Singer, Joel Zupnick, Shorefront Realty LLC, SentosaCare, LLC, and Does 1-25 are liable, jointly and severally, with and to the same extent as Shorefront Operating, to the Plaintiff and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment on behalf of themselves and the Class as follows:

a.   Certifying that the action may be maintained as a class action;

b.  Requiring that Defendants pay for notifying the members of the Class of the pendency of this suit;

c.  Awarding Plaintiffs and the Class injunctive relief prohibiting Defendants' violations of PHL §§ 2801-d and 2801-c in the future;

d.  On the First Cause of Action for violation of PHL § 2801-d, awarding Plaintiffs and the Class monetary damages in an amount to be determined at trial and punitive damages;

e.  For restitution and any other monetary relief permitted by law;

f.  For attorney's fees and costs; and

g.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by jury.

Dated:  White Plains, New York
        January 28, 2022

Respectfully Submitted,

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**

By: */s/D. Gregory Blankinship*
D. Gregory Blankinship
John Sardesai-Grant
Amanda Chan
1 North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
gblankinship@fbfglaw.com
jsardesaigrant@fbfglaw.com
achan@fbfglaw.com

*Attorneys for Plaintiff and the Proposed Class*

# Exhibit 1

# Medicare.gov | Nursing Home Compare
The Official U.S. Government Site for Medicare

## General information

### SEAGATE REHABILITATION AND NURSING CENTER

**Overall rating**  : 3 out of 5 stars
Average

Learn more about the overall star ratings

3015 W 29 ST
BROOKLYN, NY 11224
(718) 266-5700

### Nursing home information

360 certified beds ⓘ

Participates in ⓘ : Medicare and Medicaid

Automatic sprinkler systems in all required areas ⓘ :Yes

Not in a Continuing Care Retirement Community (CCRC) ⓘ

Not in a hospital ⓘ

No Resident or Family Council ⓘ

Learn why these characteristics and services are important

### Ownership information

Ownership ⓘ : For profit - Corporation

Legal business name: SHOREFRONT OPERATING LLC

Get more ownership information

### Star rating categories

**Health inspection rating** ⓘ
    3 out of 5 stars
    **Average**

**Staffing rating** ⓘ
    1 out of 5 stars
    **Much Below Average**

**Quality measures rating** ⓘ
    5 out of 5 stars
    **Much Above Average**

## Health inspections

# SEAGATE REHABILITATION AND NURSING CENTER

**Overall rating** ⓘ : 3 out of 5 stars
Average

---

## Health inspections

---

This page of Nursing Home Compare reports information about a nursing home's health inspections, complaints files and any resulting citations. Nursing homes that are certified by Medicare and Medicaid are inspected each year. Health care professionals inspect each nursing home and look for any health and safety citations. Learn more.

The health inspection star rating is based on each active provider's current health inspection survey and the 2 prior surveys, as well as findings from the most recent 3 years of complaints information and inspection revisits.

| | SEAGATE REHABILITATION AND NURSING CENTER |
|---|---|
| **Health Inspection rating** ⓘ | 3 out of 5 stars<br>Average |
| | |
| **Date of most recent health inspection** | 02/16/2018<br>View full report |
| ➤ **Total number of health citations** | 3 |
| **Average number of health citations in New York** | 4.9 |
| **Average number of health citations in the U.S.** | 8.0 |
| | |
| **Date(s) of complaint inspection(s) between 6/1/2018 - 5/31/2019** | No Complaint Inspections |
| **Number of complaints in the past 3 years that resulted in a citation** ⓘ | 1 |
| **Number of times in the past 3 years a facility-reported issue resulted in a citation** ⓘ | 0 |
| **View all health inspection details** | View all health inspection, complaint, and facility-reported issue details |

## Fire safety inspections

## SEAGATE REHABILITATION AND NURSING CENTER

**Overall rating** ⓘ : 3 out of 5 stars
Average

Learn more about the overall star ratings

### Fire safety inspections
BROOKLYN, NY 11224
Nursing homes that are certified by Medicare and/or Medicaid must meet standards set by the government to ensure
(718) 266-5700
residents are safe. Fire safety specialists inspect nursing homes to determine if a nursing home meets the Life Safety
Code (LSC) requirements, a set of fire safety and emergency preparedness requirements set by the Centers for
Medicare & Medicaid Services (CMS). These requirements are aimed at preventing fires, or protecting residents in the
event of an emergency like a fire, hurricane, tornado, flood, power failure, or gas leak.

Learn more about fire inspections.

|  | **undefined** |
|---|---|
| **Automatic Sprinkler Systems in All Required Areas** ⓘ | Yes |
| **Date of most recent standard fire safety inspection** | 02/27/2018 |
| **Total number of fire safety citations** ⓘ | 0 |
| **Average number of fire safety citations in NY** | 3.5 |
| **Average number of fire safety citations in the U.S.** | 2.9 |
| **See all fire safety inspection details** | View all fire safety inspections |

## Staffing

## SEAGATE REHABILITATION AND NURSING CENTER

**Overall rating** ⓘ : 3 out of 5 stars
Average

Learn more about the overall star ratings

### Staffing

Higher staffing levels in a nursing home may mean
higher quality of care for residents. This section
provides information about the different types of
nursing home staff and the average amount of time
per resident that they spend providing care.

Get more information about the staffing measures

Get more information about how to read the staffing chart

## Staffing

The information in this section includes registered nurses (RN), licensed practical/vocational nurses (LPN/LVN), nurse aides, and physical therapists (PT). Physical therapists aren't included in the "all staffing" star rating.

The "staffing" star rating takes into account that some nursing homes have sicker residents and may therefore need more staff than other nursing homes whose residents aren't as sick.

| | SEAGATE REHABILITATION AND NURSING CENTER | NEW YORK AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Staffing rating** | 1 out of 5 stars Much Below Average | | |
| **Average number of residents per day** | 346.1 | 168.0 | 85.7 |
| **Total number of licensed nurse staff hours per resident per day** | 54 minutes | 1 hour and 31 minutes | 1 hour and 33 minutes |
| **RN hours per resident per day** | 19 minutes | 42 minutes | 40 minutes |
| **LPN/LVN hours per resident per day** | 35 minutes | 49 minutes | 53 minutes |
| **Nurse aide hours per resident per day** ⓘ | 2 hours and 12 minutes | 2 hours and 14 minutes | 2 hours and 19 minutes |
| **Physical therapist staff hours per resident per day** ⓘ | 12 minutes | 7 minutes | 5 minutes |

### Registered Nurse (RN) staffing only

Registered nurses (RNs) are licensed healthcare professionals who are responsible for the coordination, management and overall delivery of care to the residents. Some nursing home residents who are sicker than others may require a greater level of care, and nursing homes that have more RN staff may be better able to meet the needs of those residents.

| | | | |
|---|---|---|---|
| **Registered Nurse (RN) staffing rating** | 1 out of 5 stars Much Below Average | | |
| **Average number of residents per day** | 346.1 | 168.0 | 85.7 |
| **RN hours per resident per day** | 19 minutes | 42 minutes | 40 minutes |

How to read staffing charts | About staff roles

## Quality of resident care

### SEAGATE REHABILITATION AND NURSING CENTER

**Overall rating** ℹ : 3 out of 5 stars
Average

Learn more about the overall star ratings

### Quality of resident care

Nursing homes that are certified by Medicare and Medicaid regularly report clinical information for each of their residents to the Centers for Medicare & Medicaid Services (CMS). For short-stay and long-stay resident quality measures, CMS assigns nursing homes a quality of resident care star rating based on their performance on 16 measures. These, and other measures reflect, on average, how well nursing homes care for their residents. Information is listed for 2 groups of residents:

Short-stay residents - those who spent 100 days or less in a nursing home or residents covered under the Medicare Part A Skilled Nursing Facility (SNF) benefit

Long-stay residents - those who spent over 100 days in a nursing home

Learn more about what quality of resident care information can tell you about a nursing home

| | |
|---|---|
| **Quality of resident care** ℹ | 5 out of 5 stars **Much Above Average** |
| **Short-stay quality of resident care** ℹ | 5 out of 5 stars **Much Above Average** |
| **Long-stay quality of resident care** ℹ | 5 out of 5 stars **Much Above Average** |

▼ **Short-stay residents**

Learn why these short-stay measures are important

Current data collection period

Case 1:19-cv-03541-FB-JRC  Document 97-2 Filed 01/28/23  Page 39 of 99 PageID #: 3577

| | SEAGATE REHABILITATION AND NURSING CENTER | NEW YORK AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| Short-stay quality of resident care ⓘ | 5 out of 5 stars **Much Above Average** | | |

| Measures used to calculate the star rating - Short-stay residents | | | |
|---|---|---|---|
| **Percentage of short-stay residents who were re-hospitalized after a nursing home admission.** *Lower* percentages are better. | 21.3% | 20.4% | 22.6% |
| **Percentage of short-stay residents who have had an outpatient emergency department visit.** *Lower* percentages are better. | 7.7% | 8.8% | 10.7% |
| **Percentage of short-stay residents who got antipsychotic medication for the first time.** ⓘ *Lower* percentages are better. | 1.2% | 1.5% | 1.8% |
| **Percentage of SNF residents with pressure ulcers that are new or worsened.** ⓘ *Lower* percentages are better. | 1.0% | NOT AVAILABLE | 1.6% |
| **Percentage of short-stay residents who report moderate to severe pain.** *Lower* percentages are better. | 2.4% | 8.1% | 12.3% |

Case 1:19-cv-03541-FB-JRC   Document 97-2   Filed 01/28/23   Page 40 of 99 PageID #: 3578

| | | | |
|---|---|---|---|
| **Percentage of short-stay residents who improved in their ability to move around on their own.** ⓘ<br><br>***Higher*** *percentages are better.* | 72.0% | 67.6% | 66.8% |

**Flu and pneumonia prevention measures - Short-stay residents**

| | | | |
|---|---|---|---|
| **Percentage of short-stay residents who needed and got a flu shot for the current flu season.** ***Higher*** *percentages are better.* | 80.6% | 82.7% | 82.4% |
| **Percentage of short-stay residents who needed and got a vaccine to prevent pneumonia.** ***Higher*** *percentages are better.* | 75.1% | 79.4% | 83.2% |

**Additional quality measures - Short-stay residents** ⓘ

| | | | |
|---|---|---|---|
| **Percentage of SNF residents who experience one or more falls with major injury during their SNF stay.** ***Lower*** *percentages are better.* | 0.4% | NOT AVAILABLE | 0.9% |

| | | | |
|---|---|---|---|
| **Percentage of SNF residents whose functional abilities were assessed and functional goals were included in their treatment plan.** ⓘ *Higher percentages are better.* | 100.0% | NOT AVAILABLE | 96.4% |
| **Rate of successful return to home and community from a SNF.** ⓘ *Higher rates are better.* | Better than the National Rate | NOT AVAILABLE | 48.6% |
| **Rate of potentially preventable hospital readmissions 30 days after discharge from a SNF.** *Lower rates are better.* | Not Available[16] | NOT AVAILABLE | Not Available[16] |
| **Medicare Spending Per Beneficiary (MSPB) for residents in SNFs.** ⓘ *Displayed as a ratio.* | 1.51 | NOT AVAILABLE | 1.01 |

▼ **Long-stay residents**

Learn why these long-stay measures are important

Current data collection period

Case 1:19-cv-03541-FB-JRC   Document 97-2   Filed 01/28/23   Page 42 of 99 PageID #: 3580

|  | SEAGATE REHABILITATION AND NURSING CENTER | NEW YORK AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Long-stay quality of resident care** ⓘ | 5 out of 5 stars **Much Above Average** | | |

| Measures used to calculate the star rating - Long-stay residents | | | |
|---|---|---|---|
| **Number of hospitalizations per 1,000 long-stay resident days.** *Lower* numbers are better. | 1.57 | 1.55 | 1.75 |
| **Number of outpatient emergency department visits per 1,000 long-stay resident days.** *Lower* numbers are better. | 0.61 | 0.74 | 1.03 |
| **Percentage of long-stay residents who got an antipsychotic medication.** ⓘ *Lower* percentages are better. | 4.4% | 11.3% | 14.6% |
| **Percentage of long-stay residents experiencing one or more falls with major injury.** *Lower* percentages are better. | 2.5% | 2.9% | 3.4% |
| **Percentage of long-stay high-risk residents with pressure ulcers.** ⓘ *Lower* percentages are better. | 6.8% | 8.6% | 7.4% |

| | | | |
|---|---|---|---|
| **Percentage of long-stay residents with a urinary tract infection.** *Lower* percentages are better. | 0.2% | 2.4% | 2.8% |
| **Percentage of long-stay residents who have or had a catheter inserted and left in their bladder.** ⓘ *Lower* percentages are better. | 2.5% | 1.6% | 2.2% |
| **Percentage of long-stay residents whose ability to move independently worsened.** *Lower* percentages are better. | 9.4% | 16.0% | 17.9% |
| **Percentage of long-stay residents whose need for help with daily activities has increased.** ⓘ *Lower* percentages are better. | 9.4% | 13.3% | 14.8% |
| **Percentage of long-stay residents who report moderate to severe pain.** *Lower* percentages are better. | 0.7% | 4.0% | 6.9% |
| **Flu and pneumonia prevention measures - Long-stay residents** | | | |
| **Percentage of long-stay residents who needed and got a flu shot for the current flu season.** *Higher* percentages are better. | 95.9% | 97.1% | 95.6% |

| | | | |
|---|---|---|---|
| **Percentage of long-stay residents who needed and got a vaccine to prevent pneumonia.** *Higher percentages are better.* | 77.3% | 93.7% | 93.7% |

## Additional quality measures - Long-stay residents

| | | | |
|---|---|---|---|
| **Percentage of long-stay residents who were physically restrained.** *Lower percentages are better.* | 0.0% | 0.4% | 0.3% |
| **Percentage of long-stay low-risk residents who lose control of their bowels or bladder.** *Lower percentages are better.* | 50.4% | 53.9% | 48.4% |
| **Percentage of long-stay residents who lose too much weight.** *Lower percentages are better.* | 6.2% | 6.1% | 5.6% |
| **Percentage of long-stay residents who have symptoms of depression.** *Lower percentages are better.* | 4.4% | 6.0% | 4.6% |
| **Percentage of long-stay residents who got an antianxiety or hypnotic medication.** 🛈 *Lower percentages are better.* | 10.8% | 14.0% | 20.7% |

## Penalties

| SEAGATE REHABILITATION AND NURSING CENTER | Penalties |
|---|---|

**Overall rating** ⓘ : 3 out of 5 stars
Average

Learn more about the overall star ratings

When a nursing home gets a serious citation or fails to correct a citation for a long period of time, this can result in a penalty. A penalty can be a fine against the nursing home or a denied payment from Medicare.

Search for penalties under state law.

Learn more about penalties.

| Federal fines in the last 3 years | 0 |
|---|---|
| Amount(s) and date(s) | This nursing home hasn't received any fines in the last 3 years. States may also impose penalties under state law. To search state websites Click here. |
| Payment denials by Medicare in the last 3 years | 0 |
| Date(s) | This nursing home hasn't received any payment denials in the last 3 years. States may also impose penalties under state law. To search state websites click here. |

# Exhibit 2

# NYS Health Profiles
Find and Compare New York Health Care Providers

**NEW YORK STATE** | **Department of Health**

## Seagate Rehabilitation and Nursing Center

3015 W 29 St
Brooklyn, NY 11224
(718) 266-5700

## Services

- Baseline Services
- Clinical Laboratory Service
- Radiology - Diagnostic

## Beds

| Residential Health Care | 360 |
|---|---|
| Total Number Of Beds | 360 |

## Administrative

- Ownership: Proprietary--LLC
- Operated by: Shorefront Operating LLC
  3015 W. 29th Street
  Brooklyn, NY 11224
- PFI: 1373
- Operating certificate: 7001801N
- DOH Regional Office: **New York Metro - New York City**
- Medicaid, Medicare certified

## Statistics

- Employee Flu Vaccination Rate: 61.0%
- Occupancy Rate: 97.0%

## Ombudsman

***Educating, empowering and advocating for long-term care residents.***

The Ombudsman Program is an effective advocate and resource for older adults and persons with disabilities who live in nursing homes, assisted living and other licensed adult care homes. Ombudsmen help residents understand and exercise their rights to good care in an environment that promotes and protects their dignity and quality of life.

The Ombudsman Program advocates for residents by investigating and resolving complaints made by or on behalf of residents; promoting the development of resident and family councils; and informing government agencies, providers and the general public about issues and concerns impacting residents of long-term care facilities.

The Office of the State Long Term Care Ombudsman maintains a directory of ombudsman coordinators by county. To view this directory, please visit **http://www.ltcombudsman.ny.gov/whois/**.

*Retrieved from https://profiles.health.ny.gov/nursing_home/printview/150691 on Fri Jul 05 2019 14:30:25 GMT-0400 (Eastern Daylight Time*

# Exhibit 3

*On the Date Written Below LETTERS are Granted by the Surrogate's Court, State of New York as follows:*

**File #: 2019-1121**

Name of Decedent: **Leroy Chow**      Date of Death: **December 27, 2017**

Domicile of Decedent: **Kings County**

Fiduciary Appointed:   **Walter Chow**
Mailing Address      2045 Batchelder Street
              Basement Apt
              Brooklyn NY 11229

Letters Issued:     **LETTERS OF TEMPORARY ADMINISTRATION**

Letters Expire:     **November 13, 2019**

Limitations:       **Bond having been dispensed with pursuant to SCPA § 801**

**Temporary Letters of Administration for the sole purpose of commencing and prosecuting a cause of action on behalf of the estate.**

**And said Temporary Administrator is hereby restrained from compromising any cause of action until further court order pursuant to EPTL 5-4.6 and upon filing satisfactory bond or security.**

THESE LETTERS, granted pursuant to a decree entered by the court, authorize and empower the above-named fiduciary or fiduciaries to perform all acts requisite to the proper administration and disposition of the estate/trust of the Decedent in accordance with the decree and the laws of New York State, subject to the limitations and restrictions, if any, as set forth above.

**Dated: May 13, 2019**            IN TESTIMONY WHEREOF, the seal of the Kings County Surrogate's Court has been affixed.

WITNESS, Hon Harriet L Thompson, Judge of the Kings County Surrogate's Court.

*Doreen a. Quinn*
Doreen A. Quinn, Chief Clerk

*These Letters are Not Valid Without the Raised Seal of the Kings County Surrogate's Court*

**Attorney:**
**Joseph Rones**
**Finkelstein & Partners Llp**
1279 Route 300 PO Box 1111
Newburgh NY 12551

# Exhibit 4



# Public Health and Health Planning Council

## Project # 131092 E

### Shorefront Operating, LLC d/b/a Waterfront Rehabilitation and Health Care Center

*County:* **Kings County**
*Purpose:* **Establishment**

*Program:* **Residential Health Care Facility**
*Acknowledged:* **March 1, 2013**

## Executive Summary

### Description

Shorefront Operating, LLC, an existing limited liability company, is seeking approval to become the new operator of Shorefront Jewish Geriatric Center, a 360-bed not-for-profit residential health care facility (RHCF) with an offsite adult day health care program (ADHCP) located in Brooklyn. The RHCF is to be renamed Waterfront Rehabilitation and Health Care Center. The ADHCP is not being transferred to the applicant. The current operator is considering closure of that program.

The executed asset purchase agreement is between Shorefront Jewish Geriatric Center, Inc. and Shorefront Operating, LLC. The operation is being purchased for $18,000,000. Ownership of the operation before and after the requested change is as follows:

Current
Shorefront Jewish Geriatric Center, Inc., not-for-profit corporation

Proposed
Shorefront Operating, LLC

| Name | % Ownership |
|------|-------------|
| Leah Friedman | 10.0% |
| Rochel David | 10.0% |
| David Rubinstein | 10.0% |
| Avi Philipson | 10.0% |
| Esther Farkovits | 10.0% |
| Deena Hersh | 10.0% |
| Joel Zupnick | 25.0% |
| Shaindy Berko | 10.0% |
| Berish Rubinstein | 2.5% |
| Bruchy Singer | 2.5% |

The executed real estate purchase agreement is between Shorefront Jewish Geriatric Center, Inc. and Shorefront Realty, LLC. The real property is being purchased for $32,000,000. Ownership of the real property before and after the requested change is as follows:

Current
Shorefront Jewish Geriatric Center, Inc., not-for-profit corporation.

Proposed
Shorefront Realty, LLC

| Name | % Ownership |
|------|-------------|
| Leah Friedman | 10.0% |
| Rochel David | 10.0% |
| David Rubinstein | 10.0% |
| Benjamin Landa | 20.0% |
| Philipson Family, LLC | 10.0% |
| Cheskel Berkowitz | 25.0% |
| Schlesinger Family Trust | 10.0% |
| Berish Rubinstein | 2.5% |
| Brucha Singer | 2.5% |

Esther Farkovits and Berish Rubenstein presently have ownership interests in the following Nursing Homes: Nassau Extended Care Facility, a 280-bed RHCF, located in Hempstead, New York; Park Avenue Extended Care Facility, a 240- bed RHCF, located in Long Beach, New York; Throgs Neck Extended Care Facility, a 205-bed RHCF, located in the Bronx; and Townhouse Extended Care Center, a 280-bed RHCF, located in Uniondale, New York.

Esther Farkovits also presently has ownership interest in Little Neck Care Center, a 120-bed RHCF, located in Little Neck, New York.

Berish Rubenstein also presently has ownership interest in Bay Park Center for Nursing and Rehab, a 480-bed RHCF, located in Bronx, New York.

## DOH Recommendation
Contingent Approval

## Need Summary
Shorefront Jewish Geriatric Center's utilization was 97.63% in 2011, which exceeds that for both Kings County and the New York City region.  The change in ownership will result in a name change, to Waterfront Rehabilitation and Health Care Center, upon project approval. There will be no change in beds or services.

## Program Summary
No negative information has been received concerning the character and competence of the proposed applicants identified as new members.

No changes in the program or physical environment are proposed in this application.  No administrative services or consulting agreements are proposed in this application.

## Financial Summary
The purchase price for the operation is $18,000,000 and the real estate purchase price is $32,000,000. The applicant will provide equity of $5,000,000 and a bank loan of $45,000,000.

Budget:

| | | |
|---|---|---|
| Revenues | $44,153,000 |
| Expenses | 43,130,800 |
| Net Income | $ 1,022,200 |

Subject to the noted contingencies, it appears that the applicant has demonstrated the capability to proceed in a financially feasible manner; and contingent approval is recommended.

## Recommendations

**Health Systems Agency**
There will be no HSA recommendation of this application.

**Office of Health Systems Management**
**Approval contingent upon:**
1. Submission of a commitment signed by the applicant which indicates that, within two years from the date of the council approval, the percentage of all admissions who are Medicaid and Medicare/Medicaid eligible at the time of admission will be at least 75 percent of the planning area average of all Medicaid and Medicare/Medicaid admissions, subject to possible adjustment based on factors such as the number of Medicaid patient days, the facility's case mix, the length of time before private paying patients became Medicaid eligible, and the financial impact on the facility due to an increase in Medicaid admissions. [RNR]
2. Submission of a plan to continue to enhance access to Medicaid residents. At a minimum, the plan should include, but not necessarily limited to, ways in which the facility will:
   - Reach out to hospital discharge planners to make them aware of the facility's Medicaid Access Program.
   - ommunicate with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility.
   - Identify community resources that serve the low-income and frail elderly population who may eventually use the nursing facility, and inform them about the facility's Medicaid Access policy.
   - Submit an annual report for two years to the DOH, which demonstrates substantial progress with the implementation of the plan. The plan should include but not be limited to:
     - Infomation on activities relating to a-c above; and
     - Documentation pertaining to the number of referrals and the number of Medicaid admissions; and
     - Other factors as determined by the applicant to be pertinent.
   The DOH reserves the right to require continued reporting beyond the two year period. [RNR]
3. Submission of a programmatically acceptable name for the facility. [LTC]
4. Submission of a photocopy of the applicant's executed Second Amendment to Amended and Restated Operating Agreement, acceptable to the Department. [CSL]
5. Submission of an original affidavit from the applicant, acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to the article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility. [BFA]
6. Submission of an executed loan commitment for not more than 50% of the applicable working capital, acceptable to the Department. [BFA]
7. Submission of an executed promissory note, acceptable to the Department. [BFA]
8. Submission of a commitment, acceptable to the Department, for a permanent mortgage from a recognized lending institution at a prevailing rate of interest. Included with the submitted permanent mortgage commitment, must be a sources and uses statement and debt amortization schedule, for both new and refinanced debt. [BFA]

**Approval conditional upon:**
1. The project must be completed within two years from the Public Health and Health Planning Council recommendation letter. Failure to complete the project with in the prescribed time shall constitute an abandonment of the application by the applicant and an expiration of the approval. [PMU]
2. Certification of the CMS mandated sprinkler system by the Metropolitan Area Regional Office. [LTC]

**Council Action Date**
**February 13, 2014**

## Need Analysis

### Background

Shorefront Operating, LLC seeks approval to enter into an asset purchase agreement with Shorefront Jewish Geriatric Center, a 360-bed residential health care facility located at 3015 West 29th Street, Brooklyn, 11224, in Kings County. The new owners also propose to change the name to Waterfront Rehabilitation and Health Care Center.

### Analysis

Shorefront's utilization was higher than Kings County and the New York City region for 2009, 2010, and 2011, as shown in Table 1:

*Table 1: Shorefront Center for Rehabilitation and Nursing Care /Kings County/ NYC Region Occupancy*

| Facility/County/Region | 2009 | 2010 | 2011 |
|---|---|---|---|
| Shorefront  Jewish Geriatric Center | 97.92% | 98.05% | 97.63% |
| Kings County | 93.68% | 93.55% | 94.64% |
| NYC region | 95.01% | 94.88% | 94.76% |

There is currently an unmet need of 7,649 beds in the New York City region, but RHCF bed occupancy for the five boroughs remains below the 97 percent planning optimum.  However, occupancy at Shorefront has consistently been above 97 percent.

*Table 2: RHCF Need – NYC*

| | |
|---|---|
| **2016 Projected Need** | 51,071 |
| **Current Beds** | 43,343 |
| **Beds Under Construction** | 79 |
| **Total Resources** | 43,422 |
| **Unmet Need** | 7,649 |

### Access

Regulations indicate that the Medicaid patient admissions standard shall be 75% of the annual percentage of all Medicaid admissions for the long term care planning area in which the applicant facility is located. Such planning area percentage shall not include residential health care facilities that have an average length of stay of 30 days or fewer. If there are four or fewer residential health care facilities in the planning area, the applicable standard for a planning area shall be 75% of the planning area percentage of Medicaid admissions, or 75 percent of the Health Systems Agency area Medicaid admissions percentage whichever is less. In calculating such percentages, the Department will use the most current data which have been received and analyzed by the Department.  An applicant will be required to make appropriate adjustments in its admission polices and practices so that the proportion of its own annual Medicaid patients admissions is at least 75% of the planning area percentage or Health Systems Agency percentage, whichever is applicable.

Shorefront Jewish Geriatric Center was below the 75 percent planning average for 2009 and 2010. The facility reported Medicaid admissions of 6.82 percent and 14.30 percent in 2009 and 2010, respectively. The 75 percent planning averages for Kings County for these years were 14.97 percent (2009) and 27.7 percent (2010).

### Conclusion

Shorefront's occupancy rate of 97.63% indicates that approval of this application will help maintain a needed resource for the Brooklyn community.

### Recommendation

**From a need perspective, contingent approval is recommended.**

## Programmatic Analysis

Background

|  | Existing | Proposed |
|---|---|---|
| Facility Name | Shorefront Jewish Geriatric Center | Seagate Rehabilitation and Health Care Center |
| Address | 3015 West 29th Street Brooklyn, NY. 11224 | Same |
| RHCF Capacity | 360 | Same |
| ADHC Program Capacity | N/A | Same |
| Class of Operator | Not-For-Profit Corporation | Limited Liability Company |
| Operator | Shorefront Jewish Geriatric Center, Inc. | Shorefront Operating, LLC<br><br>Managing Members:<br>Joel Zupnick          25.0%<br>Esther Farkovits     10.0%<br>Avi Philipson         10.0%<br><br>Members<br>Leah Friedman        10.0%<br>Rochel David         10.0%<br>David Rubinstein     10.0%<br>Deena Hersh          10.0%<br>Shaindy Berko        10.0%<br>Berish Rubinstein     2.5%<br>Brucha Singer         2.5% |

Character and Competence – Background

Facilities Reviewed

Nursing Homes

| North Westchester Restorative Therapy and Nursing Center | 12/2010 to 09/2011 |
|---|---|
| Bay Park Center for Nursing and Rehabilitation | 05/2007 to present |
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |

Licensed Home Care Services Agency (LHCSA)

| Pella Care, LLC | 01/2005 to present |
|---|---|
| Parent Care Home Care, LLC | 01/2005 to present |

Individual Background Review

Joel Zupnick is employed as the vice president of HHCNY, Inc., a healthcare staffing agency, and as the vice president of Specialty Rx, Inc., a pharmaceutical company. Mr. Zupnick also serves as the chief financial officer for Pella Care, LLC, a licensed home care services agency.  He discloses the following health facility ownership interests:

| North Westchester Restorative Therapy and Nursing Center | 12/2010 to 09/2011 |
|---|---|
| Pella Care, LLC  (LHCSA) | 01/2005 to present |

Esther Farkovits is currently unemployed.  She was previously a yoga instructor at the Lucille Roberts gym from February 2005 to October 2006.  Ms. Farkovits discloses the following ownership interests in health facilities:

| | |
|---|---|
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |

Avi Philipson is currently unemployed and discloses no employment history.  Avi Philipson discloses no ownership interests in health facilities.

Leah Friedman is employed in human resources at Confidence Management Systems, a housekeeping services company, located in Linden, New Jersey.  Ms. Friedman discloses no ownership interests in health facilities.

Rochel David is employed in human resources at Confidence Management Systems, a housekeeping services company, located in Linden, New Jersey.  Ms. David discloses no ownership interests in health facilities.

David Rubinstein lists his current employment as the administrator of Garden State Health Care Administrators, an insurance company based in Brooklyn, New York and as the owner/operator of United Health Administrators, an insurance company also based in Brooklyn, New York.  Mr. Rubinstein discloses no ownership interests in health facilities.

Deena Hersh is currently unemployed and discloses no employment history.  She discloses no ownership interests in health facilities.

Shaindy Berko is currently unemployed.  She was previously an eighth grade teacher at the United Talmudical Academy of Boro Park from 2010 to 2011.  Ms. Berko discloses no ownership interests in health facilities.

Berish Rubinstein lists his current employment as the Director of Human Resources at Prompt Nursing Employment, an employment agency located in Woodmere, New York.  Berish Rubinstein discloses the following health facility ownership interest:

| | |
|---|---|
| Bay Park Center for Nursing and Rehabilitation | 05/2007 to present |

Brucha Singer lists her current employment as bookkeeper and accountant at County Agency of New York, Inc., a professional employer organization located in Brooklyn, New York.  She is also employed in clerical duties at the Southside Agency, a staffing agency also located in Brooklyn, New York.  Brucha Singer discloses the following ownership interest:

| | |
|---|---|
| Parent Care Home Care LLC | 01/2005 to present |

## Character and Competence - Analysis
No negative information has been received concerning the character and competence of the applicants.

A review of the Bay Park Center for Nursing and Rehabilitation for the period identified above revealed the following:
- The facility was fined $4,000 pursuant to a Stipulation and Order issued March 2, 2011 for surveillance findings on December 18, 2009. Deficiencies were found under 10 NYCRR 415.12 -Quality of Care: Highest Practicable Potential and 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition Status.
- The facility was fined $18,000 pursuant to a Stipulation and Order issued May 30, 2012 for surveillance findings on February 16, 2011.  Deficiencies were found under 10 NYCRR 415.4(b)(1)(i) – Definition Free From Abuse; 10 NYCRR 415.4(b) – Development of Abuse

Policies; 10 NYCRR 415.12(h)(2) – Quality of Care: Accidents; 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition; and 10 NYCRR 415.26(c)(1)(iv) – Nurse Aide Competency.

It was determined by the Department of Health Nursing Home Surveillance staff that the citations under 10 NYCRR 415.12(i)(1) – Quality of Care: Nutrition, on the above stipulation and orders were not identical violations and were adequately resolved with the facility's plan of correction.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the time period identified above results in a conclusion of substantially consistent high level of care since there were no repeat enforcements.

A review of the North Westchester Restorative Therapy and Nursing Center, Little Neck Care Center, Nassau Extended Care Facility, Park Avenue Extended Care Facility, Throgs Neck Extended Care Facility, and the Townhouse Extended Care Facility for the time period identified above reveals that a substantially consistent high level of care has been provided since there were no enforcements.

A review of the licensed home care services agencies Pella Care, LLC and Parent Care Home Care, LLC for the time periods identified above reveals that a substantially consistent high level of care has been provided since there were no enforcements.

Project Review

No changes in the program or physical environment are proposed in this application.  Shorefront Jewish Geriatric Center submitted a Certificate of Need in January 2011 to renovate and refurbish its nursing units along with the installation of a sprinkler system mandated by the Centers for Medicare and Medicaid Services (CMS).  The project was approved by the Public Health and Health Planning Council in December 2011.  Prior to the proposed change of ownership of the facility, the operating board determined it would not proceed and formally withdrew the project in August 2013. A separate notice of construction was submitted to the Department to complete the CMS mandated sprinkler system.  It is recommended that the applicant should consider the need to renovate and refurbish areas of the nursing unit to create a more homelike environment that recognizes the characteristics of the nursing home residents.

As mentioned above, the facility has installed a sprinkler system in accordance to the CMS 2013 sprinkler mandate.  However, the Department of Health's surveillance unit will need to ensure that the installation of the sprinkler system has met CMS requirements.

Conclusion

No negative information has been received concerning the character and competence of the proposed applicants identified as new members.

No changes in the program or physical environment are proposed in this application.  No consulting or administrative services agreements are proposed in this application.

Recommendation:
**From a programmatic perspective, contingent approval is recommended.**

# Financial Analysis

## Asset Purchase Agreement

The change in operational ownership will be effectuated in accordance with an executed asset purchase agreement, the terms of which are summarized below:

| | |
|---|---|
| Date: | September 24, 2012 |
| Seller: | Shorefront Jewish Geriatric Center, Inc. |
| Buyer: | Shorefront Operating, LLC |
| Assets Transferred: | The business and operation of the facility; the lease; furniture, fixtures and equipment; inventory and supplies; assignable contracts, licenses and permits; resident funds; security deposits and prepayments; menus, policies and procedure manuals, phone numbers, financial books and records; resident and employee records; Medicare and Medicaid provider numbers. |
| Excluded Assets: | Personal property; marketable securities; retroactive rate increases; appeal proceeds relating to periods prior to closing. |
| Assumed Liabilities: | Those relating to transferred assets. |
| Purchase Price: | $18,000,000 with a $2,000,000 down payment upon execution of agreement with the remainder at closing. |

The applicant, as a contingency of approval, must provide an original affidavit, which is acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to Article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility.  Currently, there are no outstanding Medicaid overpayment liabilities relating to HCRA surcharges and obligations.

## Lease Agreement

Facility occupancy is subject to an executed lease agreement, the terms of which follow:

| | |
|---|---|
| Date: | February 19, 2013 |
| Lessor: | Shorefront Realty, LLC |
| Lessee: | Shorefront Operating, LLC |
| Term: | 35 years with one renewal term of 10 years |
| Rental: | Annual rent equal to debt service on lessee's mortgage plus $2,450,000 per year supplemental rent to increase to $2,695,000 on fifth anniversary date of lease and increase 2% each year after. |
| Other: | Lessee pays insurance, taxes, maintenance and utilities |

## Operating Budget

Following is a summary of the submitted operating budget for the RHCF, presented in 2013 dollars, for the first year subsequent to change in ownership:

| | Total |
|---|---|
| Revenues: | |
| Medicaid | $28,128,000 |
| Medicare | 12,650,000 |
| Private Pay/Other | 3,375,000 |
| Total Revenues | $44,153,000 |
| | |
| Expenses: | |
| Operating | $38,496,000 |
| Capital | 4,634,800 |
| Total Expenses | $43,130,800 |

| | |
|---|---|
| Net Income | $ 1,022,200 |
| Utilization (patient days) | 128,000 |
| Occupancy | 97.4% |

The following is noted with respect to the submitted RHCF operating budget:
- The capital component of the Medicaid rate is based on the return of, and return on, equity reimbursement methodology.
- Expenses include lease rental.
- Medicaid rates are based on 2013 Medicaid pricing rates with no trend.
- Medicare and private pay revenues are based on current payment rates.
- Breakeven occupancy is projected at 95.2%.
- Utilization by payor source is expected as follows:

| | |
|---|---|
| Medicaid | 75.0% |
| Medicare | 18.0% |
| Private Pay | 7.0% |

Capability and Feasibility

The applicant will satisfy the purchase price of $18,000,000 for the operation and $32,000,000 for the reality from a $45,000,000 bank loan at 4% over 30 years with the remaining $5,000,000 in members' equity.  A letter of interest has been submitted from Greystone on behalf of the applicant.  A draft promissory note has been submitted by the applicant, whereas Shorefront Operating, LLC promises to pay Shorefront Realty, LLC $16,000,000 at 4% interest over twenty years.

Working capital requirements are estimated at $7,188,467, based on two months of the first year expenses, of which $3,594,234 will be satisfied from the proposed members' net worth and the remaining $3,594,233 from a bank loan (5 year term at 6%).  A letter of interest has been supplied by Greystone for the working capital loan.  An affidavit from each applicant member, which states that he or she is willing to contribute resources disproportionate to ownership percentages, has been provided by the proposed members.  BFA Attachment A is the net worth of proposed members.

The submitted budget indicates that a net income of $1,022,200 would be maintained during the first year following change in ownership.  Staff has noted that the 2012 historical costs contain additional expenses of $401,000 due to Hurricane Sandy and legal fees associated with the sale of Shorefront.  It should also be noted that the first year budget does not reflect the current operator's administrative overhead paid to the parent company, Metropolitan Jewish Health System. The first year budget is more reflective of 2011 overall utilization with a conservative approach to increased Medicaid patients. The budget appears reasonable.

Staff notes that with the expected 2014 implementation of managed care for nursing home residents, Medicaid reimbursement is expected to change from a state-wide price with a cost-based capital component payment methodology to a negotiated reimbursement methodology.  Facility payments will be the result of negotiations between the managed long term care plans and the facility.   At this point in time, it cannot be determined what financial impact this change in reimbursement methodology will have on this project.

BFA Attachment B presents the pro-forma balance sheet of Shorefront Operating, LLC.  As shown, the facility will initiate operation with $5,063,000 members' equity.   It is noted that assets include $16,500,000 in goodwill, which is not an available liquid resource, nor is it recognized for Medicaid reimbursement purposes.  Thus, members' equity would be negative $11,437,000.

Review of BFA Attachment C, financial summary of Shorefront Geriatric Center, indicates that the facility has maintained positive working capital and equity positions and has generated an average net loss of $141,813 for the period shown.  The facility has experienced an average occupancy of 97.87% for the period shown.

Review of BFA Attachment D, financial summary of affiliated RHCFs, indicates the following facilities had operational losses in 2011 and/or 2012.  Bay Park Center had a 2011 net operational loss due to the implementation of the new reimbursement methodology not accounted for by management.  Little Neck Care Center had a 2011 and 2012 net operational loss due to costs associated with closing on the purchase of the facility from the prior owner.  The facility has steadily improved operations since the new owners have improved census.  Park Avenue Facility had a 2011 net operational loss due to a retroactive rate reduction in their adult day care.  Throgs Neck had a 2011 net operational loss due to additional expenses for third party loans.  Townhouse Extended care had 2012 and 2011 net operational losses due to a reserve for potential uncollectible accounts receivables.

Based on the preceding, and subject to the noted contingencies, it appears that the applicant has demonstrated the capability to proceed in a financially feasible manner, and approval is recommended.

Recommendation
**From a financial perspective, contingent approval is recommended.**

| Attachments |
|---|

BFA Attachment A          Net Worth of Proposed Members
BFA Attachment B          Pro-forma Balance Sheet, , LLC
BFA Attachment C          Financial Summary, Shorefront Geriatric Center
BFA Attachment D          Financial Summary of affiliated Nursing Homes

Project #131092
BFA Attachment B

**BALANCE SHEET**
**SHOREFRONT OPERATING LLC**
**PROJECTED**          REVISED 5/22/2013
**OPENING DAY**

### ASSETS

| | | |
|---|---|---|
| CASH | 7,200,000 | |
| | | |
| ACCOUNTS RECEIVABLE | | |
| INVENTORIES | 3,000 | |
| PREPAID EXP & OTHER | 460,000 | |
| **TOTAL CURRENT ASSETS** | 7,663,000 | |
| | | |
| EQUIPMENT | 1,500,000 | |
| GOODWILL | 16,500,000 | |
| **TOTAL FIXED ASSETS** | 18,000,000 | purchase price |
| | | |
| OTHER ASSETS | | |
| | | |
| **TOTAL ASSETS** | **$25,663,000** | |

### LIABILITIES

| | | |
|---|---|---|
| CURRENT PORTION LONG TERM DEBT | 533,000 | |
| LOAN PAYABLE | 3,600,000 | |
| ACCRUED & OTHER LIABILITIES | 1,000,000 | payroll & taxes |
| **TOTAL CURRENT LIABILITIES** | 5,133,000 | |
| | | |
| TOTAL LONG TERM DEBT | **15,467,000** | 16MILL@4% 240 MOS |
| | | |
| TOTAL LIABILITIES | 20,600,000 | |
| | | |
| EQUITY | 5,063,000 | |
| | | |
| TOTAL LIABILITIES & EQUITY | $22,063,000 | |

Project #131092
BFA Attachment C

## Financial Summary- Shorefront Jewish Geriatric Center

| | FISCAL PERIOD ENDED | | |
| --- | --- | --- | --- |
| | Draft | | |
| | 12/31/12 | 12/31/11 | 12/31/10 |
| ASSETS - CURRENT | $19,403,837 | $22,780,923 | $29,526,059 |
| ASSETS - FIXED AND OTHER | 35,961,033 | 37,231,462 | 39,105,780 |
| LIABILITIES - CURRENT | 13,312,312 | 10,647,189 | 19,985,725 |
| LIABILITIES - LONG-TERM | 18,592,000 | 23,968,094 | 24,263,860 |
| EQUITY | $23,460,558 | $25,397,102 | $24,382,254 |
| | | | |
| INCOME | $52,712,212 | $55,966,992 | $43,987,313 |
| EXPENSE | 54,969,543 | 54,068,121 | 44,063,293 |
| NET INCOME | ($2,257,331) | $1,898,871 | ($75,980) |
| | | | |
| NUMBER OF BEDS | 360 | 360 | 360 |
| PERCENT OF OCCUPANCY (DAYS) | 97.92% | 97.63% | 98.05% |
| | | | |
| PERCENT OCCUPANCY (DAYS): | | | |
| MEDICAID | 71.2% | 71.3% | 73.4% |
| MEDICARE | 11.1% | 11.9% | 10.5% |
| PRIVATE/OTHER | 17.7% | 16.8% | 16.1% |
| | | | |
| MEDICAID RATE BREAKDOWN: | 2013 | 2012 | 2011 |
| | | | |
| OPERATING | $261.54 | $258.32 | $251.59 |
| CAPITAL | 27.47 | 27.48 | 31.49 |
| TOTAL | $289.01 | $285.80 | $283.08 |

CON# 131092
BFA Attachment D

| **Bay Park Center** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $8,941,861 | $8,736,423 | $9,823,048 |
| Fixed Assets | 5,444,603 | 4,269,078 | 4,735,017 |
| Total Assets | 14,386,464 | 13,005,501 | $14,558,065 |
| Current Liabilities | 10,690,389 | 16,679,330 | 16,236,097 |
| Long Term Liabilities | 5,029,215 | 4,882,957 | 4,630,847 |
| Total Liabilities | $15,719,604 | $21,562,287 | $20,866,944 |
| Working Capital Position | ($1,748,528) | ($7,942,907) | ($6,413,049) |
| Net Assets | ($1,333,140) | ($8,556,786) | ($6,308,879) |
| Operating Revenues | $52,296,270 | $50,844,469 | $55,217,275 |
| Operating Expenses | 49,343,624 | 52,942,376 | 54,392,744 |
| Operating Net Income | $2,952,646 | ($2,097,907) | $824,531 |

| **Little Neck Nursing Home** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | NA | $3,505,124 | NA |
| Fixed Assets | NA | 3,174,800 | NA |
| Total Assets | NA | $6,679,924 | NA |
| Current Liabilities | NA | 3,519,751 | NA |
| Long Term Liabilities | NA | 3,024,231 | NA |
| Total Liabilities | NA | 6,543,982 | NA |
| Working Capital Position | NA | ($14,627) | NA |
| Net Assets | NA | $135,942 | NA |
| Operating Revenues | $11,425,784 | $10,049,249 | NA |
| Operating Expenses | 11,555,310 | 11,317,151 | NA |
| Operating Net Income | ($129,526) | ($1,267,902) | NA |

| **Nassau Extended Care** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $9,182,360 | $7,502,010 | $8,954,923 |
| Fixed Assets | 18,039,496 | 18,559,425 | 17,453,694 |
| Total Assets | $27,221,856 | $26,061,435 | $26,408,617 |
| Current Liabilities | 6,953,687 | 6,007,623 | 6,336,774 |
| Long Term Liabilities | 5,783,758 | 6,521,087 | 6,967,910 |
| Total Liabilities | 12,737,445 | 12,528,710 | 13,304,684 |
| Working Capital Position | $2,228,673 | $1,494,387 | $2,618,149 |
| Net Assets | $14,484,411 | $13,532,725 | $13,103,933 |
| Operating Revenues | $31,357,570 | $31,838,896 | $31,945,892 |
| Operating Expenses | 30,254,684 | 31,410,304 | 31,628,885 |
| Operating Net Income | $1,102,886 | $428,592 | $317,007 |

CON# 131092
BFA Attachment D (Continued)

| **Park Avenue Facility** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $6,534,276 | $6,406,660 | $7,705,175 |
| Fixed Assets | 15,693,338 | 15,232,521 | 14,505,397 |
| Total Assets | $22,227,614 | $21,639,181 | $22,210,572 |
| Current Liabilities | 5,828,963 | 5,098,963 | 5,195,019 |
| Long Term Liabilities | 5,852,462 | 6,570,804 | 6,847,125 |
| Total Liabilities | 11,681,425 | 11,669,767 | 12,042,144 |
| Net Assets | $10,546,189 | $9,969,414 | $10,168,428 |
| Working Capital Position | $705,313 | $1,307,697 | $2,510,156 |
| Operating Revenues | $26,820,883 | $26,172,207 | $25,872,102 |
| Operating Expenses | 25,993,108 | 26,371,221 | 25,861,931 |
| Operating Net Income | $827,775 | ($199,014) | $10,171 |

| **Throgs Neck** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $4,019,543 | $3,694,355 | $3,527,193 |
| Fixed Assets | 10,717,202 | 11,459,630 | 11,273,132 |
| Total Assets | $14,736,745 | $15,153,985 | $14,800,325 |
| Current Liabilities | 5,281,573 | 5,805,286 | 5,182,176 |
| Long Term Liabilities | 4,635,335 | 5,184,522 | 5,507,867 |
| Total Liabilities | 9,916,908 | 10,989,808 | 10,690,043 |
| Net Assets | $4,819,837 | $4,164,177 | $4,110,282 |
| Working Capital Position | ($1,262,030) | ($2,110,931) | ($1,654,983) |
| Operating Revenues | $22,723,772 | $22,083,569 | $22,301,778 |
| Operating Expenses | 21,317,610 | 22,192,071 | 22,166,725 |
| Operating Net Income | $1,406,162 | ($108,502) | $135,053 |

| **Townhouse Extended Care** | 2012 | 2011 | 2010 |
|---|---|---|---|
| Current Assets | $9,305,901 | $7,686,006 | $8,264,226 |
| Fixed Assets | 13,009,041 | 12,938,708 | 12,730,577 |
| Total Assets | $22,314,942 | $20,624,714 | $20,994,803 |
| Current Liabilities | 8,317,288 | 6,310,183 | 6,194,200 |
| Long Term Liabilities | 10,214,720 | 10,236,392 | 10,484,329 |
| Total Liabilities | 18,532,008 | 16,546,575 | 16,678,529 |
| Net Assets | $3,782,934 | $4,078,139 | $4,316,274 |
| Working Capital Position | $988,613 | $1,375,823 | $2,070,026 |
| Operating Revenues | $32,345,384 | $33,597,464 | $33,035,848 |
| Operating Expenses | 32,640,589 | 33,835,599 | 32,739,475 |
| Operating Net Income | ($295,205) | ($238,135) | $296,373 |

# Exhibit 5



**NEW YORK STATE OF OPPORTUNITY.**

**Department of Health**

# Public Health and Health Planning Council

## Project # 152177-E
## TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center

| | | | |
|---|---|---|---|
| *Program:* | **Residential Health Care Facility** | *County:* | **Bronx** |
| *Purpose:* | **Establishment** | *Acknowledged:* | **September 21, 2015** |

## Executive Summary

### Description

TCPRNC, LLC d/b/a The Plaza Rehab and Nursing Center (The Plaza), a New York limited liability company, requests approval to be established as the new operator of Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, Bronx (JHL, Bronx), a 744-bed Article 28 residential health care facility (RHCF) located at 100 West Kingsbridge Road, Bronx (Bronx County).  The facility currently operates a 100-slot adult day health care program (ADHCP) onsite, which is not part of the proposed sale. JHL, Bronx will transfer the license of the ADHCP to the license of the Jewish Home Lifecare, Manhattan Division (JHL, Manhattan). The ADHCP will remain operational at the current site under an agreement with the proposed buyers for up to 24 months, while an appropriate site in the Bronx for the ADHCP is sought by JHL Manhattan.  The facility also operates a Long Term Home Health Care Program that will close prior to the change in ownership.  Upon the change in ownership, the facility will transition from a voluntary/not-for-profit corporation to a proprietary facility.  There will be no change in certified beds or in RHCF services other than as noted.

On July 7, 2015, Jewish Home Lifecare (parent entity) and JHL, Bronx (operations and real estate sellers) entered into an Asset Purchase Agreement (APA) with SentosaCare, LLC for the sale of the operations and real estate associated with the RHCF.  The total purchase price for the operations and real estate is $110,000,000 apportioned as follows: $22,000,000 for the operations and $88,000,000 for the real estate.

On September 10, 2015, SentosaCare, LLC entered into two Assignment and Assumption Agreements, whereby the RHCF operations were assigned to TCPRNC, LLC and the real estate was assigned to TCPRNC Real Estate, LLC.  There is a relationship between TCPRNC, LLC and TCPRNC Real Estate, LLC in that the entities have common members.  The applicant will lease the premise from TCPRNC Real Estate, LLC.

Ownership of the operations before and after the requested change is as follows:

| Current Owner<br>Jewish Home Lifecare,<br>Harry & Jeanette Weinberg Campus, Bronx | |
|---|---|
| Member | % |
| Jewish Home Lifecare (nfp) | 100% |

| Purchaser<br>SentosaCare, LLC | |
|---|---|
| Members | % |
| Bent Philipson | 50% |
| Benjamin Landa | 50% |

| Proposed Owner via Assignment<br>TCPRNC, LLC<br>d/b/a The Plaza Rehab and Nursing Center | |
|---|---|
| Members | % |
| Leopold Friedman | 25.0% |
| Esther Farkovits | 25.0% |
| Avi Philipson | 12.5% |
| Raquel Philipson | 12.5% |
| Bernard Fuchs | 15.0% |
| Bescar, LLC* | 10.0% |

*Bescar, LLC members are Regina Weinstock (20%), Meryl Maybruch (20%), Barbara Gold (20%), Benjamin Fishoff (20%) and Abraham Fishoff (20%); therefore, each Bescar, LLC member will have 2% ownership interest in TCPRNC, LLC.  Bescar, LLC also has 10% ownership interest in TCPRNC Real Estate, LLC, resulting in a 2% ownership interest per Bescar, LLC member in the realty entity.

OPCHSM Recommendation
Contingent Approval

Need Summary
There will be no changes to beds upon approval of this application.  Facility occupancy was 96.8% in 2011, 97.5% in 2012, and 99.0% in 2013 with 18 vacant beds.  Occupancy is expected to remain near or exceed the Department's planning optimum going forward with the new operator.

Program Summary
No negative information has been received concerning the character and competence of the proposed applicants.  No changes in the program or physical environment are proposed in this application.  The applicant has stated there will be no administrative services or consulting agreements.

Financial Summary
SentosaCare, LLC will acquire the operating and real estate interests of the RHCF for a total purchase price of $110,000,000 and will then assign the operating interests to TCPRNC, LLC and the real estate interests to TCPRNC Real Estate, LLC.  The purchase price will be paid with $22,000,000 equity from the proposed members of TCPRNC, LLC and TCPRNC Real Estate, LLC.  The remaining $88,000,000 will be financed as follows: a $17,600,000 loan to TCPRNC, LLC for the RHCF operations and a $70,400,000 loan to TCPRNC Real Estate, LLC for the real estate.  The terms for both loans are identical, with interest at 5.5% for ten-year terms and 25-year amortizations.  HHC Finance has provided letters of interest for the respective loans.  Applicant member Bernard Fuchs (operations/realty loans) and SentosaCare members Benjamin Landa and Bent Philipson (realty loan) have provided affidavits to fund the balloon payments for the respective operating and realty financings, if acceptable terms are not available at the time of refinancing.

There are no project costs associated with this proposal.  The operating budget is as follows:

| | |
|---|---|
| Revenues | $97,388,000 |
| Expenses | $95,635,000 |
| Gain/(Loss) | $ 1,753,000 |

# Recommendations

**Health Systems Agency**
There will be no HSA recommendation for this project.

**Office of Primary Care and Health Systems Management**
**Approval contingent upon:**

1. Submission of a commitment for a permanent mortgage for the real estate portion of the project to be provided from a recognized lending institution at a prevailing rate of interest, acceptable to the Department of Health.  This is to be provided within 120 days of approval of state hospital code drawings and before the start of construction.  Included with the submitted permanent mortgage commitment must be a sources and uses statement and a debt amortization schedule, for both new and refinanced debt.   [BFA]

2. Submission of a commitment for a permanent mortgage for the operations portion of the project to be provided from a recognized lending institution at a prevailing rate of interest, acceptable to the Department of Health.  This is to be provided within 120 days of approval of state hospital code drawings and before the start of construction.  Included with the submitted permanent mortgage commitment must be a sources and uses statement and a debt amortization schedule, for both new and refinanced debt.   [BFA]

3. Submission of an executed working capital loan commitment, acceptable to the Department of Health.   [BFA]

4. Submission of a commitment signed by the applicant which indicates that, within two years from the date of the council approval, the percentage of all admissions who are Medicaid and Medicare/Medicaid eligible at the time of admission will be at least 75 percent of the planning area average of all Medicaid and Medicare/Medicaid admissions, subject to possible adjustment based on factors such as the number of Medicaid patient days, the facility's case mix, the length of time before private paying patients became Medicaid eligible, and the financial impact on the facility due to an increase in Medicaid admissions. [RNR]

5. Submission of a plan to continue to enhance access to Medicaid residents. At a minimum, the plan should include, but not necessarily be limited to, ways in which the facility will:
   a. Reach out to hospital discharge planners to make them aware of the facility's Medicaid Access Program;
   b. Communicate with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility; and
   c. Identify community resources that serve the low-income and frail elderly population who may eventually use the nursing facility, and inform them about the facility's Medicaid Access policy. [RNR]

6. Submission of a commitment, signed by the applicant, to submit annual reports to the DOH, for at least two years, demonstrating substantial progress with the implementation of the plan. These reports should include, but not be limited to:
   a. Describing how the applicant reached out to hospital discharge planners to make them aware of the facility's Medicaid Access Program;
   b. Indicating that the applicant communicated with local hospital discharge planners on a regular basis regarding bed availability at the nursing facility;
   c. Identifying the community resources that serve the low-income and frail elderly population that have used, or may eventually use, the nursing facility, and confirming they were informed about the facility's Medicaid Access policy.
   d. Documentation pertaining to the number of referrals and the number of Medicaid admissions; and
   e. Other factors as determined by the applicant to be pertinent.
      The DOH reserves the right to require continued reporting beyond the two year period. [RNR]

7. Submission of a plan, acceptable to the Department, for the disposition of the Long Term Home Health Care Program (LTHHCP).  The plan must demonstrate that the handling of the programs adheres to statutory requirements and results in a safe and orderly transition of any program participants.   [LTC]

8. Submission of Articles of Organization of Bescar, LLC, acceptable to the Department.   [CSL]
9. Submission of Articles of Organization of Kennedy RH Holdings, LLC, acceptable to the Department. [CSL]
10. Submission of Articles of Organization of Philipson Family, LLC, acceptable to the Department. [CSL]
11. Submission of an Operating Agreement of TCPRNC LLC, acceptable to the Department.  [CSL]
12. Submission of an Operating Agreement of TCPRNC Real Estate LLC, acceptable to the Department. [CSL]
13. Submission of an Operating Agreement of Bescar LLC, acceptable to the Department. [CSL]
14. Clarification as to whether or not TCPRNC LLC will have a Shared Services Agreement with Sentosacare LLC.   [CSL]
15. Submission of an executed copy of the Assignment and Asusmption Agreement between Jewish Home LifeCare, Harry and Jeanette Weinberg Campus, Bronx and Sentosacare LLC.  [CSL]
16. Submission of a fully executed Title Affidavit, Limited Guarantee, and Bargain and Sale Deed. [CSL]
17. Submission of a Certificate of Assumed Name for TCPRNC, LLC, acceptable to the Department. [CSL]
18. Submission of Amended Articles of Organization of TCPRNC, LLC, acceptable to the Department. [CSL]

**Approval conditional upon:**
1. The project must be completed within three years from the date of the Public Health and Health Planning Council recommendation letter.  Failure to complete the project within the prescribed time shall constitute an abandonment of the application by the applicant and an expiration of the approval. [PMU]


Council Action Date
**February 11, 2016**

## Need Analysis

### Project Description
TCPRNC, LLC, seeks approval to become the established operator of Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, an existing 744-bed Article 28 residential health care facility (RHCF), located at 100 West Kingsbridge Road, Bronx, 10468, in Bronx County.

### Analysis
There is currently a need for 8,824 beds in the New York City Region as indicated in the following table:

**RHCF Need – New York City Region**

| 2016 Projected Need | 51,071 |
|---|---|
| Current Beds | 42,151 |
| Beds Under Construction | 96 |
| Total Resources | 42,247 |
| Unmet Need | 8,824 |

The overall occupancy for the New York City Region is 93.5% for 2013 as indicated in the following chart:



| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* |
|---|---|---|---|---|---|---|---|
| Facility | 97.3% | 97.1% | 96.8% | 97.5% | 99.0% | 101.4% | 97.6% |
| Bronx Co. | 96.0% | 95.8% | 94.3% | 95.9% | 95.4% | 95.3% | 95.2% |
| NYC Region | 94.9% | 95.4% | 94.8% | 94.8% | 93.5% | 94.6% | 95.0% |

*unaudited, facility reported data

### Access
Regulations indicate that the Medicaid patient admissions standard shall be 75% of the annual percentage of all Medicaid admissions for the long term care planning area in which the applicant facility is located. Such planning area percentage shall not include residential health care facilities that have an average length of stay 30 days or fewer. If there are four or fewer residential health care facilities in the planning area, the applicable standard for a planning area shall be 75% of the planning area percentage of Medicaid admissions, or of the Health Systems Agency area Medicaid admissions percentage, whichever is less. In calculating such percentages, the Department will use the most current data which have been received and analyzed by the Department.

An applicant will be required to make appropriate adjustments in its admission policies and practices so that the proportion of its own annual Medicaid patient's admissions is at least 75% of the planning area percentage or the Health Systems Agency percentage, whichever is applicable.

JHL, Harry & Jeanette Weinberg's Medicaid admissions of 33.3% in 2012 and 24.7% in 2013 did not meet or exceed the Bronx County 75% rates of 35.8% and 29.8% in 2012 and 2013, respectively, and will be required to follow the contingency plan as noted.

## Conclusion
Approval of this application will result in maintaining a necessary community resource in Bronx County.

## Recommendation
**From a need perspective, contingent approval is recommended.**

---

## Program Analysis

### Facility Information

| | Existing | Proposed |
|---|---|---|
| Facility Name | The New Jewish Home Lifecare, Harry and Jeanette Weinberg Campus | The Plaza Rehab and Nursing Center |
| Address | 100 West Kingsbridge Road Bronx, NY. 10468 | Same |
| RHCF Capacity | 816 | Same |
| ADHC Program Capacity | 100 | 0 |
| Type of Operator | Corporation | Limited Liability Company |
| Class of Operator | Voluntary / Not-for-profit | Proprietary |
| Operator | The New Jewish Home Lifecare, Harry and Jeanette Weinberg Campus, Bronx | TCPRNC LLC<br><br>Membership:<br> Esther Farkovits          25.0%<br>*Leopold Friedman        25.0%<br> Bernard Fuchs            15.0%<br>*Avi Philipson            12.5%<br> Raquel Philipson        12.5%<br> Bescar, LLC              10.0%<br>  *Benjamin Fishoff  20.0%<br>  Meryl Maybruch    20.0%<br>  Barbara Gold      20.0%<br>  Regina Weinstock  20.0%<br>  Abraham Fishoff   20.0%<br>                   100.0%<br>                    100.0%<br>*Managing Member |

Character and Competence - Background

**Facilities Reviewed**

<u>Nursing Homes</u>

| | |
|---|---|
| Bay Park Center for Nursing and Rehab | 12/2009 to present |
| Bensonhurst Center for Rehabilitation and Healthcare | 01/2012 to present |
| Brooklyn Gardens Nursing and Rehabilitation Center | 10/2014 to present |
| Dewitt Rehabilitation and Nursing Center | 06/2015 to present |
| Eastchester Rehabilitation and Healthcare Center | 01/2006 to present |
| Hendon Garden Nursing and Rehabilitation Center | 11/2014 to present |
| Hopkins Center for Rehabilitation and Healthcare | 03/2011 to present |
| Hudson Pointe at Riverdale Center for Rehabilitation & Healthcare | 01/2006 to 8/2010 |
| Little Neck Care Center | 04/2011 to 1/2013 |
| Nassau Extended Care Facility | 07/2001 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Peninsula Nursing and Rehabilitation Center | 01/2013 to present |
| Sapphire Center for Rehabilitation and Nursing of Central Queens | 01/2015 to present |
| Seagate Rehabilitation and Nursing Center | 12/2014 to present |
| South Shore Rehabilitation and Nursing Center | 04/2014 to present |
| Split Rock Nursing and Rehabilitation Center | 09/2002 to present |
| The Hamptons Center for Rehabilitation and Nursing | 05/2008 to present |
| The Pavilion at Queens for Rehabilitation and Nursing | 01/2015 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Center for Rehabilitation and Nursing | 07/2004 to present |
| The Citadel Rehab and Nursing Center | 02/2015 to present |
| The Villages of Orleans Health and Rehabilitation Center | 01/2015 to present |
| White Plains Center for Nursing | 07/2004 to present |

<u>Licensed Home Care Services Agency</u>

| | |
|---|---|
| Ultimate Care, LLC | 2/2010 to present |

**Individual Background Review**

**Esther Farkovits** currently resides in Israel and lists no employment at present.  Ms. Farkovits discloses the following health facility ownerships:

| | |
|---|---|
| Little Neck Care Center | 04/2011 to present |
| Nassau Extended Care Facility | 07/2004 to present |
| Park Avenue Extended Care Facility | 07/2004 to present |
| Seagate Rehabilitation and Health Care Center | 12/2014 to present |
| South Shore Rehabilitation and Nursing Center | 03/2014 to present |
| The Citadel Rehab and Nursing Center | 11/2015 to present |
| Throgs Neck Extended Care Facility | 07/2004 to present |
| Townhouse Extended Care Center | 07/2004 to present |
| White Plains Center for Nursing | 07/2011 to present |

**Leopold Friedman** is the Chief Executive Officer, since 2006, of Advanced Care Staffing, Inc., a healthcare staffing agency.  Mr. Friedman discloses the following health facility ownership interests:

| | |
|---|---|
| Brooklyn Gardens Nursing & Rehabilitation Center | 07/2014 to present |
| DeWitt Rehabilitation and Nursing Center | 07/2015 to present |
| Hendon Garden Nursing and Rehabilitation Center | 11/2014 to present |
| Peninsula Nursing and Rehabilitation Center | 01/2013 to present |
| The Citadel Rehab and Nursing Center | 02/2015 to present |
| Ultimate Care, Inc.          (LHCSA) | 02/2010 to present |

Mr. Friedman has received Public Health and Health Planning Council approval to operate Brooklyn Gardens Dialysis Center (D&TC), Highland View Care Center (receiver since 02/03/2015), and Cassena Care Dialysis at Peninsula (D&TC).  The applicant has not closed on these purchases.

**Bernard Fuchs** lists his employment as the principal to Platinum Management (NY) LLC, a hedge fund investment company located in New York, New York.  He is also the CEO and Chief Investment Officer of Tiferes Investors LLC, an investment company located in Lawrence, New York.  Mr. Fuchs discloses the following health facility ownership interests:

| | |
|---|---|
| Bensonhurst Center for Rehabilitation and Healthcare | 01/2012 to present |
| Hudson Pointe at Riverdale Center for Nursing and Rehabilitation | 01/2006 to 08/2010 |
| Hopkins Center for Rehabilitation and Healthcare | 03/2011 to present |
| Sapphire Center for Rehabilitation and Nursing of Central Queens | 01/2015 to present |
| The Villages of Orleans Health and Rehabilitation Center | 01/2015 to present |
| The Pavilion at Queens for Rehabilitation and Nursing | 01/2015 to present |

Mr. Fuchs has also received Public Health and Health Planning Council approval to operate  Greene Meadows Nursing and Rehabilitation Center.  The applicant has not closed on this purchase.

**Avi Philipson** is a student in Israel.  Mr. Philipson will serve as the managing member of TCPRNC, and has disclosed the following health facility ownership interest:

| | |
|---|---|
| Seagate Rehabilitation and Nursing Center (managing member) | 12/2014 to present |

**Raquel Philipson** is a student.  Ms. Philipson has no management experience with a health facility or agency, nor does she have any health facility ownership interests.

**Benjamin Fishoff** is retired.  Mr. Fishoff is the managing member of BESCAR, LLC, and has disclosed the following health facility ownership interests:

| | |
|---|---|
| Bay Park Center for Nursing and Rehab | 12/2009 to present |
| Eastchester Rehabilitation and Healthcare Center | 1/2013 to present |
| Golden Gate Rehabilitation and Health Care Center | 1974-2001 |
| The Hamptons Center for Rehabilitation and Nursing | 05/2008 to present |

**Meryl Maybruch** is employed as an acquisitions curator for the Kaufman Holocaust Education Center in Brooklyn.  Ms. Maybruch has disclosed 3.8% membership interest in Eastchester Rehabilitation and Healthcare Center.

**Abraham Fishoff** is the owner of City Lights, a real estate company in Brooklyn.  Mr. Fishoff has a 2.4% interest in Eastchester Rehabilitation and Healthcare Center.

**Barbara Gold** has no employment history.  Ms. Gold has a 2.4% interest in Eastchester Rehabilitation and Healthcare Center.

**Regina Weinstock** is employed by Sentosa Care LLC as an accounts payable administrator.  Ms. Weinstock has disclosed that she was previously employed by Split Rock Nursing and Rehabilitation Center, and that the company changed its name to Sentosa. Ms. Weinstock has disclosed the following health facility ownership interests:

| | |
|---|---|
| Eastchester Rehabilitation and Healthcare Center (4.00%) | 09/2002 to present |
| Split Rock Nursing and Rehabilitation Center (8.00%) | 09/2002 to present |

Character and Competence - Analysis
No negative information has been received concerning the character and competence of the above applicants.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the period identified above reveals:
- The facility was fined $4,000 pursuant to Stipulation and Order NH-11-009 for surveillance findings on December 18, 2009.  Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The facility was fined $18,000 pursuant to Stipulation and Order NH-12-30 for surveillance findings on February 16, 2011.  Deficiencies were found under 10 NYCRR 415.4(b)(1)(i) Definition Free from abuse; 10NYCRR 415.4(b) Development of Abuse Policies; 10NYCRR

415.12(h)(2) Quality of Care Accidents; 10NYCRR 415.12(i)(1) and 415.26(c)(1)(iv) Nurse Aide Competency.
- The nursing home paid a CMP of $25,740 for Immediate Jeopardy on July 20, 2010.

A review of operations for Bay Park Center for Nursing and Rehabilitation for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of operations for Eastchester Rehabilitation and Healthcare Center for the period identified above reveals:
- The facility was fined $2,000 pursuant to Stipulation and Order NH-08-047 for surveillance findings on January 15, 2008. Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The facility was fined $2,000 pursuant to a Stipulation and Order for surveillance findings on August 20, 2012. Deficiencies were found under 10 NYCRR 415.13(h)(1)(v) Transfer and Discharge Requirements, Orientation for Transfer/Discharge.

A review of operations for Eastchester Rehabilitation and Healthcare Center for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

 A review of operations for Hopkins Center for Rehabilitation and Healthcare for the period identified above reveals:
- The facility was fined $4,000 pursuant to Stipulation and Order NH-12-037 issued August 24, 2012 for surveillance findings on April 11, 2011. Deficiencies were found under 10 NYCRR (h)(1)(2) – Quality of Care: Accidents and 10 NYCRR 415.26 – Administration.
- The facility was fined $10,000 pursuant to a Stipulation and Order for surveillance findings on February 29, 2012. Deficiencies were found under 10 NYCRR 415.3(c)(I)(ii)  Right to Refuse; Formulate Advanced Directives.

A review of operations for Hopkins Center for Rehabilitation and Nursing for the time periods indicated above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of Nassau Extended Care Facility for the period identified above reveals the following:
- The facility was fined $6,000 pursuant to Stipulation and Order NH-14-007 issued September 19, 2014 for surveillance findings on August 24, 2011. Deficiencies were found under 10 NYCRR 415.4(b) Prohibit abuse/Neglect/Mistreatment, 10 NYCRR 415.5 (a) Dignity, and 10 NYCRR 415.26 Administration.
- The facility was fined $2,000 pursuant to a Stipulation and Order issued January 5, 2016 for surveillance findings on October 15, 2012. Deficiencies were found under 10 NYCRR 415.12(c)(1) Pressure Sores.

A review of surveillance activity for Nassau Extended Care Facility for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of Split Rock Rehabilitation and Health Care Center for the period identified above revealed the following:
- The facility was fined $6,000 pursuant to Stipulation and Order NH-07-24 issued for surveillance findings on December 5, 2005. Deficiencies were found under 10 NYCRR 415.4(b) Resident Behavior and Faculty Practices: Staff Treatment of Residents, 10 NYCRR 415.11(c) Resident Assessment and Care Planning: Comprehensive Care Plans and 10 NYCRR 415.12(k)(6) Quality of Care: Special Needs.

A review of surveillance activity for Split Rock Rehabilitation and Health Care Center for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of The Hamptons Center for Rehabilitation and Nursing for the period identified above revealed the following:

- The facility was fined $4,000 pursuant to a Stipulation and Order NH-10-065 for surveillance findings on September 16, 2009.  Deficiencies were found under 10 NYCRR 415.12(h)(1)(2) – Quality of Care: Accidents and Supervision and 415.26 – Administration.
- The facility was fined $10,000 pursuant to a Stipulation and Order NH-11-031 for surveillance findings on July 30, 2010.  Deficiencies were found under 10 NYCRR 415.12 – Provide Care/Services for Highest Well Being.
- The nursing home paid a CMP of $6,853.46 for Immediate Jeopardy on September 16, 2009.

A review of surveillance activity of The Hamptons Center for Rehabilitation and Nursing for the period identified above meets the requirements for approval as set forth in Public Health Law §2801-1(3).

A review of operations Bensonhurst Center for Rehabilitation and Healthcare, Brooklyn Gardens Nursing and Rehabilitation Center, Dewitt Rehabilitation and Nursing Center, Hendon Garden Nursing and Rehabilitation Center, Hudson Pointe at Riverdale Center for Rehabilitation and Healthcare, Little Neck Nursing Home, Park Avenue Extended Care Facility, Peninsula Nursing and Rehabilitation Center, Seagate Rehabilitation and Health Care Center, Sapphire Center for Rehabilitation and Nursing of Central Queens, South Shore Rehabilitation and Nursing Center, Throgs Neck Extended Care Facility, The Pavilion at Queens for Rehabilitation and Nursing, Townhouse Center for Rehabilitation and Nursing, The Citadel Rehab and Nursing Center, The Villages of Orleans Health and Rehabilitation Center and White Plains Center for Nursing for the time period indicated above results in a conclusion of substantially consistent high level of care since there were no enforcements.

A review of Ultimate Care LLC (LHCSA) for the periods identified earlier, results in a conclusion of substantially consistent high level of care since there were no enforcements.

## Project Review
No changes in the program or physical environment are proposed in this application.  The applicant has indicated there will be no administrative services or consulting agreements with Sentosa Care LLC or any other company.  It is also noted that the proposed ownership includes family members of the principals of Sentosa Care LLC, and individuals who are directly employed by Sentosa Care.  The purchase of Jewish Home will be made by Sentosa Care and conveyed to the respective operating and real estate entities.

The applicant has disclosed that Sentosa Care LLC contracts for administrative services with the following nursing homes, which are owned by the proposed members of The Plaza Rehab and Nursing Center:

Bay Park Center for Nursing and Rehabilitation;
Eastchester Rehabilitation and Health Care Center;
Nassau Extended Care Center;
Park Avenue Extended Care Facility;
Seagate Rehabilitation and Nursing Center;
The Hamptons Center for Rehabilitation and Nursing;
Throgs Neck Extended Care Facility;
Townhouse Center for Rehabilitation and Nursing;
White Plains Center for Nursing.

The members of TCPRNC Real Estate LLC, the proposed real estate owner are as follows, and listed for disclosure purposes only.

Bescar, LLC
Kennedy RH Holdings LLC
   Joel Edelstein
   Israel Fruend
   Bernard Fuchs
   Gerald Fuchs
   Tova Fuchs
Leopold Friedman

Benjamin Landa
Philipson Family, LLC
  Bent Philipson
  Deborah Philipson

The applicant has indicated that the existing Jewish Home adult day health care program will not be part of the sale agreement, with the ADHCP to be operated by New Jewish Home Lifecare, Bronx at the current site for up to 24 months.  Subsequently an application will be filed to transfer the program to the operating certificate of New Jewish Home Lifecare Manhattan Division.  The operator will then relocate the ADHCP to a new site in the Bronx.

The applicant has also indicated the New Jewish Home long term home health care program is not part of the sale, and a closure plan will be submitted shortly.

## Conclusion
No negative information has been received concerning the character and competence of the proposed applicants.  All health care facilities are in substantial compliance with all rules and regulations.  Although the ownership structure does not appear to be transparent, the individual background review indicates the applicants have met the standard to provide a substantially consistent high level of care as set forth in Public Health Law §2801-a(3).

## Recommendation
**From a programmatic perspective, contingent approval is recommended.**

| Financial Analysis |
|---|

## Asset Purchase Agreement
The applicant submitted an executed Asset Purchase Agreement for the change in ownership of the operations and real estate related to JHL, Bronx.  The agreement will be effectuated upon Public Health and Health Planning Council approval of this application.  The terms of the agreement are summarized below:

| | |
|---|---|
| Date: | July 7, 2015 |
| Seller: | Jewish Home Lifecare, Harry and Jeanette Weingerg Campus, Bronx |
| Purchaser: | SentosaCare, LLC |
| Purchased Assets (operations): | All of Sellers' rights, title and interest in all assets owned by seller used in nursing home operations other than the excluded assets. |
| Excluded Assets (operations): | Cash and Cash equivalents as of the closing date, accounts receivable generated for services provided prior to the effective date, any litigation by sellers and proceeds relating to business prior to the effective date, seller's and nursing home's cash on hand at effective date (other than trust funds and residents' deposits), bank account, seller's minute books and records, tax records and tax returns, accounting records and general ledger or other books of account.  All retroactive rate increases and/or lump sum payments resulting from services rendered before the effective date, all proceeds of any appeals (for rate revisions and PRI adjustments addressed to Medicare or Medicaid programs) relating to periods prior to the effective date.  All tradenames, trademarks and service marks, copyrights, symbols, logos, domain names, email addresses and other business names that are proprietary to the seller, all goodwill associated with the facility name, all material bearing the current operator's name or trademark. |

| Liabilities Assumed (operations): | All liabilities for warranty obligations (express, implied or statutory) relating to any goods installed, sold leased or licensed or any services rendered or for returns of goods sold prior to closing. |
|---|---|
| Purchased Assets (real estate): | All seller's right, title and interest in and to the real property, buildings and improvements located at 100 West Kingsbridge Road, Bronx, New York |
| Liabilities Assumed (real estate): | None |
| Purchase Price: | $22,000,000 (Operations)<br>$88,000,000 (Real Estate) |
| Payment of Purchase Price: | $110,000,000 Total Price<br>Less: APA deposit of $5,250,00 and proposal deposit of $250,000<br>$104,500,000 Balance due at Closing |

The purchase price inclusive of both the operations and real estate is proposed to be satisfied as follows:

| | |
|---|---|
| Members' Equity (Cash) | $22,000,000 |
| Operations Loan (10-year term, 25-year amortization, 5.5% interest) | $17,600,000 |
| Real Estate Loan (10-year term, 25-year amortization, 5.5% interest) | $70,400,000 |
| Total | $110,000,000 |

HHC Finance has provided letters of interest for the operations and real estate loans at the stated terms.

Applicant member Bernard Fuchs (operations/realty loans) and SentosaCare members Benjamin Landa and Bent Philipson (realty loan) have provided affidavits to fund the balloon payments for the respective operating and realty financings, if acceptable terms are not available at the time of refinancing.

BFA Attachment A is the net worth summary for the proposed members' of TCPRNC, LLC, which shows sufficient assets to cover the equity requirements overall. Bernard Fuchs has provided a disproportionate share affidavit to cover potential equity shortfalls of the other members.

BFA Attachment B is the net worth summary for the proposed members' of TCPRNC Real Estate, LLC, which shows sufficient assets to cover the equity requirements. Benjamin Landa has provided a disproportionate share affidavit to cover potential equity shortfalls of the other members.

The applicant submitted an original affidavit, which is acceptable to the Department, in which the applicant agrees, notwithstanding any agreement, arrangement or understanding between the applicant and the transferor to the contrary, to be liable and responsible for any Medicaid overpayments made to the facility and/or surcharges, assessments or fees due from the transferor pursuant to Article 28 of the Public Health Law with respect to the period of time prior to the applicant acquiring its interest, without releasing the transferor of its liability and responsibility. Currently, the facility has no outstanding Medicaid liabilities or assessments.

## Assignment and Assumption Agreements
The applicant submitted executed Assignment and Assumption Agreements for the transfer of the Asset Purchase Agreement, as shown below:

**Operations**

| Date: | September 10, 2015 |
|---|---|
| Assignor: | SentosaCare, LLC |
| Assignee: | TCPRNC, LLC |
| Assets Transferred: | All rights and obligations under the Asset Purchase Agreement with Jewish Home Lifecare Effective July 7, 2015 in respect to the operating assets and a portion of the deposit in the amount of $1,000,000. |
| Liabilities Transferred: | All of the Assignor's liabilities and obligations related to the operating assets under the agreement. |

**Real Estate**

| Date: | September 10, 2015 |
|---|---|
| Assignor: | SentosaCare, LLC |
| Assignee: | TCPRNC Real Estate LLC |
| Assets Transferred: | All rights and obligations under the Asset Purchase Agreement with Jewish Home Lifecare  Effective July 7, 2015 in respect to the real estate assets and a portion of the deposit in the amount of $4,500,000. |
| Liabilities Transferred: | All of the Assignor's liabilities and obligations related to the real estate assets under the agreement. |

Lease Agreement
The applicant submitted an executed lease agreement, as summarized below:

| Date: | September 16, 2015 |
|---|---|
| Premises: | A 744-bed RHCF located at 100 Kingsbridge Road, Bronx (438,000 sq. ft.) |
| Lessor: | TCPRNC Real Estate, LLC |
| Lessee: | TCPRNC, LLC |
| Term: | 35 years |
| Rental: | $9,387,111 annually or ($782,259 per month or $21.43 per sq. ft.) |
| Provisions: | Lessee pays for all taxes, utilities, insurance and maintenance fees (Triple Net) |

With the change from a voluntary to a proprietary facility, the capital reimbursement methodology will be changed to reflect interest and amortization.  The facility however, does not have a mortgage as the facility is leased from a related entity, which is charging rent based on interest and amortization owed on the mortgage loan, plus an additional $4,200,000 per year based on the market value of the property.

The lease arrangement is a non-arm's length agreement.  The applicant has submitted an affidavit attesting that there is a relationship between the landlord and tenant through common ownership. Letters from two NYS realtors have been provided attesting to the reasonableness of the per square foot rental.

Operating Budget
The applicant provided an operating budget, in 2015 dollars, for year one subsequent to acquisition, summarized below:

| | Current Year | | Year One | |
|---|---|---|---|---|
| | Per Diem | Total | Per Diem | Total |
| Revenues | | | | |
| Medicaid (Inpatient) | $308.21 | $75,206,000 | $326.33 | $76,941,000 |
| Medicare Inpatient | $549.20 | $14,439,000 | $577.81 | $14,678,000 |
| Private Pay/Other (Inpatient) | $347.71 | $1,782,000 | $376.41 | $1,864,000 |
| Other Operating Revenue* | | $3,905,000 | | $3,905,000 |
| Medicaid (Outpatient) | | $6,740,000 | | $0 |
| Total | | $102,072,000 | | $97,388,000 |
| | | | | |
| Expenses | | | | |
| Operating | $370.00 | $101,907,000 | $318.34 | $84,719,000 |
| Capital | $24.25 | $6,680,000 | $41.02 | $10,916,000 |
| Total | $394.25 | $108,587,000 | $359.36 | $95,635,000 |
| | | | | |
| Net income/(loss) | | ($6,515,000) | | $1,753,000 |
| | | | | |
| Utilization (patient days) | | 275,428 | | 266,129 |
| Occupancy | | 98% | | 98% |

*Other revenue consists of $2,500,000 of dietary services provided to affiliated entities of the current operator, and $1,405,000 of miscellaneous revenue sources including vending machines, purchase discounts, cable TV and telephone income, rental income, and dividends.

The following is noted with respect to the submitted operating budget:
- Revenue assumptions are based on the historical experience of the current operator.
  - ✓ The Medicaid rate for year one is based on the proposed 2016 operating rate and the estimated 2016 capital per diem. The capital per diem includes the 2014 costs plus estimates for real estate taxes and return on equity.
  - ✓ The increases in the Medicare and Private Pay rates is due to the inclusion of the Part D revenue prior period adjustment.
- Expense assumptions for year one are based on the historical experience of the current operator, with consideration of the following:
  - ✓ Property rental replaces real property and movable equipment depreciation and interest expense (an increase of $4.3 million dollars).
  - ✓ Parent Company Overhead has been reduced by $9.1 million dollars.
  - ✓ Operating expenses were adjusted to reflect 2014 bed reductions and trended 2% from the 2014 actual expenses (a decrease of $3.9 million dollars).
- Utilization assumptions are based on the 2014 historical experience of the facility (98%). The applicant has projected that the facility will maintain this occupancy rate.
- Utilization by payor source for Year One and Year Three is expected as follows:

| | Current Year | Years One & Three |
|---|---|---|
| Medicaid | 88.59% | 88.59% |
| Medicare | 9.55% | 9.55% |
| Private Pay/Other | 1.86% | 1.86% |
| Total | 100.00% | 100.00 |

- Breakeven utilization in year one is projected at 96.24%.

## Capability and Feasibility

There are no project costs associated with this application.

The total purchase price of $110,000,000 with be funded with $22,000,000 equity from the members of TCPRNC, LLC and TCPRNC Real Estate, LLC, a $17,600,000 loan for the operations and a $70,400,000 loan for the real estate at the above stated terms. Letters of interest for the financings have been provided.

Working capital requirements are estimated at $15,939,167 based on two months of Year One expenses. The applicant will provide $16,000,000 toward working capital, which is $60,833 over the estimated requirement to be funded, via $8,000,000 from members' equity with the remaining $8,000,000 to be financed via a loan at 5.5% interest for a three-year term. HHC finance has provided a letter of interest for the working capital financing. BFA Attachment A is the net worth summary for the proposed members of TCPRNC, LLC, which shows sufficient liquid assets overall to cover the equity requirements of the application. Bernard Fuchs has provided a disproportionate share affidavit to cover any potential equity shortfalls of the other members. BFA Attachment A shows that Mr. Fuchs has sufficient liquid resources available.

BFA Attachment B is the net worth summary for the proposed members of TCPRNC Real Estate, LLC, which shows sufficient liquid assets to cover all aspects of the application. Benjamin Landa has provided a disproportionate share affidavit to cover any potential equity shortfalls of the other members. BFA Attachment B shows that Mr. Landa has sufficient liquid resource available.

BFA Attachment C is the pro-forma balance sheet of TCPRNC, LLC, which indicates positive members' equity of $8,000,000. It is noted that assets include $17,600,000 in goodwill, which is not an available liquid resource, nor is it recognized for Medicaid reimbursement purposes. If goodwill is eliminated, the net asset position is a negative members' equity of $9,600,000. The negative member's equity will be covered by the operator. As shown in BFA Attachment A, the operator has sufficient liquid resources available to cover this shortfall.

BFA Attachment D is the pro-forma balance sheet of TCPRNC Real Estate, LLC, which indicates positive members' equity of $17,600,000.

The submitted budget projects a net income of $1,753,000 for Year One. The budget is reasonable.

The applicant states that their business model does not include flexibility to transition to a Value Based Payment System, but noted that they are willing to participate in any future Value Based Payment initiatives.  The current project's revenue assumptions are based on the facility's historical rate data for Medicare and Private Pay.  While the Medicaid revenue assumptions are based on the facility's historical rate data plus the estimated real estate taxes and return of equity.

A transition of nursing home (NH) residents to Medicaid managed care is currently being implemented statewide.  Under the managed care construct, Managed Care Organizations (MCOs) will negotiate payment rates directly with NH providers.  A department policy, as described in the "Transition of Nursing Home Benefit and Population into Managed Care Policy Paper," provided guidance requiring MCOs to pay the benchmark Medicaid FFS rate, or a negotiated rate acceptable to both plans and NH, for three years after a county has been deemed mandatory for NH population enrollment.  As a result, the benchmark FFS rate remains a viable basis for assessing NH revenues through the transition period.

BFA Attachment E is the 2013-2014 certified and the internal financial statements for JHL, Bronx as of October 31, 2015, which shows the facility had an average positive net asset position, an average negative working capital position and generated an average net loss of $6,372,987 for the period.  The negative work capital and net loss positions are due to inefficiencies in current operations, which included extremely high accounts payable, liabilities to third parties and salaries.  The issues will be addressed and corrected by the proposed operators.

BFA Attachment G is the 2013-2014 certified and the 2015 internal financial summaries of the members' affiliated nursing homes.  As shown, the facilities have maintained a positive net asset position, positive working capital and a positive income from operations for the period shown, with the exception of White Plains, Bay Park, The Hampton Center, Southshore Healthcare, Peninsula Nursing and Throgs Neck, which were due to vacation and sick time accrual, a prior year Medicaid adjustment, above average spending in the ancillary services and a reduction in the private pay census.  In order to fix the ancillary spending the facilities moved to greater centralization of services to achieve better economies of scale and reduce the overall costs of operations.  The facilities are following the current market trends related to the patient census and working on new strategies to attract other payors such as long-term care insurance.

Based on the preceding, the applicant has demonstrated the capability to proceed in a financially feasible manner.

## Recommendation
**From a financial perspective, contingent approval is recommended.**

| Attachments |
| --- |

| | |
| --- | --- |
| BFA Attachment A | Net Worth - Proposed Members of TCPRNC, LLC |
| BFA Attachment B | Net Worth - Proposed Members of TCPRNC Real Estate, LLC |
| BFA Attachment C | Pro-forma Balance Sheet of TCPRNC, LLC |
| BFA Attachment D | Pro-forma Balance Sheet of TCPRNC Real Estate, LLC |
| BFA Attachment E | 2012-2014 certified and 2015 internal Financial Summary for Jewish Home Lifecare, Harry & Jeanette Weinberg Campus, Bronx |
| BFA Attachment F | Affiliated RHCF Ownership of Proposed Members of TCPRNC, LLC |
| BFA Attachment G | 2012-2014 certified and the 2015 internal financial summaries Proposed Members Affiliated  Nursing Homes |
| BFA Attachment H | Ownership of the real estate before and after the requested change |
| LTC Attachment A | Quality Measures and Inspection Report |

# Exhibit 6

skip to main content

## Department of Health

Information for a Healthy New York

- Home
- Help
- Contact
- A-Z En español
- A-Z Index

Folder and Previous Folders ▼

### Certificate of Need (CON)

- CON Homepage
- NYSE-CON Homepage



Return To Results     Start Over

To go back, please use the "Return to Results" button or the "Start Over" button instead of your browser's back button.

| Current | Original | **Revision 01/23/2014** |
|---------|----------|--------------------------|

## Summary Information

**Project Number:** 131092
**Facility Name:** Shorefront Jewish Geriatric Center
**Project Description:** Establish Shorefront Operating, LLC as the new operator of Shorefront Jewish Geriatric Center and rename the facility Waterfront Rehabilitation and Health Care Center

| General | Executive Summary | Sites | Decision | Post Approval | **Summary** |
|---------|-------------------|-------|----------|---------------|-------------|

### General Information

**Revision Reason:** Revised: January 23, 2014 - Removal of Bent Philipson as a proposed member

| **Status:** | Project Complete | **Submission Type:** | Application - Full Review - Establishment - New Facility or Agency Application - Full Review - Establishment - Change in Ownership |
|---|---|---|---|
| **Status Date:** | 12/29/2014 | | |
| **Review Level:** | Full | | |
| **County:** | KINGS | **Application Received Date:** | 02/19/2013 |
| **Region:** | New York City | | |
| | | **Initial Review Date:** | 02/25/2013 |
| **Total Project Cost:** | $0.00 | | |
| | | **Acknowledgement Date:** | 03/01/2013 |

### Sites

**Main Site Information**

| **Facility Name:** | Shorefront Jewish Geriatric Center | | |
|---|---|---|---|
| **Facility Type:** | Residential Health Care Facility | | |
| **Physical Address:** | 3015 W 29 St Brooklyn, NY  11224 | **Facility ID:** | 1373 |
| | | **County:** | KINGS |
| **Current Operator:** | Shorefront Jewish Geriatric Center 6323 7th Avenue Brooklyn, NY  11220 | | |
| **Operator County:** | | **Operating Certificate:** | 7001376N |
| **Proposed Operator:** | Shorefront Operating LLC c/o Sentosa Care 20 Franklin Place Woodmere, NY  11598 | **Proposed Operator County:** | NASSAU |

**Site Information**

| **Facility ID:** | 1373 |
|---|---|
| **Site Name:** | Shorefront Operating, LLC d/b/a Waterfront Rehabilitation and Health Care Center |
| **Physical Address:** | 3015 W 29 St, Brooklyn, NY 11224 |

| County: | KINGS |
|---|---|

## Decision

| Decision | Action | Date |
|---|---|---|
| Establishment and Project Review Committee | Contingent Approval | 01/30/2014 |
| Public Health and Health Planning Council | Contingent Approval | 02/13/2014 |

| | | | |
|---|---|---|---|
| **Director Action:** | Contingent Approval | **Date:** | 02/24/2014 |
| **ACS Letter Sent:** | | | |
| **PHC Final Approval Letter Sent:** | 07/25/2014 | | |

## Post Approval

| | |
|---|---|
| **Assigned Start Date:** | **Actual Start Date:** |
| **Assigned Completion Date:** | **Actual Completion Date:**    12/11/2014 |

### Notice

Public access to NYSE-CON is intended solely to allow the public convenient and immediate access to public information. Much of the information contained within NYSE-CON is provided by applicants, and much of it is historic information that may no longer be accurate or complete. While all attempts are made to provide accurate, current, and reliable information, the Department of Health recognizes the possibility of human and/or mechanical error and that information captured at a point in time often becomes obsolete. Therefore, the Department of Health, its employees, officers and agents make no representation, warranty or guarantee as to the accuracy, completeness, currency, or suitability of the information provided here.

Questions or comments: cons@health.state.ny.us
Revised: November 2014

- Disclaimer
- Privacy Policy
- Accessibility

# Exhibit 7

Case 1:19-cv-0354-FB-JRG  Document 97-2  Filed 01/29/32  Page 86 of 99 PageID #: 3624



# How N.Y.'s Biggest For-Profit Nursing Home Group Flourishes Despite a Record of Patient Harm

The state's "character-and-competence" reviews are supposed to weed out operators with histories of violations and fines — but regulators don't always act on the full story.

by Allegra Abramo and Jennifer Lehman, special to ProPublica, Oct. 27, 2015, 8 a.m. EDT



*Allegra Abramo for ProPublica*

Charlie Stewart was looking forward to getting out of the nursing home in time for his 60th birthday. On his planned release day, in late 2012, the Long Island facility instead called Stewart's wife to say he was being sent to the hospital with a fever.

When his wife, Jeanne, met him there, the stench of rotting flesh made it difficult to sit near her husband. The small wounds on his right foot that had been healing when Stewart entered the nursing home now blackened his entire shin.

"When I saw it at the hospital ... I almost threw up," Jeanne Stewart said. "It was disgusting. I said, 'It looks like somebody took a match to it.' "

Doctors told Stewart the infection in his leg was poisoning his body. To save his life, they would have to amputate above the knee.

Stewart had spent about six weeks recovering from a diabetic emergency at Avalon Gardens Rehabilitation & Health Care Center on Long Island. The nursing home is one of several in a group of for-profit homes affiliated with SentosaCare, LLC, that have a record of repeat fines, violations and complaints for deficient care in recent years.

Despite that record, SentosaCare founder Benjamin Landa, partner Bent Philipson and family members have been able to expand their nursing home ownerships in New York, easily clearing regulatory reviews meant to

7/8/2019
Case 1:19-cv-03541-FB-JRG   Document 97-2   Filed 01/29/32   Page 87 of 99 PageID #: 3625
New York For-Profit Nursing Home Group Flourishes Despite a Record of Patient Harm — ProPublica

be a check on repeat offenders. SentosaCare is now the state's largest nursing home network, with at least 25 facilities and nearly 5,400 beds.

That unhindered expansion highlights the continued weakness of nursing home oversight in New York, an investigation by ProPublica found, and exposes gaps in the state's system for vetting parties who apply to buy shares in homes.

State law requires a "character-and-competence" review of buyers before a change in ownership can go through. To pass muster, other health care facilities associated with the buyers must have a record of high-quality care.

The decision maker in these deals is the state's Public Health and Health Planning Council, a body of appointed officials, many from inside the health care industry. The council has substantial leverage to press nursing home applicants to improve quality, but an examination of dozens of transactions in recent years show that power is seldom used.

Moreover, records show that the council hasn't always had complete information about all the violations and fines at nursing homes owned by or affiliated with applicants it reviewed. That's because the Department of Health, which prepares character-and-competence recommendations for the council, doesn't report them all.

The department's assessments of Landa and other owners of SentosaCare homes have routinely found that the facilities provided a "substantially consistent high level of care" – the standard owners must meet to receive council approval.

Yet the agency's assessments in 15 separate ownership applications since 2013 did not mention at least 20 federal fines paid by the group's homes, records show. In more than a dozen cases, the department reported "no repeat violations," even when a SentosaCare home had been cited multiple times for the same serious deficiency.

Many of the nursing home deals ProPublica reviewed received a go-ahead despite rules saying they "shall not be" approved when facilities have repeat violations that put residents at risk. Under a narrow interpretation of the rules, however, the department still recommends approval if violations aren't strictly identical or were promptly addressed.

SentosaCare's owners or associates weren't the only applicants to get incomplete vetting, but the council has had repeated opportunities to scrutinize their records. Landa, Philipson or relatives bought shares in a dozen homes in 2013 and 2014, records show.

Advocates for nursing home patients say that instead of a backstop, New York's approval process has become a rubber stamp.

"The law establishes mechanisms for at least a moderate review of an applicant's character and competence," said Richard Mollot, director of the Long Term Care Community Coalition in New York. "The failure to provide complete information on a provider's past performance fundamentally undermines the review process."

Mollot's group published a recent report saying the Health Department has one of the nation's lowest rates of citing nursing home operators for deficiencies in care. New York is also among a minority of states that don't

mandate minimum staffing ratios, even though research shows a strong link between nursing staff and residents' well-being.



*Charlie Stewart with his wife, Jeanne, and their cat, Maris. (Allegra Abramo for ProPublica)*

Thirteen of SentosaCare's homes (though not Avalon Gardens) have Medicare's bottom score for nurse staffing. Inspection reports also show that at least seven residents have wandered away from the SentosaCare affiliated facilities in recent years — including one who froze to death in 2011. Inspectors and prosecutors have found that staff falsified records in some cases. Dozens of patients at SentosaCare homes have experienced long delays before receiving necessary care; some ended up in hospitals.

The Stewarts said the staff at Avalon Gardens showed "no sense of urgency" when they complained about missed meals, soiled sheets and unanswered call bells. Even though nurses dressed the wound on Charlie's leg daily, and a doctor checked it each week, no one warned them about its worsening condition, the Stewarts said.

Dr. Kris Alman, a retired endocrinologist who reviewed Stewart's medical records and photographs at ProPublica's request, said that the two quarter-sized lesions on his foot when he was admitted to Avalon Gardens could not have "become what it did overnight." That the condition "progressed as far as it did, with him coming in septic and needing an above-the-knee amputation, was inexcusable," Alman said.

Landa's attorney and business partner, Howard Fensterman, declined to comment on Stewart's case for reasons of patient privacy. Fensterman defended Avalon Gardens and other SentosaCare facilities, however, saying that when inspectors have found problems, the homes quickly addressed them and secured state approval of correction plans.

Fensterman also said that SentosaCare does not have "ownership or control" over the facilities in its network and only contracts with them to provide administrative and rehabilitation consulting, regulatory advice and purchasing services. Records show, however, that Landa and Philipson, or family members, have ownership stakes or directorships in nearly all of SentosaCare's facilities. Fensterman also co-owns 14 nursing homes with Landa in several states, including one SentosaCare home.

Fensterman is a former member of the state health council, as is Landa, who entered the nursing home business in the late 1980s and emerged as one of the sector's biggest players over the next decade. Landa, Philipson or family members now hold stakes in at least 33 nursing homes in New York and an equal number in nine other states.

In 2013, the latest year for which state data is available, homes under the SentosaCare umbrella paid the company more than $11.5 million for financial, staffing and other services, and spent nearly $630,000 with Fensterman's law firm.

---

The nation's $137 billion nursing home industry has made major improvements since the landmark 1987 federal Nursing Home Reform Act imposed mandates to combat abuse and neglect. But the industry, which draws heavily on taxpayer funding via Medicare and Medicaid, still struggles to provide safe care for many.

One-third of Medicare patients suffered preventable harm within a month of being admitted to nursing homes for short-term rehabilitation, according to a 2014 study by the Department of Health and Human Services' inspector general. The harm cost Medicare $2.8 billion for hospitalizations alone in 2011, the study estimated.

New York spends about $13 billion each year on the state's 627 nursing homes, which collectively care for more than 100,000 residents. The Department of Health is charged with day-to-day oversight of safety, but patient advocates say the agency lacks the staff and expertise to do the job adequately.

SentosaCare homes, which took in nearly $538 million from Medicare and Medicaid in 2013, aren't the only facilities in the state with repeat violations and low staffing, and several of the company's homes have above-average ratings on Medicare's Nursing Home Compare web site, which rates them with one to five stars. (State-by-state inspection reports can be searched on ProPublica's Nursing Home Inspect, which also lists deficiencies by severity level.)

But federal data through August shows that 11 of SentosaCare's homes exceeded the state average of 24 violations over the past three years, and three had double that number.

## SentosaCare's New York Nursing Homes

Medicare rates nursing homes on a scale of 1 (bottom performers) to 5 stars (best). Here are ratings for the homes currently listed as part of SentosaCare's network in New York. See what's in the ratings.

| Home | City | Beds | Overall Score | Health Inspection | Nurse Staffing | Quality |
|------|------|------|---------------|-------------------|----------------|---------|
| Avalon Gardens Rehabilitation & Health Care Center | Smithtown | 353 | 2 | 1 | 4 | 2 |
| Bay Park Home Center for | Bronx City | 480 Beds | Overall Score | Health Inspection | Nurse Staffing | 5 Quality |

| Home | City | Beds | Overall Score | Health Inspection | Nurse Staffing | Quality |
|---|---|---|---|---|---|---|
| Nursing and Rehabilitation | | | | | | |
| Brookhaven Nursing and Rehabilitation Center | Far Rockaway | 298 | 3 | 2 | 2 | 5 |
| Eastchester Rehabilitation and Health Care Center | Bronx | 200 | 4 | 4 | 3 | 3 |
| Forest Hills Care Center | Forest Hills | 100 | 4 | 4 | 1 | 5 |
| Garden Care Center | Franklin Square | 150 | 2 | 2 | 1 | 5 |
| Golden Gate Rehabilitation and Health Care Center | Staten Island | 238 | 4 | 4 | 2 | 2 |
| Grace Plaza Nursing and Rehabilitation Center | Great Neck | 214 | 4 | 4 | 2 | 4 |
| Little Neck Care Center | Little Neck | 120 | 5 | 5 | 1 | 5 |
| Nassau Extended Care Facility | Hempstead | 280 | 2 | 3 | 1 | 4 |
| New Surfside Nursing Home | Far Rockaway | 183 | 2 | 2 | 1 | 5 |
| Park Avenue Extended Care Facility | Long Beach | 240 | 5 | 5 | 1 | 5 |
| Parkview Care and Rehab Center | Massapequa | 169 | 1 | 1 | 1 | 4 |
| Pathways Nursing & Rehabilitation Center | Niskayuna | 112 | 4 | 3 | 4 | 4 |
| Rockville Skilled Nursing & Rehabilitation Center | Rockville Centre | 66 | 3 | 2 | 4 | 4 |
| Seagate Rehabilitation and Nursing Center | Brooklyn | 360 | 3 | 4 | 1 | 4 |
| South Point Home | Island Park | 185 | 1 | 1 | 1 | 2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Plaza Nursing & Rehabilitation Center | | | | | | |
| South Shore Rehabilitation and Nursing Center | Freeport | 100 | 4 | 3 | 2 | 5 |
| Spring Creek Rehabilitation and Nursing Care Center | Brooklyn | 188 | 1 | 2 | 1 | 2 |
| The Grove at Valhalla Rehabilitation and Nursing Center | Valhalla | 160 | 4 | 4 | 3 | 4 |
| The Hamptons Center for Rehabilitation and Nursing | South Hampton | 280 | 3 | 3 | 2 | 2 |
| Throgs Neck Extended Care Facility | Bronx | 205 | 4 | 5 | 1 | 4 |
| Townhouse Center For Rehabilitation & Nursing | Uniondale | 280 | 1 | 3 | 1 | 1 |
| White Plains Center for Nursing Care | White Plains | 88 | 3 | 2 | 4 | 4 |
| Woodmere Rehabilitation and Health Care Center | Woodmere | 336 | 1 | 1 | 3 | 4 |

Sources: Centers for Medicare & Medicaid Services data as of Oct. 1, 2015; Nursing Home Inspect

The most critical nursing home deficiencies are known as "immediate jeopardy" violations — incidents or conditions that have caused or are likely to cause the "serious injury, harm, impairment, or death" of patients. Less than 6 percent of all New York homes were cited for four or more immediate-jeopardy violations in recent years.

By comparison, Avalon Gardens was cited for 10 immediate-jeopardy violations in the three years ending in August, the third-highest number in the state for that period. Two other SentosaCare homes — Woodmere Rehabilitation & Health Care Center and South Point Plaza Nursing and Rehabilitation Center — each have been cited for four.

Elopements — where residents leave the premises without the knowledge of a home's operators — have been a repeat problem for Avalon and

Case 1:19-cv-03544-FB-JRG   Document 97-2   Filed 01/29/32   Page 92 of 99 PageID #: 3630

Woodmere, where SentosaCare co-owner Philipson has been listed as longtime managing partner.

Two days before Thanksgiving in 2011, a group of Woodmere residents walked to a nearby school for a holiday lunch. When aides took a head count, one of the 19 residents, a 55-year-old with dementia named Dennis Buckham, was missing.

Buckham wasn't found until four days later, face down on a Brooklyn sidewalk, frozen and without a pulse. He died of cardiac arrest and hypothermia, according to the chief medical examiner's report cited in the Department of Health underline_investigation.

Fensterman said Woodmere overhauled its policies and procedures, and that the state signed off on an official plan of correction. Two years later, however, a 64-year-old Woodmere resident with schizophrenia left a secure unit 10 times over three months. Staffers found her in the basement and at the front door, but according to the state's report, the home did not investigate, change her care plan or conduct a doctor-ordered psychiatric evaluation.

About a month later, the woman walked past a security guard and was found in the road. Fensterman said no harm resulted, the home fired the security guard who let the resident slip out, and the state again approved a correction plan.

Residents also wandered from Avalon Gardens in 2011 and 2013, state inspection reports show. In all, at least seven residents wandered away from SentosaCare facilities between 2011 and 2014, according to state inspection reports.

The reports also document dozens of cases of delayed treatment at SentosaCare homes. At Woodmere in 2012, staffers failed to promptly send four patients to the hospital, two of whom died. Two years later, a resident at Parkview Care and Rehabilitation Center in Nassau County suffered from a collapsed lung for four days while staff failed to check results from a chest X-ray or assess his breathing or vital signs.

Fensterman said that each SentosaCare home is distinct. "There is no pattern of delayed treatment among facilities," he said, "as each facility cited had separate issues, which in no way relate to each other." He said the Health Department found the incidents to be isolated and that all were corrected.

On multiple occasions, state inspectors discovered that staff at SentosaCare facilities tried to cover up lapses in care — allegedly lying about elopements or the failure to spot bedsores, for example. After a 2012 investigation by New York Attorney General Eric Schneiderman, the administrator of The Hamptons Center for Rehabilitation and Nursing, a SentosaCare home in Suffolk County, pled guilty to falsifying records after a resident wandered away and was found walking on the highway five hours later. The administrator was sentenced to a $2,500 fine and probation.

In June, after another investigation by Schneiderman's office, four Woodmere nurses were arrested for falsely signing off on forms saying they had checked on a resident who fell three times in a week and ended up hospitalized. Three pleaded guilty to misdemeanors; the fourth case is pending.

Case 1:19-cv-03541-FB-JRG Document 97-2 Filed 01/29/32 Page 93 of 99 PageID #: 3631

Researchers and patient advocates say that insufficient staffing is one of the biggest contributors to poor outcomes for nursing home residents. The issue is important enough that the federal Centers for Medicare and Medicaid Services (CMS) tracks staffing and has determined that less than 4.1 hours of total daily nursing care per long-term resident increases the risk of bed sores, weight loss and other types of harm to patients.

"Direct bedside nursing home staff is probably the most important factor in nursing home care — end of story," said Dr. Michele Bellantoni, clinical director of geriatrics at the Johns Hopkins School of Medicine.

Only three SentosaCare homes meet the 4.1-hour threshold, however. Six provide less than three hours of daily nursing care per resident, according to data the facilities self-report to CMS.

Fensterman said CMS' overall staff ratings are not a good measure for comparing homes because they don't reflect the different nursing needs of homes' patients or high scores on other quality measures. As an example, he cited Park Avenue Extended Care, another SentosaCare facility, which CMS rated with one star on staffing but five stars for health quality, which tracks data such as how often patients get bedsores or infections.

On the other end of the scale is Avalon, with nearly 45 percent more complaints and double the number of complaint-related citations per 100 beds than the averages found in New York homes. In its most recent inspection, this past June, Avalon was cited for 21 deficiencies. Among them: Eight residents received medications up to three hours late because the facility did not have sufficient nursing staff.

Tom Bennett, 60, spent about a month in short-term rehabilitation at Avalon Gardens in 2013. Obesity and a back injury made it impossible for the Long Island man to get out of bed. In an interview, he said he didn't receive regular sponge baths and sometimes sat in his own feces for hours because no one was available to help.

"They were all over-worked. They were telling me, you know, we just don't have enough help to take care of everybody," Bennett said. "And you can hear the buzzers going off constantly — *meep, meep, meep, meep*. And the aides are just like running from room to room to room."

Fensterman declined to comment about Bennett's situation. State records list SentosaCare partners Landa and Philipson as co-owners of Avalon Gardens, each with an interest of more than 30 percent. In 2013, the home reported paying $1 million to SentosaCare for services and $90,000 to Fensterman's firm.

Although New York doesn't mandate minimum staffing ratios, federal law says homes must have "sufficient staff" to "attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."

Patient advocates say that vague standard is one reason that the state rarely cites homes for insufficient staffing. Health Department officials, in response to an email asking about the agency's citation rate, also noted the lack of specific minimum staffing rules.

Avalon Gardens and a second SentosaCare home, South Point Plaza Nursing and Rehabilitation Center on Long Island, were among only 29 cited specifically for insufficient staffing in the past three years.

Case 1:19-cv-0354-N-FBJRG Document 97-2 Filed 01/20/33 Page 94 of 99 PageID #: 3632

Patient advocates say lack of staff is one of the most common complaints from residents and that state inspectors should be following federal guidance, which instructs them to look for staffing issues "whenever quality of care problems have been discovered."

Advocacy groups and the state's biggest nurses' union have pushed for mandatory staffing ratios, and "safe-staffing" bills have been introduced in the New York Legislature for at least a decade, according to the office of Assemblyman Richard Gottfried, D-Manhattan, the health committee chairman. Hospitals and nursing homes have objected, saying the mandates would be too costly.

Mollot said that while legislating a staffing floor would help, the key is whether the Health Department does more to police the problem. If a new staffing law "just becomes another requirement that's not enforced," he said, "what good is it?"

---

When nursing home ownership changes hands in New York, character-and-competence reviews are supposed to provide an important checkpoint.

State law gives the Public Health and Health Planning Council the power to bar new owners or directors based on the compliance record of any facility they are "affiliated" with. "If some bad actor wanted to buy a new nursing home," said Susan Regan, a lawyer who spent 18 years on council, "we could say no."

Except the council seldom says "no."

ProPublica's review of Health Department and council records did not turn up any nursing home ownership applications within the last five years that were rejected because of lapses in patient care. In most cases, the council — 24 volunteers appointed by the governor — follows the department's recommendations.

Although the department's reviews summarize past violations and fines at an applicant's related facilities, they typically conclude there is a "substantially consistent high quality of care." Regulations say applicants "shall not" receive such a finding if a facility's violations were "recurrent or were not promptly corrected."

But the council doesn't always get a look at the complete record.

Thanks to home purchases and shuffling of ownership shares, Landa, Philipson, their family members and other owners of SentosaCare facilities have come up for council reviews a dozen times since 2013. In addition to omitting mention of at least 20 federal fines paid by SentosaCare homes, the department's reviews reported "no repeat violations" a dozen times when there had been multiple citations for the same problems.

Since 2011, Woodmere has been cited and fined several times for the same class of violations that put residents in immediate jeopardy, including giving unnecessary medications and failing to protect residents from falls. The home paid more than $80,000 in federal fines, which are shared with the state. In 2013, the federal government also temporarily halted payments for new admissions at Woodmere, a stiff penalty for homes with ongoing problems.

None of those actions was noted in character-and-competence summaries provided to council members on at least three occasions in 2013 and 2014, when Landa, Philipson and others associated with Woodmere applied to buy shares of other nursing homes. Instead, the department wrote that Woodmere had "no enforcements" or made no mention of the department.

In each case, the department recommended approval, and the council voted in favor without any objections. Records list Landa as a director and Philipson as the managing partner of Woodmere. Fensterman, who served on the council from 2010 until 2014, recused himself from votes involving business partners and clients.

When SentosaCare's South Point Plaza was part of reviews in 2013 and 2014, the department also said it had "no repeat enforcements," even though the home had been cited and fined more than once for residents having pressure sores. Although three state fines were noted, an additional $90,000 in federal fines and one Medicare payment denial were not included in the reviews.

Asked about the omissions, the department initially said its character-and-competence process includes federal investigations and fines. In a later statement, it said federal fines are not currently included, but that its policy is being reviewed. The agency began listing them in council papers in February, it said in an email, but only "for informational purposes."

A review of dozens of health council applications shows that the department doesn't always flag serious violations if there was no state fine, or if the amount isn't finalized. The state did not settle $18,000 in fines for elopements at Woodmere and Avalon until last month, more than two years after the incidents. Recent character-and-competence reviews did not mention pending fines or report that the elopements had occurred.

About a year ago, the department began appending copies of its website pages on citations and quality ratings to council review documents. A list of deficiencies and their severity isn't always included.

Concerning what it counts as a repeat enforcement, the agency said that while some violations may fall in the same category, they are not necessarily the same. That is consistent with its reviews, which sometimes note that violations were not "identical."

Mollot said it was "extremely alarming" that violations and fines might be omitted.

In interviews, three former or current council members expressed uncertainty about what standards apply in character-and-competence reviews. With dozens of projects and ownership changes to vote on at each monthly meeting, council members must rely on the department's information to do their jobs.

For many of her years on the council, Regan chaired the establishment committee, which reviews applications to buy or build facilities. Members would often ask for more details about applicants' histories, she said, "but what you do about it is difficult." Operators argue that they have paid their fines and corrected deficiencies, she said, or that repeat violations were not connected.

"I would argue, you know what, if you're in business to find every opportunity to game the standards, and do the minimum, and give the

How N.Y.'s Biggest For-Profit Nursing Home Group Flourishes Despite a Record of Patient Harm — ProPublica

shoddiest care you can possibly give while still getting out from under the deficiency, it should raise a question of whether you should hold a license," Regan said.

Arthur Levin, a current establishment committee member, said that he and others are increasingly asking the Health Department for information about quality of care, not just violations, especially for dialysis centers. Levin is director of the Center for Medical Consumers and the council's lone representative from a patient group.

"At the very least, let it be the basis of a question to an applicant: 'What are you going to do to do better?' " Levin said.

Three years ago, the council recommended changes to character-and-competence reviews as part of a regulatory overhaul requested by Gov. Andrew Cuomo. Among the proposals was one to give the department and council more discretion to disqualify applicants for patterns of violations across multiple facilities affiliated with an applicant.

"When a proposed owner or trustee presents affiliations with a health care facility or agency that has a pattern of, or multiple, enforcements, or a sub-standard quality record, there should be a presumption of disqualification which may be rebutted in limited circumstances," says the recommendation, which is still on the shelf.

Recent versions of the safe-staffing bill would expand character-and-competence reviews to consider not only staffing but worker safety violations like those that resulted in 13 citations and $24,600 in fines to Avalon Gardens in 2013.

---

In his short stay at Avalon Gardens, Charlie Stewart remembers waiting for hours for help getting from his bed to the toilet. One time, when no one answered the call bell, he started yelling, he said. Still no one came. Eventually he decided to crawl across the floor to the bathroom rather than soil the bed.

"When you need help and it's not coming, you know, your reality changes immediately," said Stewart. "It's not nice feeling helpless. And several times in that place, I gotta say, I felt like I was helpless."

On multiple occasions, Stewart said, no one brought him dinner, even though he needed to eat regularly because of his diabetes. His wife, Jeanne, said she thought pain medications were making him forgetful. But he kept calling. "I might have been drugged, but I know I wasn't fed, 'cause I'm starving," he recalls telling his wife.

Fensterman said privacy laws prohibited SentosaCare from responding to specific questions about Stewart's care.

Jeanne said she called the Health Department while Charlie was still at Avalon to complain about the missed meals and lack of help getting to the bathroom. When a representative finally called back to follow up on her complaint, she told the caller she was sitting next to her husband in the hospital as he recovered from an amputation.

A few weeks later, she said, a letter arrived saying the state hadn't substantiated the initial complaint. Furious, Jeanne threw it away.

Case 1:19-cv-03541-FB-JRG   Document 97-2   Filed 01/29/22   Page 97 of 99 PageID #: 3635

Today, Stewart is learning how to walk up stairs on his prosthetic leg. Jeanne limits the hours in her job at a grocery store so she can care for her husband. She still finds the episode difficult to talk about.

"I felt more could have been done sooner," she said of her husband's care. "And it just shouldn't have gotten as far as it did."

Charlie Stewart agreed. "That's what I sincerely wish — that this doesn't happen to anybody else."

*Allegra Abramo is a freelance writer and photographer living in Seattle. Jennifer Lehman is a writer living in New York City.*



*"I felt more could have been done sooner," Jeanne said of her husband's care. "And it just shouldn't have gotten as far as it did." (Allegra for ProPublica)*

# Exhibit 8

**CMS Ratings for**
**SEAGATE REHABILITATION AND NURSING CENTER**
**(Fed. Prov. No. 335513)**

| Time Period | Overall Staffing Rating | RN Staffing Rating |
|---|---|---|
| 2013Q1 | 1 | 2 |
| 2013Q2 | 1 | 2 |
| 2013Q3 | 1 | 2 |
| 2013Q4 | 2 | 3 |
| 2014Q1 | 2 | 3 |
| 2014Q2 | 2 | 3 |
| 2014Q3 | 2 | 3 |
| 2014Q4 | 1 | 2 |
| 2015Q1 | 1 | 2 |
| 2015Q2 | 1 | 2 |
| 2015Q3 | 1 | 2 |
| 2015Q4 | 1 | 1 |
| 2016Q1 | 1 | 1 |
| 2016Q2 | 1 | 1 |
| 2016Q3 | 1 | 1 |
| 2016Q4 | 1 | 1 |
| 2017M1 | 1 | 1 |
| 2017M2 | 1 | 1 |
| 2017M3 | 1 | 1 |
| 2017M4 | 1 | 1 |
| 2017M5 | 1 | 1 |
| 2017M6 | 1 | 1 |
| 2017M7 | 1 | 1 |
| 2017M8 | 1 | 1 |
| 2017M9 | 1 | 1 |
| 2017M10 | 1 | 1 |
| 2017M11 | 1 | 1 |
| 2017M12 | 1 | 1 |
| 2018M1 | 1 | 1 |
| 2018M2 | 1 | 1 |
| 2018M3 | 1 | 1 |
| 2018M4 | 1 | 2 |
| 2018M5 | 1 | 2 |
| 2018M6 | 1 | 2 |
| 2018M7 | 1 | 1 |
| 2018M8 | 1 | 1 |
| 2018M9 | 1 | 1 |
| 2018M10 | 1 | 2 |
| 2018M11 | 1 | 2 |
| 2018M12 | 1 | 2 |
| 2019M1 | 1 | 2 |
| 2019M2 | 1 | 2 |
| 2019M3 | 1 | 2 |
| 2019M4 | 1 | 1 |
| 2019M5 | 1 | 1 |
| Source: https://data.medicare.gov/data/archives/nursing-home-compare | | |