

June 17, 2022

**David M. Ross**
202.626.7687 (direct)
David.Ross@wilsonelser.com

**By ECF**

Magistrate Judge James R. Cho
U.S. District Court
Eastern District of New York

Re:     ***Chow v. SentosaCare, LLC et al.***, No. 1:19-cv-03541-FB-JRC
        **Request for Court Assistance with Subpoena to De-designated Expert**

Dear Judge Cho:

  We represent Defendants in this action. We write to request that the Court assist the parties in resolving their dispute regarding Plaintiff's subpoena for the deposition of, and documents from, Stuart Shapiro, after Defendants de-designated Mr. Shapiro as a testifying expert under Fed. R. Civ. P. 26(b)(4). Defendants take the position that Plaintiff's subpoena is not proper, and seek to have the subpoena quashed, or at a minimum, narrowed in scope.

## DEFENDANT'S POSITION

### Background and Meet and Confer

  On April 13, 2022, pursuant to Plaintiff's advocacy for a simultaneous exchange of expert disclosures, Defendants produced to Plaintiff their expert disclosures at 8:32 pm. To ensure Defendants covered all potential areas that Plaintiff might propound expert testimony, Defendants designated four experts: Gisele Wolf-Klein, MD, FACP; Stuart H. Shapiro, MD, MPH; Demetria P. Haffenreffer, RN, MBA; and Mark Levine, MHA, NHA.[1] Plaintiff later responded with his expert disclosures at 10:42 pm, but listed only one expert, Nurse Elizabeth Halifax.

  At the time of their disclosure, Defendants did not then know that Plaintiff would only designate one expert. Upon seeing the scope and breadth of Plaintiff's expert disclosure, Defendants served only one rebuttal by nursing expert Demetria Haffenreffer. In turn, Plaintiff's expert issued a rebuttal as to all of Defendants' identified experts. Plaintiff deposed Mr. Levine on May 24, 2022 and Ms. Haffenreffer on June 2, 2022. The expert reports and testimony of Mr. Levine and Ms. Haffenreffer address their respective roles as an administrator and nursing director, and their opinions concerning the sufficiency of staffing of skilled nursing facilities in general and

---

[1] Dr. Wolf-Klein is a physician specializing in geriatrics. Dr. Shapiro is a physician, holds a Master of Public Health, and served as health commissioner for the city of Philadelphia. Ms. Haffenreffer is a registered nurse and former director of nursing and geriatric nurse leader. Mr. Levine holds a Master in Health Care Administration and is a licensed nursing home administrator.

1500 K Street, NW, Suite 330  •  Washington, DC  20005  •  p 202.626.7660  •  f 202.628.3606

Alabama • Albany • Atlanta • Austin • Baltimore • Beaumont • Boston • Chicago • Dallas • Denver • Edwardsville • Garden City • Hartford • Houston
Indiana • Kentucky • Las Vegas • London • Los Angeles • Miami • Michigan • Milwaukee • Missouri • Nashville • New Jersey • New Orleans
New York • Orlando • Philadelphia • Phoenix • San Diego • San Francisco • Sarasota • Stamford • Virginia • Washington, DC • Wellington • White Plains
**wilsonelser.com**

271974455v.2



Shorefront Operating LLC d/b/a Seagate in particular. Although Dr. Shapiro's deposition was scheduled for June 7, after reviewing the prior expert witnesses' deposition testimony, Defendants notified Plaintiff on June 5 that they intended to withdraw Dr. Shapiro as an expert who may testify as his opinions could be construed as cumulative to those provided by Mr. Levine and Ms. Haffenreffer.

On June 6, Plaintiff responded with the attached subpoena, seeking Mr. Shapiro's deposition testimony on June 21, and demanding that he produce:

> 1. All documents that reflect or identify the nursing staff hppd (hours per patient day), hprd (hours per resident day), and/or nursing to patient ratios of any skilled nursing homes at which Dr. Shapiro worked, was employed, or for which he provided any consultation or other services, or that were the subject of any, or referred to in, reports, studies, consultations, or testimony authored or provided by Mr. Shapiro.
> 2. Mr. Shapiro's entire file regarding the case.

*See* Exhibit 1.

Defendants contacted Plaintiff and advised that in their position, the subpoena was improper because Defendants withdrew his status as a testifying expert under FRCP 26(b)(4). In addition, the scope of the documents sought in Plaintiff's subpoena of Mr. Shapiro was improper. Plaintiff responded that by naming Mr. Shapiro as a testifying expert and providing his report, and then de-designating him as non-testifying, Plaintiff could seek Mr. Shapiro's deposition.

On June 7, 2022, to attempt to resolve this dispute, and in satisfaction of any pre-motion conferral requirement, the parties met and conferred via Zoom. During the discussion, Defendants asked if Plaintiff would consider withdrawing the subpoena if Defendants agreed to produce Mr. Shapiro's case file, as Plaintiff requested in his second of his two document requests. Plaintiff responded via email on June 8, 2022, advising that he would not accept Defendants' offer to produce Mr. Shapiro's case file in lieu of his deposition.

**The Impropriety of the Subpoena**

"There is a split of authority on whether the 'dedesignation' of an expert witness protects the witness from discovery by converting the once-testifying expert into a consulting expert." *SEC v. Penn*, No. 14-cv-581 (VEC), 2018 U.S. Dist. LEXIS 243838, *4 (S.D.N.Y. Apr. 18, 2018). Under "the 'majority rule,' a party may re-designate an expert as nontestifying and thereby insulate the expert from deposition by other parties absent a showing of exceptional circumstances under *Rule 26(b)(4)(D)*." *Walls v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 184063, *40 (M.D.N.C. Sept. 27, 2021) (quoting *Layman v. Junior Players Golf Acad., Inc.*, 314 F.R.D. 379, 383 (D.S.C. 2016)); *Court v. LLB Gym, LLC,* 2018 U.S. Dist. LEXIS 108004, *6 (E.D. Pa. June 28, 2018) ("Thus, 'the majority approach in federal jurisprudence is to allow the work product protection/consultative



privilege to be restored, even if a testifying expert witness' designation is withdrawn after his/her opinions have been disclosed.'") (quoting *Estate of Manship v. United States,* 240 F.R.D. 229, *237 (M.D. La. December 18, 2006)). A minority of courts have held Rule 26(b)(4)(D) is inapplicable once de-designation occurs, with a less exacting standard such as the Fed. R. Evid. 403 "balancing approach" utilized. *See, e.g., Anderson v. Metro-North Commuter R.R. Co.*, 2016 U.S. Dist. LEXIS 62708, *10 (D. Conn. May 11, 2016) (applying test in case involving party subjected to examination by expert under Fed. R. Civ. P. 35).

The Second Circuit has not provided binding "precedent on whether withdrawal of an expert witness prevents the deposition of that witness by the opposing party…" *Vincent v. Mortman*, 2006 U.S. Dist. LEXIS 60442, *7 (D. Conn. Aug. 11, 2006). *See also NetJumper Software, L.L.C. v. Google Inc.*, 2005 U.S. Dist. LEXIS 27813, *5 (S.D.N.Y. Nov. 10, 2005) (same).

Your Honor should follow the majority rule and not permit Plaintiff to proceed with his subpoena for Mr. Shapiro. Indisputably, Plaintiff cannot demonstrate that exceptional circumstances are present under Rule 26(b)(4)(D). This case does not present a situation where courts tend to find that exceptional circumstances are present or that a lesser standard should apply. Mr. Shapiro was not an expert who examined a party at issue (Leroy Chow died long before the case was filed), or performed destructive testing. *See, e.g., Walls*, 2021 U.S. Dist. LEXIS 184063, at *43; *Anderson*, 2016 U.S. Dist. LEXIS 62708, at *2. Mr. Shapiro's report did not raise any issues not already addressed in the expert reports or deposition testimony of two of Defendants' experts and of course, by Plaintiff's lone expert, all of which focused on the staffing at the Facility. There is no harm to Plaintiff in the withdrawal of one of Defendants' experts, whose opinion is additive to those reports and testimony already provided.

This is not a situation where "the object or condition observed by the non-testifying expert is no longer observable by an expert of the party seeking discovery, or that the costs would be judicially prohibitive to replicate expert discovery on a contested issue." *Vincent*, 2006 U.S. Dist. LEXIS 60442, at *8. While Defendants produced a report for Mr. Shapiro, *before* Plaintiff had even made his expert disclosures, Mr. Shapiro did not author a rebuttal report, and Defendants did not de-designate Mr. Shapiro after his deposition had commenced. As the court noted in *NetJumper*, "the weight of authority favors the application of Rule 26(b)(4)(B)" as the case was unlike another "where the party re-designated the expert after the start of his deposition to avoid producing documents consulted by the expert in preparation for the deposition," or another case "where the expert had examined the opposing party and generated a Rule 35(b) report." 2005 U.S. Dist. LEXIS 27813, at *8.

Your Honor should find that Mr. Shapiro "is a non-testifying expert witness subject to the protections of Rule 26(b)(4)(B)." *NetJumper Software*, 2005 U.S. Dist. LEXIS 27813, at *9.

Even if Your Honor is not inclined to quash the subpoena in its entirety, as Defendants



request, only Mr. Shapiro's case file should be produced, as Defendants already offered. At a bare minimum, whether or not Your Honor permits Plaintiff to depose Mr. Shapiro, Plaintiff's first document request should not be permitted. That request, as quoted above, requires Mr. Shapiro to search for and produce:

> All documents that reflect or identify the nursing staff hppd (hours per patient day), hprd (hours per resident day), and/or nursing to patient ratios of any skilled nursing homes at which Dr. Shapiro worked, was employed, or for which he provided any consultation or other services, or that were the subject of any, or referred to in, reports, studies, consultations, or testimony authored or provided by Mr. Shapiro.

This request is entirely untethered in scope or date to this case or to the Defendant Facility. The request requires Mr. Shapiro to somehow locate and provide "all documents that reflect or identify" nursing staff hours or ratios *anywhere* where Mr. Shapiro worked, consulted, or, incredibly, that were referred to in *any* reports or studies that Mr. Shapiro provided or wrote. The request is entirely lacking in proportionality, and is unreasonably burdensome and highly prejudicial to both Mr. Shapiro and Defendants, as Defendants would have to try to analyze and address any such documents. *Surles v. Air France*, 2001 U.S. Dist. LEXIS 10048, *20 (S.D.N.Y. July 17, 2001) ("By implication, because the rule requires only production of a *list* of the expert's cases, Surles is not entitled to disclosure of the reports in those cases, regardless of their subject matter.").

### STUART SHAPIRO'S POSITION

Mr. Shapiro's position, as set forth in a June 10, 2022 email to Defendants' counsel, is:

**From:** Stuart Shapiro [mailto:shapirostu@gmail.com]
**Sent:** Friday, June 10, 2022 11:36 AM
**To:** Sciales, William <William.Sciales@wilsonelser.com>; Semlies, Lori <lori.semlies@wilsonelser.com>; Stuart Shapiro <shapirostu@gmail.com>
**Subject:** Subpoena and Exhibit A

Will and Lori,

As you know, I received a subpoena from Plaintiff's Counsel in the Chow/Seagate matter, and am unable to be deposed on June 21 as requested due to prior commitments.

Additionally, I have reviewed Exhibit A to the Subpoena and find it extremely troubling.  It is extremely broad and will be impossible for me to comply with.  Over the past two decades, I have visited and/or provided services to hundreds of nursing homes in the Commonwealth of Pennsylvania, the State of New Jersey, Alabama, Wisconsin, Ohio, New York and other states as



a nursing home resident advocate and nursing home association executive or as an expert in various other matters.   It would be impossible to even produce a complete list of those nursing homes to which I provided services.   Even for those nursing homes that I can recall the names, or on which I have retained records, I would have to review thousands of pages of those individual nursing home records to even begin to identify the specific information requested for each nursing home.   I would like to be cooperative, but meeting the terms of Exhibit A would be impossible.

## PLAINTIFF'S POSITION

**Plaintiff Is Entitled To Depose Dr. Shapiro**

Courts in this circuit consistently hold that de-designated expert witnesses who have propounded an expert report are subject to deposition. *See, e.g.*, *Anderson v. Metro-N. Commuter R.R. Co.*, No. 14-452, 2016 WL 2755910, at *1 (D. Conn. May 11, 2016) ("[T]he interest in allowing counsel to obtain expert advice without fear of potentially benefitting their adversary[ ] is simply not implicated where, as here, an expert is retained not for the purpose of consultation . . . and where the expert's report has already been written and served on the plaintiff."); *Vidal v. Metro-N. Commuter Ry. Co.*, No. 12-0248, 2014 WL 413952, at *3 (D. Conn. Feb. 4, 2014) ("Defendant has already produced his report, which generally waives the protections afforded a non-testifying expert by Rule 26(b)(4)(D)"); *Agron v. Trustees of Columbia Univ. in City of New York*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997) ("Plaintiff, by submitting the Deutsch Report to Defendant in discovery, voluntarily waived the only relief that Rule 26(b)(4)(B) provides—the non-disclosure of expert discovery for a non-testifying expert."). *See also* 6 *Moore's Federal Practice Civil* § 26.80 ("Once a party has designated an expert witness as someone who will testify at trial, the later withdrawal of that designation may neither prevent the deposition of that witness by the opposing party nor the expert's testimony at trial.").

*Anderson v. Metro-N. Commuter R.R. Co.* is instructive.   The *Anderson* court reasoned that the logic of the protections afforded under Fed. R. Civ. P. 26(b)(4)(D) are not applicable where the expert "has already produced a report to Plaintiff[.]"   *Anderson*, 2016 WL 2755910 at *2.   "The logic of these cases [such as *Netjumper Software, LLC v. Google, Inc.*, No. 19-138, 2005 WL 3046271, at *9 (S.D.N.Y. Nov. 10, 2005)] is not, however, applicable here.   Unlike in many of the cited cases, the expert at issue here [ ] has already produced a report to Plaintiff, as he was required to do . . . . Rule 26(b)(4)'s concern about the 'unfairness of allowing one party to benefit from the opposing party's trial preparation,' is therefore, inapposite."   *Id.*

Likewise here.   Defendants' reliance on Rule 26(b)(4) to protect its consultant privilege is belied by the fact that Defendants specifically retained Dr. Shapiro as a testifying witness and produced his expert report to Plaintiff.   There is simply no consultant privilege where the party has retained the expert for testimony, not for consulting.   *See, e.g.*, *Layman v. Junior Players Golf Acad., Inc.*, 314 F.R.D. 379, 384 (D.S.C. 2016) ("[T]he policy considerations of the 'consulting expert privilege' are not directly implicated in this case. Although Rule 26(b)(4)(D) seeks to protect the interest in free consultation between counsel and non-testifying experts, Yalden was retained as a testifying expert expected to give "detailed testimony" regarding his expertise . . . .").

Instead, the Court should apply Fed. R. Civ. P. 403, which provides that "[t]he court may



exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative." *See Anderson*, 2016 WL 2755910, at *4. Defendants make no showing of any of these dangers, save to assert, without support, that Dr. Shapiro's testimony is cumulative.

Defendants fail to cite a *single* case from this circuit quashing a subpoena of a de-designated expert witness who had served an expert report. *See Netjumper*, 2005 WL 3046271, at *1 ("[Expert] never produced any written reports or drafts."); *Estate of Manship v. United States*, 240 F.R.D. 229, 237 (M.D. La. December 18, 2006) (ruling that an expert need not be deposed where he did not produce an expert report and did not assist other defense expert in writing expert report); *SEC v. Penn*, 2018 WL 11319021, at *2 ("The Court does not perceive any unfairness in compelling discovery of [expert witness]. It was the Defendants' decision to designate [expert witness] as a testifying witness. Had Defendants not done so but had retained [expert witness] only as a consulting expert, the documents provided to it would be protected[.]"); *Vincent v. Mortman*, No. 04-491, 2006 WL 2390448, at *1 (D. Conn. Aug. 11, 2006) (declining discovery on expert witness who had been designated for sixteen days and never produced a report). To the extent that *Court v. LLB Gym, LLC,* 2018 U.S. Dist. LEXIS 108004, *6 (E.D. Pa. June 28, 2018) stands for the proposition that parties may not uncover relevant, damaging testimony simply because a witness was previously designated as an expert witness, Plaintiff respectfully suggests that the decision was wrongly decided.

Courts within the Second Circuit are clear: de-designated expert witnesses are not immune to examination under Rule 26. *See Anderson*, 2016 WL 2755910, at *1. The Court should thus enforce Plaintiffs' subpoena of Dr. Shapiro. Plaintiff also notes that Plaintiff's Counsel spent significant resources, time, and energy into preparing for Dr. Shapiro's deposition before Defendants' eleventh-hour de-designation.

**Plaintiff Properly Seeks Documents Which Dr. Shapiro Put Into Issue[2]**

Defendants oppose Plaintiffs' first document request subpoena of Dr. Shapiro (Exhibit 1) as "lacking in proportionality" and "unreasonably burdensome and highly prejudicial[.]" Dr. Shapiro similarly characterizes the document request as "extremely broad." However, Dr. Shapiro put his "experience" in nursing home consulting at issue in his expert report. *See* Exhibit 2, pg. 4 ("After review of these regulations . . . it is my professional opinion, based on my education, knowledge, and *experiences* that Seagate met the requirements of these regulations regarding staffing.") (emphasis added); *id.* at pg. 5 ("After review of these regulations and available data, it

---

[2] Defendants have no standing to object to a subpoena of Dr. Shapiro, a third-party in this matter. *See Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness."). Defendants do not assert that Plaintiff's document requests in the subpoena violates a claim of privilege. The Court should reject Defendants' arguments due to lack of standing. *See Sali v. Zwanger & Pesiri Radiology Grp., LLP*, No. 19-275, 2022 WL 1085508, at *19 (E.D.N.Y. Jan. 10, 2022), *report and recommendation adopted*, No. 19-275, 2022 WL 819178 (E.D.N.Y. Mar. 18, 2022) (Block, J.) (denying party's motion to quash subpoena for lack of standing to object to a third-party subpoena).



is my professional opinion, based on my education, knowledge, and *experiences* that Seagate Rehabilitation and Nursing Center has met these requirements.") (emphasis added); *id.* at pg. 6 ("Thus, in my professional judgment, based on my education, knowledge, and *experiences*, review of all documents referenced, I can state with a reasonable degree of medical certainty that Seagate Nursing and Rehabilitation Center followed applicable . . . [r]egulations and practices.") (emphasis added); *id.* at pg. 6 ("It is my further professional judgment based on the materials reviewed, and based on my education, knowledge, and *experiences*, the Seagate was in compliance with staffing level requirement, was not understaffed, and that the events alleged in the Complaint related to Mr. Chow were not caused by any lack of staffing or inadequate staffing levels on the part of the Defendants.") (emphasis added).  Dr. Shapiro did not qualify his "experiences" by time period, scope, or to a particular Facility.

"With respect to undue burden, 'a court is required to weigh the burden to the subpoenaed party against the value of the information to the serving party.'" *Libraire v. Kaplan*, 760 F.Supp.2d 288, 293 (E.D.N.Y. 2011) (denying motion to quash subpoena on grounds that "it is overly broad or unduly burdensome").  The *Libraire* court denied a motion to quash a subpoena because the documents sought were "clearly relevant and necessary[.]"  *Id.* at 294.  Dr. Shapiro's claims of inability to review thousands of pages of materials to comply with Plaintiff's subpoena are curious. Plaintiff does not seek his review of thousands of pages -- indeed, Plaintiff just seeks documents reflecting staffing ratios at nursing homes for which Dr. Shapiro worked or consulted.  Complying with this request should require no more than an afternoon, and given Dr. Shapiro's sophisticated practice as a consultant, should not constitute the overburden he and Defendants trumpet.

Because Dr. Shapiro heavily relies on his "experiences" to opine that the Defendant nursing home complied with staffing regulations and that understaffing did not cause Mr. Chow's alleged harm, Plaintiff is entitled to discover that which constitute such experiences.  This information is thus "clearly relevant" to Plaintiff's case and it should be produced.  *See also First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) ("This [subpoena] may be burdensome, but [movant] has not convinced the district court, or us, that the burden is undue."); *Calabro v. Stone*, 224 F.R.D. 532, 533-34 (E.D.N.Y. 2004) ("[T]he Court rejects defendant's argument that the subpoena are overly broad in temporal scope.  The deponents' current insurance policies may be relevant . . . . [R]equiring the production of policies to the present is not onerous or unduly burdensome.").

Accordingly, the Parties request a conference with Your Honor to address this dispute.

Respectfully submitted,

**Wilson, Elser, Moskowitz, Edelman & Dicker LLP**

By: */s/ David M. Ross*
David M. Ross
david.ross@wilsonelser.com



cc:
All counsel of record (by ECF)
Stuart Shapiro (by email)

# EXHIBIT 1

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WALTER CHOW | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:19-cv-03451-FB-JRC |
| | ) | |
| SENTOSACARE, LLC, ET AL | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
STUART SHAPIRO
1425 LOCUST STREET
PHILADELPHIA, PA 19102

*(Name of person to whom this subpoena is directed)*

☒ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  THE WESTIN PHILADELPHIA<br>99 S. 17TH STREET<br>PHILADELPHIA, PA 19103 | Date and Time:<br>JUNE 21, 2022 AT 10AM |
|---|---|

The deposition will be recorded by this method: _____

☒ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

EXHIBIT A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  6/6/2022

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | s/ D. Greg Blankinship |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A TO SUBPOENA OF STUART SHAPIRO

1.     All documents that reflect or identify the nursing staff hppd (hours per patient day), hprd (hours per resident day), and/or nursing to patient ratios of any skilled nursing homes at which Dr. Shapiro worked, was employed, or for which he provided any consultation or other services, or that were the subject of any, or referred to in, reports, studies, consultations, or testimony authored or provided by Mr. Shapiro.

2.     Mr. Shapiro's entire file regarding the case.

# EXHIBIT 2

**Stuart H. Shapiro, M.D.**

1425 Locust Street

Unit 16 C/D

Philadelphia, PA 19102

717-599-2080

shapirostu@gmail.com

April 10, 2022

**RE:  Walter Chow, as Administrator of the Estate of Leroy Chow v. Shorefront Operating LLC d/b/a Seagate Rehabilitation and Nursing Center, et.al   File Number: 22182.00025**

Lori Semlies

Will Sciales

Attorney at Law

Wilson Elser Moskowitz Edelman & Dicker LLP

150 East 42nd Street

New York, NY 10017

Dear Ms. Semlies and Mr. Sciales:

Please accept this as my report regarding my review of staffing and care related issues and facts in this case and the opinions I have reached.   For the purpose of preparing this report, I have reviewed:

- Plaintiff's Amended Complaint
- Death Certificate of Leroy Chow
- Plaintiff's Responses to Interrogatories
- Plaintiff's Responses to Requests for Production of Documents
- Plaintiff's Initial document Production (Includes Surrogate Court Documents)
- Plaintiff's First Supplemental Document Production (Includes 671's, 672's, 1513, Statement of Deficiencies and Plans of Corrections, CASPER exerts, Investigation Reports, MDS Indicator Facility Reports
- Plaintiff's Second Supplemental Document Production (Includes: Plaintiff Walter Chow emails and Diary entries)
- Seagate Rehabilitation and Nursing Center Medical Records
- Seagate Rehabilitation and Nursing Center Staffing Logs
- Seagate Rehabilitation and Nursing Center Resident Census Information
- Seagate Rehabilitation and Nursing Center Census Information
- CMS Five-Star Technical Users Guide 2016
- CMS Five-Star Technical Users Guide 2022
- Extraction and Analysis of Various Nursing Home Compare, Five Star, and Casper data
- Deposition Transcript of Walter Chow
- Deposition Transcript of Eli Grinspan
- Deposition Transcript of Manny Kaufman
- State of New York Department of Health New York Codes, Rules and Regulations Nursing Home Regulations 10 N.Y.C.R.R. 415.13 in effect in 2015, 2016, and 2017
- U.S. Government Department of Health and Human Services (DHHS)/Centers for Medicare and Medicaid Services (CMS) Requirements for States and Long Term Care Facilities (41 C.F.R. 483)

1

My opinion in this case will primarily focus on the review of the above materials to assess the staffing and care related issues at the Seagate Rehabilitation and Nursing Center (hereafter, Seagate), between October 27, 2015 and August 18, 2016, and compliance with the then in place State of New York and Federal regulations regarding staffing.

I am an expert in the area of nursing home quality, especially with respect to staffing including Registered Nurses (RNs), Licensed Practical Nurses (LPNs), and Certified Nursing Assistants (CNAs); and, in this area I am qualified to give opinions due to my education and experiences.   Moreover, I am knowledgeable of published standards, expert committees, guidelines, peer reviewed publications, and professional standards.  I have served on Committees that have reviewed and studied staffing and quality data at the American Health Care Association, the Health Care Association of New Jersey, and the Pennsylvania Health Care Association.   I have served as an advocate for nursing home residents and their providers of care as President and CEO of the Pennsylvania Health Care Association and as Interim CEO of the Health Care Association of New Jersey.  I was raised in Western New York, graduated with a BA from Syracuse University, and obtained my M.D. (with honors) from the State University of New York at Buffalo.   I have practiced Medicine in New York, Pennsylvania, New Jersey, and the Commonwealth of Massachusetts where I was a member of the Board of Licensing and Discipline for physicians.   I am currently licensed to practice medicine in Pennsylvania and New York.

## **Case Summary:**

Mr. Leroy Chow (Date of Birth April 9, 1948) was initially admitted to Seagate Rehabilitation and Nursing Center (hereafter Seagate) on October 27, 2015 at age 67 after being discharged from Coney Island Hospital following an 18 day hospitalization where he had been treated for multiple issues including an exacerbation of his chronic obstructive pulmonary disease (COPD) as well as his Congestive Heart Failure.

On admission to Seagate he suffered from multiple physical and psychological co-morbidities, including:

- Coronary Artery Disease (CAD)
- Chronic Paroxysmal Atrial Fibrillation with pacemaker inserted
- Congestive Heart Failure (CHF)
- Chronic Obstructive Pulmonary Disease (COPD)
- Hypertension
- Diabetes Mellitus-Type II with Hyperglycemia and Hypoglycemia without Coma
- Morbid Obesity (BMI > 35)
- Chronic Kidney Disease
- Diabetic Neuropathy
- Post-Stroke/Transient Cerebral Ischemic Attack
- Bipolar Disorder with severe Psychotic Features
- Depression
- Anxiety
- Hypercholesterolemia as well as Mixed Hyperlipidemia

2

- Enlarged Prostate
- Heartburn

Following his admission to Seagate, Mr. Chow was seen regularly by his primary care physicians and consulting physicians, cared for on a daily basis by an experienced team of registered nurses, licensed practical nurses and nurse aids and receive, and received other services such as physical therapy.   During his 16 month residency at Seagate, Mr. Chow had short stay visits to nearby hospitals for exacerbations of his chronic diseases as well as weakness and aphasia. Throughout Mr. Chow's stay, increasing doses of insulin were required to control his diabetes, in part this was due to morbid obesity.  His psychiatric illnesses, which required substantial medication while at Seagate, compounded his physical illnesses.   It was not unusual for Mr. Chow to display disruptive, aggressive, and/or belligerent behaviors because of his psychiatric disease.  During his stay at Seagate, Mr. Chow was complimentary about the care he was receiving.

During Mr. Chow's time at Seagate, because of his multiple physical and psychiatric co-morbidities, Mr. Chow was on the following medications during his stay:

- Metformin
- Digoxin
- Atrovent HFA
- Cardizem
- Lasix
- Zocor
- Crestor
- Lisinopril
- Pradaxa
- Zyprexa
- Clonazepam
- Levaquin
- Pepcid AC
- Insulin Glargine
- Novolin
- Humalog
- Levemir Flex pen
- Aspirin
- Senokot
- Colace
- Guaifenesin

After about 9 months at Seagate, at his personal request, Mr. Chow was discharge to his home on August 18, 2016 in stable condition with multiple medications given to him and appointments for subsequent physician visits scheduled.  More than 16 months following his discharge from Seagate, Mr. Chow died on December 27, 2017 at 1:35 P.M at Maimonides Hospital of Multi-lobar pneumonia.  Mr. Chow had been brought to the hospital three days earlier by ambulance.  The Maimonides records indicate he had been on the toilet for 24 hours before 911 was called.  His Death Certificate certified that "traumatic injury or poisoning did not play any part in causing death, and that death did not occur in any unusual manner and was due entirely to natural causes."

**Opinion:**

My opinion will primarily relate to the staffing of licensed nursing personnel (defined as registered nurses and licensed practical nurses) and ancillary nursing personnel (defined as nurses' aides and orderlies) at Seagate as well as compliance with applicable New York State Department of Health Nursing Home Regulations (10 CRR-NY 415.13) in effect from October 2015 through August 2016 and applicable Federal Regulations (42 C.F.R. 483) also in effect in 2015 and 2016.

Seagate Rehabilitation and Nursing Center had an Operating Certificate issued by the State of New York as a Residential Health Care Facility-Skilled Nursing Facility in effect during Mr. Chow's care at this facility.

The State of New York Department of Health Codes, Rules and Regulations 10 N.Y.C.R.R. 415.13 establish a set of staffing standards for Licensed Nursing Facilities such as Seagate Nursing and Rehabilitation Center.   After review of these regulations then in effect in 2015 and 2016 and available data, it is my professional opinion, based on my education, knowledge, and experiences that Seagate met the requirements of these regulations regarding staffing.   Specifically, Seagate Nursing and Rehabilitation Center met, among other sections of New York State Codes, the following:

> Section 415.13 Nursing Services. The facility shall have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care.  The facility shall assure that each resident receives treatments, medications, diets and other health services in accordance with individual care plans.

> (a) Sufficient staff.  (1) The facility shall provide services by sufficient numbers of each of the following types of personnel on a 24 hour basis to provide nursing care to all residents in accordance with resident care plans:

> > (i)      Registered professional nurses or licensed practical nurses;
> > (ii)     Certified nurse aides; and
> > (iii)    Other nursing personnel

4

The Department of Health and Human Services (DHHS), and its Centers for Medicare and Medicaid Services (CMS) likewise has established regulations for Long-Term Care Facilities primarily in 42 C.F.R. 483. These relate to Resident Rights, Quality of Life, Quality of Care, Physician Services, Nursing Services among others matters. After review of these regulations and available data, it is my professional opinion, based on my education, knowledge, and experiences that Seagate Rehabilitation and Nursing Center has met these requirements. Specifically, Seagate Rehabilitation and Nursing Center met, among other sections of the Federal Regulations, the following:

> Section 483.35 (Nursing Services) The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at 483.70 (e).

> (a) Sufficient staff. The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans.

It is important to note that neither the State of New York nor the Federal Government has established any quantitative numerical minimums for staffing, and none were in effect at the time of Mr. Chow's residency at Seagate. Notwithstanding that the applicable state and federal regulations do not establish minimum staffing ratios, the available information concerning staffing at Seagate during Mr. Chows residency support the conclusion that staffing at the facility was appropriate and within all applicable standards of care.

I have also reviewed the CMS Star Rating System in Nursing Home Compare for Seagate for the period October 2015 through December 2017. The Quality metrics indicate that the facility was rated by CMS as 4 or 5 Star during Mr. Chow's residency at Seagate and was rated in the top 10% throughout 2017. Four Stars is above average (Top 25-30%) and five Stars indicated that Seagate was in the top 10% nationally. The Quality metrics are important in assessing outcomes of care, and are the most reliable quantitative metric of care for a nursing home. Likewise the CMS/New York Department of Health Surveys overall were excellent and rated above average. Statistically, Seagate performed better than both the National and New York State averages both in number and severity of deficiencies. Importantly, there were no staffing deficiencies issued by either New York State or CMS. Although the staffing score was rated a 1 star, because of the methodology utilized in 2015 and 2016, this was not an indication of whether staffing was sufficient or insufficient. The methodology in place at that time utilized data from 2011 to categorize all nursing homes, and this methodology assured that 25% of all nursing homes received one or two stars on staffing no matter the quality of care provided by their staff. In fact, the methodology of data collection utilized during this period was found to be so unreliable and lacking in accuracy as a quantitative measure of quality, that the entire data input was "scrapped" and abandoned

by CMS and replaced by a new and more accurate way of collecting data electronically that began to be used by CMS in 2018.   Seagate's "Overall" or "Summary" Five Star rating was consistently either average or above average during Mr. Chow's residency and was above average throughout 2017. Seagate was able to receive these later ratings because CMS believed that the staffing scores were far less valuable than survey scores in determining overall ratings.

Thus, in my professional judgement, based on my education, knowledge, and experiences, and review of all documents referenced, I can state with a reasonable degree of medical certainty that Seagate Nursing and Rehabilitation Center followed applicable State of New York and U.S. Government (Department of Health and Human Services/Centers for Medicare and Medicaid Services) Regulations and practices. Specifically, staffing at the Seagate Nursing and Rehabilitation Center by licensed nursing personnel (RN and LPN) and ancillary nursing personnel (CNA) met all standards of the State of New York and the Federal Government regarding staffing level.   It is my further professional judgement based on the materials reviewed, and based on my education, knowledge, and experiences, the Seagate was in compliance with staffing level requirement, was not understaffed, and that the events alleged in the Complaint related to Mr. Chow were not caused by any lack of staffing or inadequate staffing levels on the part of the Defendants.

I reserve the right to determine whether this report should be amended, and to amend or supplement this report, if additional information, records, or testimony becomes available.

Sincerely,

Stuart H. Shapiro, M.D.

6